**LEWIS BRISBOIS BISGAARD & SMITH** LLP
DAVID E. RUSSO, SB# 112023
  Email: David.Russo@lewisbrisbois.com
LYNN L. KRIEGER, SB# 209592
  Email: Lynn.Krieger@lewisbrisbois.com
333 Bush Street, Suite 1100
San Francisco, California 94104-2872
Telephone: 415.362.2580
Facsimile: 415.434.0882

Attorneys for Plaintiff, PAN OCEAN CO. LTD.

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| PAN OCEAN CO. LTD., | CASE NO. |
| Plaintiff, | **PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT** |
| vs. | **[Filed Under Rule 9(h) Fed. R. Civ. P.]** |
| CLEARLAKE SHIPPING PTE LTD., | **(Admiralty)** |
| Defendant. | |

Plaintiff Pan Ocean Co. Ltd., by its attorneys Lewis Brisbois Bisgaard & Smith LLP, complaining of the above-named Defendant Clearlake Shipping Pte Ltd., alleges upon information and belief as follows:

### JURISDICTION AND PARTIES

1.      This is a case within this Court's maritime and admiralty subject matter jurisdiction pursuant to 28 U.S.C. section 1333 as hereinafter more fully appears, and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Court has jurisdiction to authorize the maritime attachment of certain funds currently held by garnishee Chevron ("Chevron") within the Northern District of California, as described in greater detail below.

2.      Pan Ocean Co. Ltd. ("Pan Ocean" or "Plaintiff") is a corporation organized and existing under the laws of the Republic of South Korea, having its principal place of business in Seoul, South Korea. Pan Ocean is in the business of owning, chartering and operating ocean going vessels.

3.      Clearlake Shipping Pte Ltd. ("Clearlake Shipping" or at times "Defendant") is a business entity organized and existing under the laws of Singapore, having its principal place of business in Singapore. Clearlake Shipping is in the business of chartering vessels.

4.      Defendant is a foreign entity that is not present within the district as that term is understood under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). *See* accompanying Affidavit of David E. Russo, attached hereto as *Exhibit A*. Defendant has not registered to do business with the California Secretary of State, does not maintain a business office or address in California, and has not designated or maintained a resident agent for service of process in California.  Substituted service of process can be had over Defendant by serving the Secretary of State of California with duplicate copies of process.  Process or notice can be sent to Clearlake Shipping Pte Ltd, 12 Marina Boulevard, #35-02 Marina Financial Tower 3, Singapore, 018982.

## BASIC FACTS

5.      At all relevant times Pan Ocean was the owner (bare boat charterer) of the ocean going vessel M/V GRAND ACE 12.

6.      On or about April 13, 2016 Pan Ocean, as owner, chartered the M/V GRAND ACE 12 to Clearlake Shipping for one voyage to carry cargos of clean petroleum cargos to be loaded and discharged in a specified geographic range (the "Charter").  A true and correct copy of the Charter is annexed hereto as *Exhibit B*.

7.      Clause 30.3 of the Charter provided in relevant part:

> If a Bill of lading is not available at any discharge port to which the Vessel may be ordered by Charterers under this Charter or if Charterers require Owners to deliver cargo to a party and/or at a port other than as set out in the Bills of Lading, then Owners shall nevertheless discharge such cargo in compliance with Charterers' instructions, upon presentation by the consignee nominated by Charterers ("the Receiver") of reasonable identification to the Master and in consideration of Charterers undertaking:
>
> 30.3.1 to indemnify Owners (which term shall, for the purpose of this Clause, include Owners' servants and agents) and to hold Owners harmless in respect of any liability, loss, damage, cost or expense of whatsoever nature which Owners may sustain by reason of delivering the cargo to the receiver in accordance with Charterers' instructions;



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

30.3.2 to provide Owners on demand, in the event of any proceedings being commenced against Owners in connection with the delivery of the cargo as aforesaid, from time to time, with sufficient funds to defend the same;

30.3.3 to provide Owners on demand with such bail or other security as may be required if, in connection with the delivery of the cargo as aforesaid, the Vessel, or any other vessel or property belonging to Owners, should be arrested or detained or, if the arrest or detention thereof should be threatened, in order to prevent such arrest or detention, or to secure the release of such Vessel or property and to indemnify Owners in respect of any loss, damage, cost or expense caused by such arrest or detention whether or not the same be justified . . .

8.      During performance of the Charter, Clearlake Shipping requested that Pan Ocean make certain modifications to the loading and discharge orders relating to blending of the cargoes on board and issuance of bills of lading.

9.      Pan Ocean agreed to these modifications in consideration of Clearlake Shipping issuing a Letter of Indemnity ("LOI") in favor of Pan Ocean indemnifying and holding Pan Ocean harmless for all consequences for following Clearlake Shipping's instructions.

10.     Clearlake Shipping issued the requested LOI.  A true and correct copy of the LOI is attached hereto as *Exhibit C*.

11.     The indemnity provisions of the LOI provided in relevant part:

In consideration of your complying with our above request, we hereby agree as follows:

1.      To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the loading of the cargoes as aforesaid in accordance with our above request even if such liability, loss, damage and/or expense is caused and/or incurred solely by act or negligence of you, your servants and/or agent.

2.      In the event of any proceedings being commenced against you or any of your servants or agents in connection with the loading of the cargoes as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.      If, in connection with the loading of the cargoes as aforesaid, the ship, of any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    howsoever), to provide on demand such bail or other security as may
2    be required to prevent such arrest or detention or to secure the release
     of such ship or property or to remove such interference and to
3    indemnify you in respect of any liability, loss, damage or expense
     caused by such arrest or detention or threatened arrest or detention or
4    such interference, whether or not such arrest or detention or threatened
     arrest or detention or such interference may be justified.

5    **12.**    The LOI provides that it shall be governed and construed in accordance with English

6    law.

7    **13.**    Prior to the GRAND ACE 12's  arrival at the discharge port, Clearlake Shipping

8    requested pursuant to clause 30 of the Charter that Pan Ocean discharge the cargo without presentation

9    of the original bills of lading.  Pan Ocean complied with this request.

10   **14.**    On March 1, 2018 the GRAND ACE 12 was arrested in Singapore by entities claiming

11   they were the receivers of the aforementioned cargo (the "Singapore plaintiffs") and who are alleging

12   that Pan Ocean is liable to them for negligent/fraudulent misstatements and/or breach of duty in

13   connection with the bills of lading.

14   **15.**    Pan Ocean has denied any wrongful activity on its part, but nonetheless to secure the

15   release of the GRAND ACE 12 it was required to provide security for the Singapore plaintiffs claim in

16   the amount of $5,652,052.71.

17   **16.**    Pan Ocean denies any knowledge of any fraud, and has repeatedly demanded under

18   clause 30 of the charter party and the LOI that Clearlake Shipping provide counter security, defend the

19   action in Singapore, and indemnify Pan Ocean for all consequences of following Clearlake Shipping's

20   instructions, as provided in clause 30 of the Charter and the LOI.

21   **17.**    To date Clearlake Shipping has refused to honor its obligations under the Charter and

22   the LOI, and is in breach thereof.

23                           **CAUSES OF ACTION**

24                                 **COUNT I**

25                          **<u>BREACH OF CONTRACT</u>**

26   **18.**    Pan Ocean repeats and re-alleges each and every allegation contained in paragraphs 1

27   through 17 in its complaint herein as if set forth in full.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4816-4574-1161.1

PLAINTIFF'S  VERIFIED  ORIGINAL  COMPLAINT

19.     Pan Ocean and Clearlake Shipping had agreements for valuable consideration pursuant to which Clearlake Shipping undertook to indemnify Pan Ocean for complying with Clearlake Shipping's instructions to deliver cargo without presentation of original bills of lading and to modify the loading and discharging order relating to blending of cargo and issuance of bills of lading.

20.     Pan Ocean has duly performed all the terms and conditions of the agreements on its part.

21.     In breach of the express obligations in the Charter and the LOI, Clearlake Shipping has failed to provide security for the Singapore claims, defend the action in Singapore, and indemnify Pan Ocean for all consequences of following Clearlake Shipping's instructions.

22.     Under English law, based on the foregoing, Pan Ocean has a *prima facie* breach of contract claim against Clearlake Shipping.

23.     Pan Ocean has demanded that Clearlake Shipping fulfill its obligations under the Charter and LOI, but Clearlake Shipping has failed and refused and continues to fail and refuse to do so.

24.     As a result of Clearlake Shipping's breach, Pan Ocean was forced to provide security for the Singapore plaintiffs claim in the amount of $5,652,052.71 in order to obtain the release of the GRAND ACE 12 from arrest.

25.     By reason of Clearlake Shipping's breach of the Charter and the LOI, in failing to provide security for the Singapore entities' claims, defend the action in Singapore, and indemnify Pan Ocean for all consequences of following Clearlake Shipping's instructions, Pan Ocean has sustained damages in the principal sum of $5,652,052.71.

26.     Pan Ocean under Singapore law is entitled to pre-judgment interest on this principal amount at the rate of 5.33% per annum, and is further entitled under Singapore law to an award of its costs and attorney fees should it prevail in the litigation by the Singapore plaintiffs, which as best as can presently be estimated would be approximately $100,000.

/ / /

/ / /

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## COUNT II

### RECOVERY OF SINGAPOREAN HIGH COURT COSTS, FEES AND INTEREST

27.     Pan Ocean repeats and re-alleges each and every allegation contained in paragraphs 1-26 in its complaint herein as if set forth in full.

28.     Attachment to secure claims that are subject to foreign judicial proceedings is commonplace and available even after the litigation has been commenced.

29.     In connection with this dispute, Pan Ocean has commenced proceedings in the High Court of Singapore against Clearlake Shipping which does not preclude its right to a Rule B attachment to obtain security for its potential award.

30.     The Singapore proceedings against Clearlake are expected to take up to three years to resolve. As best as can be estimated, the costs in such a case are expected to be US$500,000 over 3 years. Interest is calculated in Singapore proceedings at the default statutory rate of 5.33% per annum. Pan Ocean is entitled to the costs/fees incurred by it in the Singapore proceedings against Clearlake.

## COUNT III

### RULE B RELIEF

31.     Pan Ocean repeats and re-alleges each and every allegation contained in paragraphs 1 through 30 in its complaint herein as if set forth in full.

32.     As best as can now be estimated, Pan Ocean's total claim, including interest, costs and attorneys' fees, is $7,251,755.93.  This amount is broken down as follows:

| CLAIM | AMOUNT |
|---|---|
| Security Posting | $5,652,052.71 |
| Singaporean High Court Costs | $500,000.00 |
| Singaporean Defense Costs and Fees | $100,000.00 |
| Singaporean Interest at 5.33% per annum on the above for 3 years | $999,703.22 |
| **TOTAL** | **$7,251,755.93** |

Pan Ocean therefore seeks issue of process of maritime attachment in the amount of $7,251,755.93 to obtain security for its claim, including interest, costs and attorneys' fees.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

33.     No security for Pan Ocean's claims has been posted to date by Defendant or anyone acting on its behalf.

34.     Defendant Clearlake Shipping cannot be found within this district within the meaning of Rule B.  *See* accompanying Affidavit of David E. Russo, see ***Exhibit A***.

35.     On information and belief, Clearlake Shipping has entered into a separate voyage charter with Chevron for the transportation of certain cargoes from Brownsville, Texas to a foreign locale aboard the vessel MR PAT BROWN, which upon information and belief is currently on voyage to Chile where she will discharge cargo around June 15-20, 2018.   In connection with this arrangement, Chevron, which is located within the Northern District of California at 6001 Bollinger Canyon Road, San Ramon, California 94583, has or will have during the pendency of this action, assets which are owed to Clearlake Shipping in the form of freight, property, effects, cash, funds, hire, credits and/or debts owed to it or in the hands of garnishees in this District, including but not limited to Chevron.

**WHEREFORE,** Pan Ocean respectfully requests the Court to enter judgment as follows:

A.      That process in due form of law issue against Defendant Clearlake Shipping, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.      That since Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee, including but not limited to freight held by Chevron, which are due and owing to Defendant up to the amount of $7,251,755.93 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.      That since it appears that the U.S. Marshal's Service lacks sufficient staff to effect service of process of Maritime Attachment and Garnishment promptly or economically, and that since appointing a person over 18 years of age and who is not a party to this action will result in substantial economies in time and expense and save jurisdictional resources, such a person be appointed pursuant to Fed. R. Civ. P. 4(c) to serve process of Maritime Attachment and Garnishment in this action.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4816-4574-1161.1

7

PLAINTIFF'S  VERIFIED  ORIGINAL  COMPLAINT

1      D.      That this Court retain jurisdiction over this matter through the entry of a judgment or

2  award associated with the pending claims including appeals thereof.

3      E.      That Pan Ocean be awarded all costs and attorneys' fees incurred in connection with

4  this action; and

5      F.      That Pan Ocean may have such other, further and different relief as may be just and

6  proper.

7  DATED:  June 13, 2018                        LEWIS BRISBOIS BISGAARD & SMITH LLP

8

9                                  By:   */s/ David E. Russo*

10                                        David E. Russo
                                          Lynn L. Krieger
                                          Attorneys for Plaintiff, PAN OCEAN CO. LTD.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## <u>VERIFICATION</u>

2       David E. Russo, being duly sworn, deposes and says:

3       1.     I am a member of the bar of the State of California and I am licensed to practice before

4 this Honorable Court.  I am a partner of the firm of Lewis Brisbois Bisgaard & Smith LLP, attorneys

5 for Plaintiff.

6       2.     I have read the foregoing Complaint and I believe the contents thereof are true.

7       3.     The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is

8 a foreign corporation, no officer or director of which is within this jurisdiction.

9       4.     The sources of my information and belief are documents provided to me and statements

10 made to me by representatives of Plaintiff.

11 Dated:  June 13, 2018                *David E. Russo*_____

12                           David E. Russo

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4816-4574-1161.1

# EXHIBIT A

1   **LEWIS BRISBOIS BISGAARD & SMITH** LLP
DAVID E. RUSSO, SB# 112023
2     Email: David.Russo@lewisbrisbois.com
LYNN L. KRIEGER, SB# 209592
3     Email: Lynn.Krieger@lewisbrisbois.com
333 Bush Street, Suite 1100
4   San Francisco, California 94104-2872
Telephone: 415.362.2580
5   Facsimile:  415.434.0882

6   Attorneys for Plaintiff, PAN OCEAN CO. LTD.

7

8                          UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11   PAN OCEAN CO. LTD.,                    CASE NO.

12              Plaintiff,                  **AFFIDAVIT PURSUANT TO SUPPLEMENTAL RULE B**

13        vs.                              **[Filed Under Rule 9(h) Fed. R. Civ. P.]**

14   CLEARLAKE SHIPPING PTE LTD.,          **(Admiralty)**

15              Defendant.

16

17          David E. Russo, being duly sworn, deposes and says:

18          1.      I am a member of the Bar of the State of California and a partner with the firm of Lewis

19   Brisbois Bisgaard & Smith LLP, attorneys for the Plaintiff herein. I am familiar with the circumstances

20   of the complaint and submit this affidavit in support of Plaintiff's request for the issuance of process of

21   maritime attachment and garnishment of the property of Defendant Clearlake Shipping Pte Ltd.

22   ("Defendant") pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime

23   Claims of the Federal Rules of Civil Procedure.

24          2.      Defendant is a party to the maritime contract of charter party and letter of indemnity on

25   which this claim is based and is a foreign company organized and existing under the laws of Singapore,

26   having its principal place of business in Singapore.

27          3.      Defendant is not incorporated or registered to do business in the State of California.

28   / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4.      Under my supervision, my office did a search of the California Secretary of State, online search database, and a general internet search on the Google search engine.

5.      In our search, we did not find any listing referencing Defendant in this district or state.

6.      In the circumstances, I believe Defendant cannot be "found" within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

7.      Upon information and belief and as outlined in Plaintiff's Verified Complaint, Defendant has, or will have during the pendency of this action, assets in this jurisdiction consisting of freight, cash, funds, hire, and/or credits in the hands of garnishees in this District, including but not limited to Chevron, which is located in this district at 6001 Bollinger Canyon Road, San Ramon, California, 94583.

8.      We anticipate that the U.S. Marshal's Service lacks sufficient staff to effect service of Process of Maritime Attachment and Garnishment promptly or economically.  I respectfully request that the Court appoint any person selected by Lewis Brisbois Bisgaard & Smith LLP who is over 18 years of age and is not a party to this action, to serve Process of Maritime Attachment and Garnishment and supplemental process on the garnishee named in Schedule A to the Order Directing Clerk to Issue Process of Maritime Attachment and Garnishment and Appointing Process Service, or upon any other or additional garnishees as may be named in any supplemental Process of Maritime Attachment and Garnishment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  June 13, 2018                                        _David E. Russo_____
                                                            David E. Russo



4834-8179-8505.1

AFFIDAVIT PURSUANT TO SUPPLEMENTAL RULE B

# EXHIBIT B

성제용 [탱커영업팀]

| | |
|---|---|
| 보낸 사람: | 김경현 [탱커영업팀] |
| 보낸 날짜: | 2016년 4월 14일 목요일 오전 9:46 |
| 받는 사람: | 강철민 [싱가폴법인]; 탱커영업팀; 탱커운항팀 |
| 제목: | FW: GRAND ACE 12/CLEARLAKE MCHINA–TWN/CHINA IN DC – CP DATED 13TH APRIL 2016 |
| 첨부 파일: | 1.Q88(GRAND_ACE12_FEB).doc; Fwd: GRAND ACE 12/CLEARLAKE MCHINA–TWN/CHINA IN DC – CP DATED 13TH APRIL 2016 ADDENDUM NO. 1 |

GRAND ACE12-V.085  CLEAN RECAP 입니다.

+ 양하지 M.CHINA 기준으로 FIX되었으나, TRADING PART에서 재차 South/North option 요청하여 첨부와 같이 addendum 1 작성됨.

+ Intention은 M.CHINA

김경현 배상
Everything will work out just fine

**From:** Chris Tan Wen Li [mailto:Chris.Tan@Braemar.com]
**Sent:** Wednesday, April 13, 2016 8:00 PM
**To:** randy.tan@gunvortrade.sg; 김경현 [탱커영업팀]; 강철민 [싱가폴법인]; SOH Terence
**Cc:** Misha Lim (Braemar ACM Shipbroking Singapore); kwoon@acmshipping.com.sg; Chris Tan Wen Li; Prapaharan Letchumanan
**Subject:** GRAND ACE 12/CLEARLAKE MCHINA/CHINA IN DC - CP DATED 13TH APRIL 2016

TO  : CLEARLAKE SHIPPING PTE LTD
ATTN: MR RANDY TAN/MR TERENCE SOH

TO  : PAN OCEAN
ATTN: MR JAMES KIM

DATE: 13TH APRIL 2016

FROM: BREAMAR ACM SHIPBROKING PTE LTD

RE  : GRAND ACE 12/CLEARLAKE CP DATED 13 APR 2016

REF OUR TELCONS AND AS PER YR AUTHORITY, WE ARE PLEASED TO CONFIRM
FOLLOWIN FIXTURE WITH ALL SUBJECTS LIFTED IN ORDER AS AT friday
13ST april 2016 1800HRS SINGAPORE TIME:

STRICTLY PRIVATE AND CONFIDENTIAL

IT IS THIS DAY AGREED BETWEEN PAN OCEAN CO. LTD (HEREINAFTER REFERRED TO
AS "DISPONENT OWNERS"), BEING [DISPONENT OWNERS] OF THE GOOD MOTOR TANKER
VESSEL CALLED GRAND ACE 12 (HEREINAFTER REFERRED TO AS "THE VESSEL")
DESCRIBED
HEREOF AND CLEARLAKE SHIPPING PTE LTD OF SINGAPORE (HEREINAFTER REFERRED TO
AS "CHARTERERS"):

1

------------------------------------------------------------------
(TITLE)

CHARTERER          : CLEARLAKE SHIPPING PTE LTD
                     12 MARINA BOULEVARD
                     #35-02 MARINA FINANCIAL TOWER 3,
                     SINGAPORE 018982
                     TEL: +65 6496 9900
                     FAX: +65 6496 9901

REGISTERED OWNER     : POS MARITIME NX S.A.
                     53RD STREET, URBANIZACION MARBELLA MMG TOWER 16TH,
                     PANAMA CITY, REPUBLIC OF PANAMA
                     TEL: 82-2-316-5357
                     FAX: 82-2-316-5075
                     TELEX: NOT APPLICABLE
                     EMAIL: kkh7@panocean.com

TECHNICAL OPERATOR     : STX MARINE SERVICE CO., LTD
                     18F, PANOCEAN BLDG, 102, JUNGANG-DAERO,
                     JUNG-GU, BUSAN 600-725, KOREA rep
                     TEL: +82-51 461 2151
                     Fax: +82 51 464 3558
                     Email: BIZ-TOT@ONESTX.COM

COMMERCIAL OPERATOR     : PAN OCEAN CO., LTD.
                     STX NAMSAN TOWER, 98 HUAMRO, JUNG-GU, SEOUL, KOREA
                     TEL: +82 2 316 5560
                     FAX: +82 2 316 5075
                     TELEX: NOT APPLICABLE
                     EMAIL: THERESA_SEOL@PANOCEAN.COM

DISPONENT OWNER     : PAN OCEAN CO., LTD.
                     STX NAMSAN TOWER, 98 HUAMRO, JUNG-GU, SEOUL, KOREA
                     TEL: +82-2-316-5357
                     FAX: +82-2-316-5076
                     TELEX: NOT APPLICABLE
                     EMAIL: KKH7@PANOCEAN.COM

CHARTER PARTY FORM     : BPVOY 4 WITH CHARTERERS RIDER CLAUSES

C/P DATE          : 13TH APRIL 2016

------------------------------------------------------------------
(VESSEL DETAILS)

VESSEL          : GRAND ACE12
EX-NAME          : STX ACE12 (OCT 19, 2014)
IMO NUMBER          : 9384077
SDWT          : 46,187.769 MT
SDRAFT          : 12.216 M
BUILT          : SEPT 11, 2008
FLAG          : PANAMA
LOA          : 183 M

2

```
BEAM            : 32.23 M
KTM             : 46.35 M
BCM             : 92.34 M
TPC/TPI         : 51.80 TON TPC
CUBIC 98 PCT      : 52,219.863 CBM
SLOP 98 PCT      : 1,104.591 CBM (PLEASE ADVISE AVAILABILITY)
SEGREGATIONS      : 6
PUMPS           : 12
COATED            : PHENOLIC EPOXY
COILED            : DECK MOUNTED VERTICAL HEAT EXCHANGER
P AND I           : BRITANNIA
H&M VALUE         : USD XX MILLION
C/P SPEED         : ABOUT 13.0 KNOTS WSNP
LAST SIRE         : 27 DEC 2015 AT BOTANY BAY
APPROVALS WOG     : BP / SHELL

LAST 3 CARGOS     : GASOIL/MIXED ARO/JET+MX ARO/

ITINERARY         : ETA SUBIC 14/4 PM
                  ETD SUBIC 15/4
                  ETA NANTONG 18/4
                  ETD NANTONG 21/4
                  ETA ZHOUSHAN 21/4
                  ABV BSS AGW WSNP
```

-------------------------------------------------------------
                (CARGO)

CARGO QUANTITY      : CHARTERER'S OPTION UPTO FULL CAPACITY ALWAYS CONSISTENT
                WITH SAFE PERMISSIBLE DEADWEIGHT AND DRAFTS AT BOTH LOAD
                AND DISCHARGE PORTS

GRADE           : ONE/TWO GRADE(S) OF CLEAN PETROLEUM PRODUCT(S)

SEGREGATION       : WVNS

HEAT            : N/A

-------------------------------------------------------------
                (DATES)

LAYDAYS           : IN DIRECT CONTINUATION NORMAL STEAMING PLUS TWENTY-FOUR
(24) hours

-------------------------------------------------------------
                (GEOGRAPHICAL)

LOADING RANGE       : 1-3 SAFE PORT(S) MCHINA NINGBO-YIZHENG RANGE INCL
ZHOUSHAN
                AND/OR IN CHOPT
                1-3 SAFE PORT(S)/STS TAIWAN, INT TAICHUNG

DISCHARGING RANGE      : 1-3 SAFE PORT(S)/STS TAIWAN, INT TAICHUNG

3

AND/OR IN CHOPT
1-3 SAFE PORT(S) PHILIPPINES, BATAAN-BATANGAS RANGE, INCL SUBIC BAY
AND/OR IN CHOPT
1-3 SAFE PORT(S) MCHINA NINGBO-YIZHENG RANGE INCL ZHOUSHAN
AND/OR IN CHOPT
1-3 SAFE PORT(S)/STS KERTEH/SINGAPORE/TANJUNG PELEPAS/TANJUNG
LANGSAT/PASIR GUDANG/TANJUNG BIN/PENGERANG-KARIMUN-NIPAH
RANGE INCL BATAM

-----------------------------------------------------------------------
          (FINANCIAL)

FREIGHT RATE in lumpsum : USD 335,000/- BSS 2:1 TAIWAN F/B SUBIC and DISCHARGE mchina
          USD 355,000/- BSS 2:1 MCHINA F/B SUBIC AND DISCHARGE MCHINA
          USD 545,000/- BSS 3:1 TAIWAN F/B SPORE F/B SUBIC AND DISCHARGE MCHINA
          USD 565,000/- BSS 3:1 MCHINA F/B SPORE F/B SUBIC AND DISCHARGE MCHINA
          USD 460,000/- BSS 3:1 TAIWAN F/B MCHINA F/B SUBIC AND DISCHARGE
MCHINA
          USD 385,000/- BSS 3:1 MCHINA F/B TAIWAN F/B SUBIC AND DISCHARGE
MCHINA

          - SUBIC BAY PORT CHARGES TO BE FOR CHARTERERS ACCOUNT
          - charterer's option to discharge/top up at philippines prior
            to final discharge in china
          - IF STS AT LOADING PORT MINUS USD 10,000; PORT CHARGES + AGENCY
            FEES TO BE CHTRS' ACCOUNT AND SETTLED DIRECTLY BY THEM
          - STS LICENSE, EQUIPMENT (HOSES, FENDERS..) AND ARRANGMENT,
            IF ANY, TO BE CHTRS' ACCOUNT.
          - STS AT YANGON, PORT CHARGES + AGENCY FEES TO BE OWNERS'
ACCOUNT
            ( N/A FOR THIS VOY )
          - TANK CLEANING BSS CFW METHOD IN SHELL TANK CLEANING GUIDE

OVERAGE          : N/A

DEMURRAGE RATE          : USD 16,500/- PDPR

LAYTIME          : TOTAL 84 HOURS SHINC

-----------------------------------------------------------------------

BANKING DETAILS          : BENEFICIARY BANK : HANA BANK (SWIFT CODE : HNBNKRSE)
          KCCI BRANCH SEOUL, KOREA
          JP MORGAN CHASE BANK, NEW YORK, U.S.A.
          (SWIFT CODE : CHASUS33/ABA NO:021-000-021)
          BENEFICIRAY : PAN OCEAN CO., LTD
          ACCOUNT NUMBER : 77690057450739

-----------------------------------------------------------------------

STOWAGE, CARGO OPERATION AND COMPLIANCES
----------------------------------------

- For ops procedure – NA FOR THIS VOY

4

jysung/성제용/탱커영업팀/2016-07-24 14:12:2

===================

1) Load 15kt of gasoline blendstock at vopak sebarok
2) Redoc gasoline blendstock to "raffinate" .
3) Head to batam to top up 15kt of "low aromatics components/reformate" via
    sts of Maersk Mississippi
4) Perform ITT to blend the full cargo evenly
5) Final redoc full parcel as mix aromatics ex batam.
In all cases in the absence of original bl's , owners to issue NN bls for
same. Original new bl's to be reissued only upon receipt of the old ones.


- Attached documents from class for vessel fit to carry mixed aromatics.
======================================================================

### (SPECIAL PROVISIONS)

- Please find CHTRS intention below for MT GRAND ACE 6 : (REINSTATE)
1) To load at SPORE AREA/KOREA/TAIWAN/SUBIC via TERMINAL OR STS with MT "XXX".
    Vessel on completion of loading to be issued with Bls reflecting the
    cargo loaded as GASOIL AND/OR RAFFINATE/REFORMATE AND/OR LCO AND/OR
    MX ARO.
2) To proceed to Philippines, to receive approx 50mt MGO into 1 empty
    slop tank, via barge at potential anchorage at Philippines. As cargo
    will be received via bunker barge, no BL will be issued. However,
    captioned vessel will receive Bunker Delivery Note for MGO received.
    As instructed by Charterers, vessel will proceed to Philippines to
    carry out comingling operations. 50 MT of MGO supplied will be mixed
    in all Tanks and circulated to ensure proper comingling is carried
    out at Philippines, charterers to provide a LOI for comingling.
    INTENTION SUBIC BAY
3) To proceed to China port - Final Port TBA. INTENTION CHINA
4) Charterer would require re-documentation for entire cargo on-board
    vessel (which will include the cargo in slop tank), prior arrival at
    discharge port.
5) For final redoc B/L details:
    aa) Final B/L quantity - will be a total quantity basis B/L quantity
        loaded at SPORE AREA/KOREA/TAIWAN/SUBIC, together with the total quantity for MGO
        loaded at Philippines.
    bb) In addition, Philippines (potentially Subic Bay) will be reflected
        as the loadport in the final redoc B/L
    cc) Final B/L date will be based on date when MGO is loaded on-board
        captioned vessel at Philippines.
    dd) For customs clearance purposes, Charterer require only Non-Negotiable
        BL to be issued by vessel Master.
    ee) For the first set OB/L issued at SPORE AREA/KOREA/TAIWAN/SUBIC, Charterer will
        DO best endeavourS TO return full set to Owner as soon as available
        in exchange of the final Original Redoc BL.

In the absence of original bl's, owners will furnish chrts with a Non Nego
copy for custom clearance AT DISCHARGE PORT

- BUNKERING : OWNERS HAVE OPTION TO TAKE BUNKER ON WAY TO DISCHARGE PORT.

- IF PREWASHING AFTER DISCHARGE IS REQUIRED AS PER LOCAL OR TERMINAL
REGULATION,
  TIME USED FOR SUCH MANDATORY PREWASH SHALL BE FOR CHARTERER'S ACCOUNT
BUT
  MAXIMUM 4 HRS AND COSTS FOR CHRTRS ACCT

- FROM THE POSITION/ITINERARY GIVEN WHEN FIXING THIS CHARTER, OWNERS
WARRANT
  THAT THE VESSEL WILL NOT PERFORM ANY INTERIM VOYAGE AND WILL PROCEED WITH
  UTMOST DESPATCH TO THE LOADPORT.

- CHARTERERS' NOMINATED AGENTS BOTH END PROVIDED COMPETITIVE IN COST

- TRADE SANCTIONS

  OWNERS/CHRTS REPRESENT, WARRANT AND GUARANTEE THAT:
  - IT IS NOT SUBJECT TO SANCTION OR A SANCTIONED ENTITY,
  - THE VESSEL IS NOT SUBJECT TO SANCTION OR A SANCTIONED ENTITY, THE VESSEL'S
    FLAG OR ITS REGISTERED COUNTRY IS NOT SUBJECT TO SANCTION,
  - THE OPERATIONAL MANAGER, THE SHIPMANAGER, THE REGISTERED OWNER, THE
DISPONENT
    OWNER ARE NOT SANCTIONED ENTITIES OR NOT SUBJECT TO SANCTION.

  "SANCTION" MEANS ANY SANCTION, REGULATION, STATUTE, OFFICIAL EMBARGO
MEASURES
    OR ANY 'SPECIALLY DESIGNATED NATIONALS' OR 'BLOCKED PERSONS' LISTS, OR ANY
    EQUIVALENT LISTS MAINTAINED AND IMPOSED BY THE UNITED NATIONS, THE
EUROPEAN
    UNION, SWISS, SINGAPORE, THE UNITED STATES DEPARTMENT OF TREASURY'S OFFICE
OF
    FOREIGN ASSETS CONTROL, THE UNITED STATES STATE DEPARTMENT OR ANY
REPLACEMENT
    OR OTHER REGULATORY BODY ENFORCING ECONOMIC AND TRADE SANCTIONS
LEGISLATION
    IN SUCH COUNTRIES OR BY ANY SUPRANATIONAL OR INTERNATIONAL
GOVERNMENTAL
    ORGANIZATION.

  "SANCTIONED ENTITY" MEANS ANY ENTITY, BEING AN INDIVIDUAL, CORPORATION,
  COMPANY, VESSEL, ASSOCIATION OR GOVERNMENT, WHO OR WHICH:

  (A) IS SUBJECT TO A SANCTION; OR
  (B) IS CONNECTED TO ANY ENTITY WHO IS SUBJECT TO A SANCTION OR IS OWNED OR
    CONTROLLED, DIRECTLY OR INDIRECTLY, BY ANY ENTITY WHO IS SUBJECT TO A
    SANCTION.

  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NOTHING IN THIS
CONTRACT
    IS INTENDED, AND NOTHING HEREIN SHOULD BE INTERPRETED OR CONSTRUED, TO
    INDUCE OR REQUIRE THE CHARTERER/OWNERS HERETO TO ACT IN ANY MANNER
(INCLUDING
    FAILING TO TAKE ANY ACTIONS IN CONNECTION WITH A TRANSACTION) WHICH IS
    INCONSISTENT WITH, PENALISED OR PROHIBITED UNDER ANY SANCTION.

IN THE EVENT IT IS OR BECOMES UNLAWFUL FOR THE CHARTERER/OWNERS IN THE
CHARTERER'S/OWNERS SOLE JUDGMENT TO PERFORM ANY OF ITS OBLIGATIONS UNDER
THIS CONTRACT THE CHARTERER/OWNERS MAY, AT ITS SOLE DISCRETION, IMMEDIATELY
TERMINATE THE CONTRACT FORTHWITH, WITHOUT INCURRING ANY LIABILITY.

--------------------------------------------------

ADDITIONAL TERMS:
==================

IF REQUIRED OWNERS TO REMEASURE TO ONE OF VSL'S PRE-EXISTING LOADLINES AT
OWNERS TIME AND EXPENSE ONE TIME ONLY.

- OWNER TO GUARANTEE THE VSL HAS POLLUTION COVER FROM THEIR P+I CLUB UP TO
  USD 1 BILLION.
- ANY TAXES A/O DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS ACCOUNT
  AND SETTLED DIRECTLY BY THEM.
- WAITING CARGO DOCUMENTATION AFTER HOSE DISCONNECTED, MAXIMUM 3 HOURS FOR
  OWNERS ACCOUNT THEREAFTER FOR CHARTERERS ACCOUNT
- SOUTH KOREA ANCHORAGE DUES MAXIMUM 48 HOURS FOR OWNER'S ACCOUNT THERE-AFTER
  FOR CHRTR ACCOUNT.
- IN CASE THE VESSEL ARRIVES AT CUSTOMARY ANCHORAGE IN SKOREA AND TENDER
  N.O.R. TO LOAD BETWEEN 1800 HOURS AND 2400HOURS, LAYTIME TO COMMENCE AT
  0600 HOURS THE NEXT DAY.
- DEBALLASTING/BALLASTING/SHIFTING TIME FROM ANCHORAGE TO THE FIRST BERTH
  SHALL NOT COUNT AS USED LAYTIME OR AS DEMURRAGE TIME UNLESS THESE ACTIVITIES
  WERE DONE CONCURRENTLY WITH THE LOADING. SHIFTING FROM BERTH TO BERTH
  FOR CHARTERER'S PURPOSES SHALL COUNT AS LAYTIME.
- IF DELAYED IN BERTHING DUE TO BAD WEATHER/SEA SWELL, CONOCO WEATHER CLS
  TO APPLY
- IN CASE OF LOADING AT INCHEON, NOTICE OF READINESS SHALL BE TENDERED AFTER
  "PALMIDO"
- THE CONCEPT OF "ONCE ON DEMURRAGE, ALWAYS ON DEMURRAGE" NOT TO APPLY.
- INTERIM PORT COSTS CLAUSE
  CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT AT COST WITH
  ADDITIONAL STEAMING TIME TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS
  DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT AS PER BP'S DISTANCE
  TABLE. TIME TO COUNT FROM ARRIVAL PILOT STATION INTERIM OAD/DISCHARGE
  PORT UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCH PORT I.E. NO
  ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING EVEN FROM ANCHORAGE
  TO FIRST BERTH AND NO DEDUCTION FOR TIME LOST DUE TO TIDE, SEA AND WEATHER
  CONDITIONS. DEVIATION AND TIME USED TO BE CALCULATED AT DEMURRAGE RATE PER
  DAY PRO RATA PLUS COST FOR ADDITIONAL BUNKERS (INCLUDING IFO AND MDO)
  CONSUMED AS PER MASTERS TELEX STATEMENT. DEVIATION, ADDITIONAL TIME USED,
  ADDITIONAL BUNKERS CONSUMED AND PORT COSTS AS PER AGENTS D/A TO BE PAID
  TOGETHER WITH FREIGHT AS PER OWNERS TELEXED INVOICE, WHICH LATER TO~BE
  SUPPORTED BY HARD COPY DOCUMENTATION.

7

REINSTATE BUT N/A FOR THIS VOYAGE, DATED XXX
- RE-DOC PROCESS: (AMENDED)
 IN CASE REQUESTED BY RECEIVER, CHARTERERS TO ORDER AGENT TO RE-ISSUE ALL
 3 ORIGINAL B/LS INCLUDING SULPHUR CONTENT (GRADE NAME X.XX% SULPHUR).
 CHARTERERS WILL PROVIDE CERTIFICATE OF QUALITY AT LOADPORT TO PROVE
SULPHUR
 CONTENT IS IN LINE WITH B/LS MAKE UP.

 AFTER MASTER HAVING SIGNED ALL ORIGINAL 3 B/LS STATING "GASOIL" AGENT WILL
 PROCEED TO USE IT FOR PORT CLEARANCES. AFTER COMPLETION OF CUSTOM
CLEARANCES,
 THE ORIGINAL 3 B/LS SHALL BE RETURNED BACK TO OWNER/MASTER.

 THE NEW SET OF B/LS INSERTION WITH SULPHUR CONTENT WILL BE PRESENTED TO
 MASTER FOR SIGNATORY. QUANTITY ALWAYS TO BE SAME ON 1ST AND 2ND SET OF
 ORIGINAL B/LS. THE NEW SET OF ORIGINAL B/S (3/3) WILL BE GIVEN TO LOCAL
 AGENT AND THEN COURIERED TO CHARTERERS BANK FOR LC.

 CHARTERERS TO PROVIDE OWNERS WITH AN EMAIL LETTER OF INDEMNITY WITH
WORDING
 AS PER OWNERS PNI CLUB WITHOUT BANK GUARANTEE FOR ABOVE OPERATIONS
CARRIED
 OUT.

- CONOCO WEATHER CLAUSE

- DISCHARGE ALWAYS TO BE IN GEOGRAPHICAL ROTATION MAX 3 HRS AWAITING CARGO
 DOCS FOR OWNERS ACCT

- VESSEL NOT TO TENDER NOR PRIOR TO LAYCAN WITHOUT CHRTRS PRIOR CONSENT

- GARB LONDON ENG LAW

- IF DISCHARGING STS OFF KARIMUN OR T.PELAPAS OR PASIR GUDANG ONLY, NO PORT
 CHARGES (INCLUDING AGENCY FEES) FOR OWNERS ACCCOUNT. IF REQUIRED,
CHARTERERS
 TO APPOINT AGENTS DIRECTLY.

- STS CLAUSE (IF APPLICABLE)
 ALL PORT CHARGES INCLUDING TOWAGE CHARGES AND AGENCY FEES AT STS AREA
(UNLESS
 COVERED BY WORLDSCALE) TO BE FOR CHRTRS AND TO BE SETTLED DIRECTLY BY
THEM.
 ALL COSTS FOR STS INCLUDING ARRANGEMENT OF FENDERS HOSES AND SAFETY
EQUIPMENT
 TO BE FOR CHRTRS ACCT AND TO BE SETTLED DIRECTLY BY THEM. STS OPERATIONS
 ALWAYS TO BE IN ACCORDANCE WITH LATEST EDITION OF OCIMF STS TRANSFER GUIDE.
 STS/LIGHTERAGE VESSELS SUBJECT TO OWNERS APPROVAL.

- OWNER TO ARRANGE VESSEL'S DWT REMEASURE UDOWN TO WITHIN MULTI LOAD LINE
CERT
 PRIOR ARRIVAL AT LOAD/DISCH PORT, IF CHTRS REQUEST. AT OWNERS TIME AND COSTS
 MAX ONE TIME REMEASUREMENT. CHTRS TO LET OWNERS KNOW IF SHE NEEDS IT OR
NOT

8

4 WORKING DAYS BEFORE ARRIVAL OF LOAD/DISCH.

- OWNERS AGREE TO DO INTER TANKS TRANSFER (ITT)/BLENDING ON BOARD/TOP-UP IF
  INSTRUCTED BY CHARTERER PROVIDED AT SAFE LOCATION. CHARTERER TO PROVIDE
  OWNER WITH AN EMAIL LETTER OF INDEMNITY WITH WORDING AS PER OWNERS PNI
CLUB
  WITHOUT BANK GUARANTEE FOR ABOVE OPERATIONS CARRIED OUT. COSTS, NOT
LIMITED
  TO BUT OF INCLUDING BUNKER AS PER MASTER'S STATEMENTS, AND DELAYS, IF ANY,
  ARE CHARTERERS'ACCOUNT.

- FREIGHT TO BE PAID UNDER THIS C/P SHALL BE LUMPSUM BASED. OWNER SHALL PAY
  FOR ALL PORT COST AT FIRST LOADING PORT AND FINAL DISCHARGING PORT
INCLUDING
  ANY STANDBY TUGS, MOORING/UNMOORING TUGS IF REQUIRED.


AMENDMENTS TO BPVOY 4 INCLUSIVE OF CHARTERERS AMENDMENTS TO BPVOY 4

IN THE EVENT OF CONFLICT BETWEEN THE PROVISIONS SET OUT HEREIN AND ANY
PRINTED
TERMS OF THE CHARTER PARTY FORM, THE PROVISIONS SET OUT HEREIN WILL PREVAIL:

GENERAL AMENDMENTS:
A. DELETE ALL REFERENCES TO "BP SHIPPING QUESTIONAIRE" AND REPLACE WITH "Q88
   QUESTIONNAIRE FORM VERSION 3 OR ANY SUBSEQUENT MODIFICATION"
B. ANY REFERENCE TO TELEX (ES) TO BE DEEMED TO ALSO BE A REFERENCE TO EMAIL(S)
C. ALL DISTANCES AND ANY REFERENCE TO ADDITIONAL DISTANCES TO BE ASSESSED BY
   REFERENCE TO ONLINE WEB-BASED "BP SHIPPING MARINE DISTANCE TABLES"
PRODUCED
   BY ATOBVIAC.

PART 1
LINE 55 & 56 : ABOUT 13.0 KNOTS WSNP
LINE 8-82 DELETE
LINE 98.1: INSERT 'N. POSITION  OWNERS WARRANT VESSEL'S POSITION AT TIME OF
     FIXTURE IS _____ AND VESSEL IS PROCEEDING AT_____ KNOTS,
     AND IS EXPECTED TO ARRIVE AND BE READY TO LOAD _____ AT LOAD
     PORT OF _____.'

AMMENDMENTS TO BPVOY4

PART II

CLAUSE 1. CONDITION OF THE VESSEL
LINE 110: RECOMMENDATIONS SET OUT IN THE DELETE '1996' INSERT 'MOST RECENT'
     EDITION OF ISGOTT,

CLAUSE 2. CHARTERING QUESTIONNAIRE
2.2.2 DELETE "DEDUCTION FROM FREIGHT OR OTHERWISE"
     INSERT "CLAIM FROM OWNERS"

CLAUSE 3. LOADING/COMPLIANCE WITH CHARTERERS' VOYAGE ORDERS
REVISED CLAUSE 3.3

jysung/성제용/탱커영업팀/2016-07-24 14:12:2

LINE 158 AFTER '("CHARTER SPEED")' DELETE TO END OF PARA
3.4 LINE 168 DELETE FROM 'IF OWNERS....' TO END OF PARA ADD AT END "SAME TO BE
    SETTLED AS PER CLAUSE 31.6'
3.5 DELETE

CLAUSE 4. ESTIMATED TIMES OF ARRIVAL
LINE 186: AFTER 'EXPENSES' INSERT 'DIRECTLY'
LINE 188: AFTER 'TELEX' ADD 'FAX/EMAIL'
LINE 201: DELETE 'IMMEDIATELY' INSERT 'PROMPTLY'
LINE 202: AFTER 'TELEX' ADD 'FAX/EMAIL'
LINE 209: AFTER 'TELEX' ADD 'FAX/EMAIL'
LINE 212: AFTER 'TELEX' ADD 'FAX/EMAIL'

CLAUSE 5. LOADING AND DISCHARGE PORT/SHIFTING
LINE 232: AFTER 'SHALL' INSERT 'TOGETHER WITH FREIGHT'

CLAUSE 6. NOTICE OF READINESS ('NOR')
PART 6.3.3- DELETE CLAUSE IN ITS ENTIRETY AND INSERT THE FOLLOWING:

FREE PRATIQUE HAS BEEN GRANTED OR IS GRANTED WITHIN SIX (6) HOURS OF THE
MASTER
TENDERING NOR. IF FREE PRATIQUE IS NOT GRANTED WITHIN SIX (6) HOURS OF THE
MASTER
TENDERING NOR, THROUGH NO FAULT OF OWNERS, AGENTS, OR THOSE ON BOARD THE
VESSEL,
THE MASTER SHALL ISSUE A PROTEST IN WRITING ("NOP") TO THE PORT AUTHORITY AND
THE FACILITY AT THE PORT ("TERMINAL") FAILING WHICH LAYTIME OR, IF THE VESSEL
IS ON DEMURRAGE, DEMURRAGE SHALL ONLY COMMENCE (IN ACCORDANCE WITH
CLAUSE 7.3.2)

CLAUSE 7. LAYTIME/DEMURRAGE
LINE 288: DELETE 'UNLESS.........PORT' IN LINE 289
LINE 301: INSERT " ALL TIME SAVED TO COUNT IN HALF. "
LINE 311: AFTER 'DOCUMENTS' INSERT '(INCLUDING CUSTOMS DOCUMENTS)'
LINE 314-315: DELETE "UPON THE COMPLETION OF CARGO DOCUMENTATION" AND
REPLACE
        WITH "ONCE CARGO DOCUMENTS ARE DELIVERED ON BOARD BUT MAXIMUM
        3 HOURS."

CLAUSE 8. CARGO TRANSFERS
LINE 355: AFTER '(PETROLEUM)' INSERT 'AND ALWAYS SUBJECT TO MASTER'S APPROVAL
        WHICH NOT TO BE UNREASONABLY WITHHELD.'
LINE 370: AFTER 'COSTS' INSERT 'INCLUDING BUT NOT LIMITED TO TUGS AND PILOTS
        UNLESS SO DEFINED BY WORLDSCALE'
LINE 389: AFTER 'CLAUSE 18.1' INSERT 'AND THE REFERENCE TO ADVERSE WEATHER IN
        CLAUSE 17.'
LINE 407: AFTER 'COSTS INSERT 'INCLUDING BUT NOT LIMITED TO TUGS AND PILOTS'
LINE 419: AFTER '7.3' ADD 'IF HOWEVER ADVERSE WEATHER OR SEA STATE AFFECTS STS
        BUT DOES NOT AFFECT GENERAL CARGO OPERATIONS AT THE PORT THE TIME
        SHALL COUNT IN FULL'

CLAUSE 9. DOCUMENTATION
LINE 423 AFTER 'VESSEL' ADD 'AND ITS OFFICERS/CREW'

CLAUSE 11. CLEANING OF VESSEL'S TANKS, PUMPS AND PIPELINES.
LINE 452: DELETE 'ANY' INSERT 'THE'

CLAUSE 12. INERT GAS SYSTEM ('IGS')
LINE 480: AFTER 'DEMURRAGE' INSERT 'CHARTERERS SHALL REIMBURSE OWNERS FOR ANY
  BUNKERS USED IN CONNECTION WITH THIS OPERATION UPON RECEIPT OF OWNERS
  INVOICE TOGETHER WILL FULL SUPPORTING DOCUMENTATION. FIRST INERTION
  ALWAYS TO BE FOR OWNERS ACCOUNT PROVIDED VESSEL WAS REQUIRED TO GAS
  FREE HER TANKS FOR CLEANING PURPOSES IN LINE WITH INDUSTRY STANDARDS.'

CLAUSE 14. OILY RESIDUES/ CLEAN BALLAST
LINE 491 DELETE ALL FROM 'OWNERS' TO 'SEGREGATED' IN
LINE 538 ADD AT END 'OWNERS WARRANT THAT THE VESSEL, HER OFFICERS AND CREW WILL
  THROUGHOUT THE DURATION OF THE VOYAGE FOLLOW ALL MARPOL
REGULATIONS.'

CLAUSE 15. AGENCY
LINE 541: INSERT AT END 'PROVIDED COMPETITIVE'

CLAUSE 16. CANCELLATION
LINE 552: DELETE 'FORTY EIGHT(48)' INSERT 'TWO WORKING DAYS'
LINE 562: DELETE 'NINETY SIX(96)' INSERT 'FORTY EIGHT(48)'. BEFORE 'SUNDAYS'
  INSERT 'SATURDAYS'
LINE 571: DELETE 'NINETY SIX (96)' INSERT 'FORTY EIGHT(48)'
LINE 572: BEFORE 'SUNDAYS' INSERT 'SATURDAYS'
LINE 583: AS PER PRINTED

CLAUSE 18. SUSPENSION OF LAYTIME/DEMURRAGE
LINE 600: DELETE 'INCLUDING AWAITING TIDE'
LINE 603: DELETE AND THE...........BE'
LINE 604: DELETE 'USED, IS IN PLACE'
LINE 610: AFTER 'PILOTS' ADD 'SHALL COUNT AS ONE HALF LAYTIME OR, IF THE VESSEL
  IS ON DEMURRAGE, AT ONE HALF OF THE DEMURRAGE RATE'
LINE 621: AFTER 'CONNECTION WITH, THE' INSERT 'BUNKERING AND/OR' AND AFTER
  'UNLESS' INSERT 'BUNKERING AND/OR'
LINE 622: DELETE 'CONCURRENTLY' UP TO 'CARGO' IN LINE 623

CLAUSE 19. LOADING AND DISCHARGE OF CARGO AND CRUDE OIL WASHING AND
  STRIPPING
LINE 627: INSERT 'THROUGHOUT THIS CLAUSE PUMPING WARRANTY ARE EXCLUDING TIME
  USED FOR START-UP AND TRIM AND STABILITY'
LINE 649-650 : DELETE AND REPLACE BY,
  "SHORE PERSONNEL SHALL SUPERVISE, APPROVE, AND BE RESPONSIBLE
  FOR CONNECTION AND DISCONNECTION OF HOSES. SHIP'S CREW IS/ARE
  TO ASSIST THIS OPERATION."
LINE 653 : AFTER 'LOAD A FULL', INSERT 'HOMOGENOUS'.
LINE 654: (24) HOURS INSERT 'OR 1/3 OF TOTAL LAYTIME WHICHEVER IS LESS,' PRO RATA
LINE 660: (24) HOURS INSERT 'OR 1/3 OF TOTAL LAYTIME WHICHEVER IS LESS,' PRO RATA
LINE 661: DELETE 'A MINIMUM' INSERT 'AN AVERAGE'
19.5 DELETE
19.5.1 DELETE

19.5.2 DELETE
19.8 DELETE
19.9 DELETE

CLAUSE 20. CLAIMS TIME BAR
LINE 787 DELETE 'DETENTION'
LINE 789 AFTER 'DOCUMENTATION' ADD ' WHERE POSSIBLE'
LINE 792: AFTER 'CLAIM' INSERT 'EXCEPT CLAIMS ARISING UNDER THE BILL OF LADING'
LINE 796: INSERT 'WHERE POSSIBLE' AFTER 'DOCUMENTATION'
AFTER LINE 798 INSERT: HOWEVER OWNERS ALWAYS HAVE THE OBLIGATION TO PROVE
          THAT THEY HAVE MADE BEST ENDEAVOURS TO SECURE
          RELEVANT DOCUMENTATION.

INSERT 20.3: CLAIMS ARISING UNDER CLAUSE 20.1 AND/OR 20.2 AND ANY OTHER CLAIM
          AGAINST CHARTERERS SHALL BE EXTINGUISHED AND CHARTERERS SHALL BE
          DISCHARGED FROM ALL LIABILITY WHATSOEVER IN RESPECT THEREOF UNLESS
          PROCEEDINGS HAVE BEEN COMMENCED IN RESPECT OF SUCH CLAIM IN THE
          RELEVANT FORUM WITHIN EIGHTEEN MONTHS OF THE DATE OF ACCRUAL OF
          THE CAUSE OF ACTION, EXCLUDING ANY CLAIMS RELATING TO BILLS OF
          LADING.

CLAUSE 22. REVISED CHARTERERS' VOYAGE ORDERS FOR LOADING OR DISCHARGE PORTS
LINE 836: ADD 'PROVIDED THE VESSEL HAS SUFFICIENT BUNKERS AND FRESH WATER
          WITHIN HER SAFETY POLICY TO REMAIN SAFE AND STILL BE ABLE TO
          PERFORM THE CP.'

CLAUSE 24. MAINTENANCE OF CARGO TEMPERATURE - N/A FOR CPP TO BE DISCUSSED
LINE 880: INSERT 135>F DELETE 60>C
LINE 881: INSERT 135>F DELETE 60>C

CLAUSE 25. CARGO HEATING - N/A FOR CPP TO BE DISCUSSED ALONG WITH CLEARLAKE
          AMENDMENT

CLAUSE 26. LIBERTY
LINE 916: AFTER 'CHARTERERS,' INSERT 'WHICH NOT TO BE UNREASONABLY WITHHELD'

CLAUSE 28. DELETE IN FULL AND INSERT 'VESSEL NOT TO TRADE IN ANY KIND OF ICE
          NOR FOLLOW ICE BREAKER'

CLAUSE 29. QUARANTINE
LINE 975-977 : DELETE "HOWEVER..." TIL THE END.

CLAUSE 30. BILLS OF LADING AND INDEMNITIES - SEE CLEARLAKE AMENDMENTS TO
          BPVOY 4 CLAUSE 30.3

DELETE ORIGINAL/INSERT:
IF AN ORIGINAL BILL OF LADING IS NOT AVAILABLE AT ANY DISCHARGE PORT TO WHICH
THE VESSEL MAY BE ORDERED BY CHARTERERS UNDER THIS CHARTER, OR IF
CHARTERERS
REQUIRE OWNERS TO DELIVER CARGO TO A PARTY OR AT A PORT OTHER THAN AS SET
OUT
IN THE BILL OF LADING, THEN OWNERS SHALL NEVERTHELESS DISCHARGE SUCH CARGO
IN

COMPLIANCE WITH CHARTERERS' INSTRUCTIONS, UPON PRESENTATION BY THE CONSIGNEE
NOMINATED BY CHARTERERS ("THE RECEIVER") OF REASONABLE IDENTIFICATION TO THE
MASTER AND IN CONSIDERATION OF CHARTERERS INDEMNIFY OWNERS(RPOVIDE LOI) IN
ACCORDANCE WITH OWNERS P&I CLUB WORDING INDEMNIFYING OWNERS IN THE MANNER
PRESCRIBED IN THE FORM OF LETTER OF INDEMNITY AGREED AND PUBLISHED FROM TIME
TO TIME BY THE INTERNATIONAL GROUP OF P&I CLUBS ADDRESSING THE RELEVANT
CIRCUMSTANCES. SUCH INDEMNITY SHALL BE DEEMED TO HAVE BEEN GIVEN WHEN CHARTERERS
ISSUE INSTRUCTIONS TO OWNERS PURSUANT TO THIS CLAUSE.

CLAUSE 31. FREIGHT RATE
LINE 1086: ADD 'OWNERS ARE TO PROVIDE AN ROB CERTIFICATE, EVIDENCE OF PRICE
    PAID FOR BUNKERS AND MASTER'S CALCULATION OF ADDITIONAL BUNKERS
    USED WITH FREIGHT INVOICES.'

LINE 1088: ADD '31.6 IF OWNERS INCREASE THE SPEED OF THE VESSEL IN ACCORDANCE
    WITH CHARTERER'S VOYAGE ORDERS, CHARTERERS SHALL REIMBURSE OWNERS
    FOR ADDITIONAL BUNKERS CONSUMED AT ACTUAL COSTS WITH PROPER
    SUPPORTING DOCUMENTS.'

CLAUSE 32 ADDRESS COMMISSION
LINE 1090: AMEND TO READ 'CHARTERERS SHALL DEDUCT 2.5% ADDRESS COMMISSION
    FROM FREIGHT (INCLUDING FIXED AND'

LINE 1091: AMEND TO READ 'VARIABLE FREIGHT DIFFERENTIALS), AND ANY DEADFREIGHT,
    DEMURRAGE, HIRE (STORAGE/DEVIATION)'

CLAUSE 33. CARGO RETENTION
33.1 DELETE 'DEDUCT' INSERT 'CLAIM'
LINE 1096+1097 AFTER 'LIQUID' INSERT 'AND REACHABLE BY VESSELS FIXED PUMPS'

33.2 DELETE
LINE 1117 DELETE 'DEDUCTION' INSERT 'CLAIM'
LINE 1119 DELETE 'DEDUCTION' INSERT 'CLAIMED'
LINE 1121 ADD AT END 'UNLESS CARGO HAS BEEN LOADED ON TOP OF SLOPS AS PER
    CLAUSE 14.3

CLAUSE 34. DUES AND OTHER CHARGES
34.1 LINE 1131: INSERT 'ANY TAXES AND/OR DUES ON FREIGHT AND/OR CARGO TO BE FOR
    CHARTERERS ACCOUNT AND SETTLED DIRECTLY BY THEM.'

CLAUSE 35. CARGO INSURANCE
DELETE

CLAUSE 36. CODING OF CARGO DOCUMENTATION - US CUSTOMS REGULATIONS
    (REVISED 6TH NOVEMBER 2006)

DELETE ORIGINAL/INSERT:

(A) IF THE VESSEL LOADS OR CARRIES CARGO DESTINED FOR THE US OR PASSING THROUGH

US PORTS IN TRANSIT, THE OWNERS SHALL COMPLY WITH THE CURRENT US CUSTOMS REGULATIONS (19 CFR 4.7 AND 178) OR ANY SUBSEQUENT AMENDMENTS THERETO AND SHALL (UNLESS CHARTERERS REQUEST OTHERWISE) UNDERTAKE THE ROLE OF CARRIER

FOR THE PURPOSES OF SUCH REGULATIONS AND SHALL:

  (I) HAVE IN PLACE A SCAC (STANDARD CARRIER ALPHA CODE) AND INSERT THE SAME ON EACH BILL OF LADING;
  (II) HAVE IN PLACE AN ICB (INTERNATIONAL CARRIER BOND);
  (III) SUBMIT CARGO DECLARATIONS BY AMS (AUTOMATED MANIFEST SYSTEM) TO THE US CUSTOMS; AND
  (IV) PROVIDE CHARTERERS AND AGENTS ON REQUEST WITH DETAILS OF THE UNIQUE IDENTIFIER IN RESPECT OF ALL CARGO CARRIED

(B) THE CHARTERERS SHALL PROVIDE ALL NECESSARY INFORMATION TO THE OWNERS AND/OR

THEIR AGENTS TO ENABLE THE OWNERS TO SUBMIT A TIMELY AND ACCURATE CARGO DECLARATION.

(C) OWNERS WARRANT THAT THEY ARE AWARE OF THE US BUREAU OF CUSTOMS AND BORDER

PROTECTION REGULATIONS FOR ENTERING US PORTS (THE "CBP REGULATIONS"), INCLUDING BUT NOT LIMITED TO THOSE REGULATIONS ISSUED ON DECEMBER 5TH 2003 UNDER FEDERAL REGISTER PART II DEPARTMENT OF HOMELAND SECURITY 19 CFR PARTS

4, 103, ET AL, AND OWNERS FURTHER WARRANT THAT THEY WILL COMPLY FULLY WITH THE CBP REGULATIONS.

(D) THE OWNERS SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD

HARMLESS THE CHARTERERS AGAINST ANY LOSS AND/OR DAMAGE (EXCLUDING CONSEQUENTIAL

LOSS AND/OR DAMAGE) AND ANY EXPENSES, FINES, PENALTIES AND ANY OTHER CLAIMS,

INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE OWNERS' FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF SUB-CLAUSE (A) OR FAILURE TO COMPLY

WITH THE CBP REGULATIONS, PROVIDED ALWAYS THAT CHARTERERS HAVE, WITHIN A REASONABLE PERIOD AFTER BEING REQUESTED BY OWNERS, PROVIDED THEM WITH SUCH

INFORMATION AS IS REASONABLY REQUIRED TO ENABLE THEM TO COMPLY WITH THE CBP

REGULATIONS. SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING

ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, THE PERIOD OF SUCH DELAY SHALL NOT COUNT AS LAYTIME OR, IF THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE.

(E) THE ASSUMPTION OF THE ROLE OF CARRIER BY THE OWNERS PURSUANT TO THIS CLAUSE

AND FOR THE PURPOSE OF THE US CUSTOMS REGULATIONS (19 CFR 4.7) SHALL BE WITHOUT PREJUDICE TO THE IDENTITY OF CARRIER UNDER ANY BILL OF LADING,

Jysung/성제용/탱커영업팀/2016-07-24 14:12:8

OTHER CONTRACT, LAW OR REGULATION.

CLAUSE 39. WAR RISKS
LINE 1249-1251: OK FOR CPP FIXTURES ONLY
LINE 1265 AFTER 'RECOMMENDATIONS' INSERT 'AS PER INTERNATIONAL REGULATIONS
    AND LOCAL LAW'
LINE 1273 AFTER 'RECOMMENDATIONS' INSERT 'AS PER INTERNATIONAL REGULATIONS
    AND LOCAL LAW'

CLAUSE 44 OIL POLLUTION INSURANCE
DELETE ORIGINAL/INSERT:
OWNERS WARRANT THAT THEY HAVE, AND SHALL MAINTAIN IN FORCE THROUGHOUT THE
PERIOD OF THIS CHARTER, THE STANDARD OIL POLLUTION INSURANCE COVER (CURRENTLY
US$1,000 MILLION) AVAILABLE, FROM TIME TO TIME, FROM THEIR PROTECTION AND
INDEMNITY CLUB.

CLAUSE 45.1.2 OIL POLLUTION PREVENTION

DELETE ORIGINAL PART 45.1.2/INSERT:
IS ENTERED IN THE P & I CLUB STATED IN THE Q88 LAST COMPLETED BY OR ON BEHALF
OF OWNERS AND WILL SO REMAIN UNLESS OWNERS HAVE GIVEN CHARTERERS PRIOR WRITTEN
NOTICE OF THEIR INTENTION TO CHANGE. OWNERS WARRANT THAT THE VESSEL WILL ONLY
BE ENTERED IN A P & I CLUB WITHIN THE INTERNATIONAL GROUP OF P & I CLUBS.

CLAUSE 47 - N/A

CLAUSE 49 LAW
LINE 1440: DISPUTE WHICH MAY ARISE OUT OF THIS CHARTER, SAVE AS HEREINAFTER
    PROVIDED. ANY DISPUTE ARISING OUT OF THIS CHARTER OF LESS THAN
    USD 50,000 SHALL BE REFERRED TO A SINGLE ARBITRATOR IN LONDON,
    SUBJECT TO THE LMAA SMALL CLAIMS PROCEDURE.


CLEARLAKE VOYAGE CHARTERING TERMS

EFFECTIVE SEPTEMBER 1, 2010

CLEARLAKE SHIPPING LTD.
P.O.BOX 3159
ROAD TOWN
TORTOLA
BRITISH VIRGIN ISLANDS

ADDITIONAL CLAUSES TO BPVOY 4

1.    BP ISPS CLAUSE FOR VOYAGE CHARTER PARTIES
(A)  (I)  THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY"
(AS DEFINED BY THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT
FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE))
AND THE "OWNER" (AS DEFINED BY THE US MARITIME TRANSPORTATION SECURITY ACT

jysung/성제용/행커영업팀/2016-07-24 14:12:25

2002 (MTSA)) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE RELATING
TO THE VESSEL AND "THE COMPANY" AND THE REQUIREMENTS OF THE MTSA, IF
APPLICABLE,
RELATING TO THE VESSEL AND THE "OWNER". UPON REQUEST THE OWNERS SHALL
PROVIDE
A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE
INTERIM
INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS. THE OWNERS
SHALL
PROVIDE THE CHARTERERS WITH THE FULL STYLE CONTACT DETAILS OF THE COMPANY
SECURITY OFFICER (CSO).

   (II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE,
EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE
PART
OF THE OWNERS OR "THE COMPANY" TO COMPLY WITH THE REQUIREMENTS OF THE ISPS
CODE OR THE MTSA, IF APPLICABLE, OR THIS CLAUSE SHALL BE FOR THE OWNERS'
ACCOUNT.

(B) (I)   THE CHARTERERS SHALL PROVIDE THE OWNER WITH THEIR FULL STYLE
CONTACT DETAILS AND ANY OTHER INFORMATION THE OWNERS REQUIRE TO COMPLY
WITH
THE ISPS CODE AND THE MTSA, IF APPLICABLE. ADDITIONALLY, CHARTERERS SHALL
ENSURE THAT THE CONTACT DETAILS OF ANY SUB-CHARTERERS ARE LIKEWISE
PROVIDED
AND THAT ALL SUB-CHARTERS THEY ENTER INTO CONTAIN THE FOLLOWING PROVISION:

"THE CHARTERERS SHALL PROVIDE OWNERS WITH THEIR FULL STYLE CONTACT DETAILS
AND, WHERE SUB-CHARTERING IS PERMITTED UNDER THE TERMS OF THE CHARTER
PARTY,
SHALL ENSURE THAT CONTACT DETAILS OF ALL SUB-CHARTERERS ARE LIKEWISE
PROVIDED
TO OWNERS."

   (II)   EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS,
DAMAGE, EXPENSE, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE
PART OF THE CHARTERERS TO COMPLY WITH THIS SUB-CLAUSE (B) SHALL BE FOR
THE CHARTERERS' ACCOUNT AND ANY DELAY CAUSED BY SUCH FAILURE SHALL BE
COMPENSATED AT THE DEMURRAGE RATE.

(C) (I)   WITHOUT PREJUDICE TO THE FOREGOING, OWNERS' RIGHT TO TENDER
NOTICE OF READINESS AND CHARTERERS' LIABILITY FOR DEMURRAGE IN RESPECT OF
ANY TIME DELAYS CAUSED BY BREACHES OF THIS CLAUSE SHALL BE DEALT WITH IN
ACCORDANCE WITH CLAUSES 6 (NOTICE OF READINESS), 7 (LAYTIME/DEMURRAGE) AND
18 (SUSPENSION OF LAYTIME/DEMURRAGE), OF THE CHARTER.

   (II) EXCEPT WHERE THE DELAY IS CAUSED BY OWNERS' AND/OR CHARTERERS'
FAILURE TO COMPLY WITH SUB-CLAUSES (A) AND (B) RESPECTIVELY OF THIS CLAUSE,
THEN ANY DELAY ARISING OR RESULTING FROM MEASURES IMPOSED BY A PORT
FACILITY
OR BY ANY RELEVANT AUTHORITY, UNDER THE ISPS CODE/MTSA, SHALL COUNT AS HALF
LAYTIME, OR, IF THE VESSEL IS ON DEMURRAGE, HALF RATE DEMURRAGE.

(D) ANY COSTS OR EXPENSES RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED
BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE/MTSA INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, TUG ESCORTS, PORT SECURITY FEES OR TAXES AND INSPECTIONS, SHALL BE SHARED EQUALLY BETWEEN OWNERS AND CHARTERERS, EXCEPT WHERE:-

(I)  SUCH COSTS OR EXPENSES ARE IMPOSED AS A RESULT OF OWNERS' OR CHARTERERS' FAILURE TO COMPLY WITH SUB-CLAUSES (A) AND (B) RESPECTIVELY OF THIS CLAUSE; OR

(II) IF FREIGHT FOR THE VOYAGE IS BASED ON WORDSCALE, SUCH COSTS OR EXPENSES ARE INCLUDED BY WORLDSCALE IN THEIR FREIGHT CALCULATION (IN WHICH CASE SUCH COSTS OR EXPENSES SHALL BE FOR OWNERS' ACCOUNT).  ALL MEASURES REQUIRED BY THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR OWNERS' ACCOUNT.

(E)  IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER PARTY'S ACCOUNT
ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY.

(F)  (I)  [OTHER THAN CALLING AT          ON          ]
OWNERS WARRANT THAT ALL OF THE PREVIOUS TEN PORTS AT WHICH THE VESSEL HAS CALLED, OR WILL HAVE CALLED, PRIOR TO TENDERING NOTICE OF READINESS AT THE FIRST LOAD PORT HEREUNDER:

(AA) HAD AN APPROVED SECURITY PLAN; AND
(BB) WERE (AND REMAIN) REGISTERED WITH THE IMO AS ISPS COMPLIANT PORTS; AND
(CC) HAD A SECURITY LEVEL NO HIGHER THAN LEVEL 1 (NORMAL) OR MARSEC LEVEL 1;
    AND
(DD) WERE NOT, NOR HAVE SUBSEQUENTLY BEEN, DEEMED UNACCEPTABLE BY THE US
    AUTHORITIES UNDER THEIR SECURITY REGIME.

   (II)   OWNERS FURTHER WARRANT THAT, OTHER THAN AS EXPRESSLY DISCLOSED TO CHARTERERS IN WRITING, THE VESSEL HAS NOT LOADED GOODS OR SUPPLIES (NOR EMBARKED
ANY INDIVIDUALS) FROM, NOR ENGAGED IN ANY SHIP TO SHIP TRANSFER OF CARGO WITH,
ANOTHER VESSEL.

   (III)   EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR DELAY CAUSED BY BREACH BY OWNERS OF THE WARRANTIES CONTAINED IN THIS
SUB-CLAUSE (F) SHALL BE FOR THE OWNERS' ACCOUNT.


2.      BP ISM CLAUSE
(A)  OWNERS UNDERTAKE THAT FOR THE DURATION OF THIS CHARTER, THE VESSEL AND "THE COMPANY" (AS DEFINED IN THE INTERNATIONAL MANAGEMENT CODE FOR THE SAFE
OPERATION OF SHIPS AND FOR POLLUTION PREVENTION (THE INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE) (THE "ISM CODE")) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISM CODE. CHARTERERS MAY AT ANY TIME REQUEST AN INSPECTION OF THE

Jysung/성제웅/탱커영업팀/2016-07-24 14:12:2

RELEVANT DOCUMENT OF COMPLIANCE AND/OR SAFETY MANAGEMENT CERTIFICATE, AND
UPON RECEIPT OF SUCH A REQUEST OWNERS SHALL FORTHWITH PROVIDE THE SAME.

(B)   WITHOUT PREJUDICE TO ANY RIGHTS OR REMEDIES AVAILABLE TO CHARTERERS
UNDER THE TERMS OF THIS CHARTER OR UNDER THE LAW APPLICABLE HERETO, IN THE
EVENT OF A BREACH OF THE ABOVE UNDERTAKING ANY LOSS, DAMAGE, EXPENSE OR
DELAY
FOLLOWING THEREFROM SHALL BE FOR OWNERS' ACCOUNT.

3.     BP REGULATORY AND GUIDELINE COMPLIANCE CLAUSE
THROUGHOUT THE PERIOD OF THIS CHARTER, THE OWNERS AND THE VESSEL SHALL
COMPLY
WITH ALL RELEVANT REGULATIONS AND GUIDELINES ISSUED BY THE IMO AND OCIMF
AND,
IN THE CASE OF A VESSEL CARRYING LPG OR LNG, WITH THE RECOMMENDATIONS AND
GUIDELINES ISSUED FROM TIME TO TIME BY SIGTTO. IN ADDITION, ALL OPERATIONS
SHALL BE CARRIED OUT IN ACCORDANCE WITH THE LATEST EDITION OF ISGOTT, AND
ANY
AMENDMENTS OR UPDATES THERETO WHICH MAY BE ISSUED FROM TIME TO TIME.

4.     ELIGIBILITY
OWNER WARRANTS THAT THE VESSEL IS IN ALL RESPECTS ELIGIBLE FOR TRADING
WITHIN,
TO AND FROM RANGES AND AREAS SPECIFIED IN CHARTER PARTY, AND THAT AT ALL
TIMES
SHE SHALL HAVE ON BOARD ALL CERTIFICATES, RECORDS AND OTHER DOCUMENTS
REQUIRED
FOR SUCH SERVICE. IN THE EVENT THAT THE VESSEL IS FOUND, AT ANY TIME, NOT TO
BE ELIGIBLE AS WARRANTED, CHARTERERS SHALL HAVE THE RIGHT TO CANCEL
SUBJECT
CHARTER PARTY AS WELL AS TO HAVE RECOURSE TO OWNERS FOR ANY AND ALL
PROVEN
DAMAGES, DEMURRAGE, EXPENSES AND LOSSES RELATED TO SUCH CANCELLATION.

5.     BP OIL POLLUTION INSURANCE CERTIFICATION AND COFR'S CLAUSE
THE VESSEL SHALL HAVE ON BOARD ALL CERTIFICATES OF FINANCIAL RESPONSIBILITY
("COFRS") IN RESPECT TO OIL POLLUTION NECESSARY FOR THE REQUIRED TRADE WITHIN
THE AGREED TRADING LIMITS, INCLUDING BUT NOT LIMITED TO:

(A) THE CERTIFICATE OF INSURANCE REQUIRED UNDER THE INTERNATIONAL
CONVENTION
    ON CIVIL LIABILITY FOR OIL POLLUTION DAMAGE AND THE PROTOCOLS THERETO;
    AND

(B) THE CERTIFICATE OF INSURANCE REQUIRED UNDER THE INTERNATIONAL
CONVENTION
    ON CIVIL LIABILITY FOR BUNKER OIL POLLUTION 2001; AND

(C) UNITED STATES COAST GUARD CERTIFICATE OF FINANCIAL RESPONSIBILITY MEETING
    THE REQUIREMENTS OF THE UNITED STATES FEDERAL OIL POLLUTION ACT 1990
    ("OPA 90").

Jysung/성제용/탱커영업팀/2016-07-24 14:12

6. BP ITWF CLAUSE

OWNERS UNDERTAKE TO ENSURE THAT THE TERMS OF EMPLOYMENT OF THE VESSEL'S MASTER,
OFFICERS AND CREW SHALL ALWAYS REMAIN ACCEPTABLE TO THE INTERNATIONAL TRANSPORT
WORKER'S FEDERATION ("ITWF") AND THE VESSEL WILL AT ALL TIMES CARRY AN ITWF BLUE
CARD OR EQUIVALENT CERTIFICATION ACCEPTABLE TO ITWF.

7. BALLAST WATER MANAGEMENT CLAUSE

VESSEL TO ARRIVE AT EACH LOADING PORT WITH CLEAN BALLAST. VESSEL IS TO BE ABLE
TO BALLAST / DEBALLAST SIMULTANEOUSLY WITH LOADING / DISCHARGING. OWNERS
ADDITIONALLY WARRANTS THE VESSEL WILL COMPLY WITH ALL MANDATORY BALLAST WATER
REQUIREMENTS. THE OWNERS SHALL ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND
AND HOLD HARMLESS THE CHARTERERS AGAINST ANY LOSS AND/OR DAMAGE (EXCLUDING
CONSEQUENTIAL LOSS AND/OR DAMAGE) AND ANY EXPENSES, FINES, PENALTIES AND ANY
OTHER CLAIMS, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE OWNERS'
FAILURE TO COMPLY WITH ANY SUCH PROVISIONS. SHOULD SUCH FAILURE RESULT IN ANY
DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY,
THE PERIOD OF SUCH DELAY SHALL NOT COUNT AS LAYTIME OR, IF THE VESSEL IS ON
DEMURRAGE, AS DEMURRAGE PROVIDED THAT NOTHING IN THIS CLAUSE WILL RENDER VALID
ANY NOR THAT WOULD OTHERWISE HAVE BEEN INVALID.

8. BP TOPIA 2006 CLAUSE (ISSUED NOVEMBER 2006)

OWNERS WARRANT THAT THEY ARE A PARTICIPATING OWNER (AS DEFINED IN THE TANKER
OIL POLLUTION INDEMNIFICATION AGREEMENT 2006 (TOPIA 2006)) AND THAT THE VESSEL
IS ENTERED IN TOPIA 2006 AND SHALL SO REMAIN THROUGHOUT THE PERIOD OF THIS
CHARTER, PROVIDED ALWAYS THAT:-
 I) THE VESSEL IS AND REMAINS A RELEVANT SHIP AS DEFINED IN CL.III OF TOPIA
   2006; AND
II) TOPIA 2006 IS NOT TERMINATED IN ACCORDANCE WITH CL.IX OF THAT AGREEMENT.

9. BP STOPIA 2006 CLAUSE (ISSUED NOVEMBER 2006)

IF THE VESSEL HAS A GROSS REGISTERED TONNAGE OF 29,548 OR LESS OWNERS WARRANT
THAT THEY ARE A PARTICIPATING OWNER (AS DEFINED IN THE SMALL TANKER OIL
POLLUTION INDEMNIFICATION AGREEMENT 2006 (STOPIA 2006)) AND THAT THE VESSEL
IS ENTERED IN STOPIA 2006 AND SHALL SO REMAIN THROUGHOUT THE PERIOD OF THIS
CHARTER, PROVIDED ALWAYS THAT:-
 I) THE VESSEL IS AND REMAINS A RELEVANT SHIP AS DEFINED IN CL.III OF STOPIA
   2006; AND
II) STOPIA 2006 IS NOT TERMINATED IN ACCORDANCE WITH CL. IX OF THAT AGREEMENT.

10. FUEL SULPHUR CONTENT CLAUSE - N/A

(A) OWNERS WARRANT THAT OWNERS AND THE VESSEL SHALL COMPLY WITH ALL APPLICABLE
REQUIREMENTS OF ANY EMISSION CONTROL ZONE AND SHALL, WITHOUT LOSS OF TIME AND/OR
DEVIATION, USE FUELS (WHICH TERM SHALL INCLUDE ALL HEAVY FUEL OILS, MARINE GAS
OILS AND MARINE DIESEL OILS AS APPLICABLE) OF SUCH SPECIFICATIONS AND GRADES
TO ENSURE COMPLIANCE WITH THESE REQUIREMENTS.

(B)  FOR THE PURPOSE OF THIS CLAUSE, "EMISSION CONTROL ZONE" SHALL MEAN AREAS
AS STIPULATED IN MARPOL ANNEX VI INCLUDING EU DIRECTIVE 2005/33/EC AND/OR ZONES
AND/OR AREAS REGULATED BY REGIONAL AND/OR NATIONAL AUTHORITIES SUCH AS, BUT
NOT LIMITED TO, THE EU, THE US ENVIRONMENTAL PROTECTION AGENCY AND THE CALIFORNIA
ENVIRONMENTAL PROTECTION AGENCY.

(C)  OWNERS SHALL INDEMNIFY, DEFEND AND HOLD CHARTERERS HARMLESS IN RESPECT OF
ANY DIRECT OR INDIRECT LOSS, LIABILITY, DELAY, FINES, COSTS OR EXPENSES ARISING
OR RESULTING FROM OWNERS' FAILURE TO COMPLY WITH THIS CLAUSE.


11.    INTERIM PORTS CLAUSE  - N/A REFER TO MAIN TERMS
CHARTERER SHALL PAY FOR ANY INTERIM LOAD/DISCHARGE PORT(S) AT COST AND NET OF
ANY REBATES AFFORDED TO OWNERS. TIME FOR ADDITIONAL STEAMING, WHICH EXCEEDS
DIRECT ROUTE FROM FIRST LOADPORT TO FURTHEST DISCHARGE PORT, SHALL BE PAID AT
THE DEMURRAGE RATE PLUS ADDITIONAL BUNKERS CONSUMED, PLUS ACTUAL PORT COSTS,
IF ANY. THE REASONABLE, ESTIMATED COSTS WILL BE PAYABLE AS AN ON ACCOUNT PAYMENT
TOGETHER WITH FREIGHT, FOLLOWED BY FINAL INVOICE PLUS ALL SUPPORTING DOCUMENTS
AS SOON AS POSSIBLE BUT NOT LATER THAN NINETY (90) DAYS AFTER COMPLETION OF
THIS VOYAGE. ALL LAYTIME SAVED SHALL BE CREDITED TOWARDS COST FOR ADDITIONAL
TIME INCURRED.  SEE OWNERS INTERIM PORT CLAUSE

12.    UNSPECIFIED DELAY - N/A
ANY DELAYS FOR WHICH LAYTIME/DEMURRAGE CONSEQUENCES ARE NOT SPECIFICALLY ALLOCATED
IN THIS OR ANY OTHER CLAUSE OF THIS CHARTER AND WHICH ARE BEYOND THE REASONABLE
CONTROL OF OWNER OR CHARTERER SHALL COUNT AS LAYTIME OR, IF VESSEL IS ON DEMURRAGE,
AS TIME ON DEMURRAGE. IF DEMURRAGE IS INCURRED, ON ACCOUNT OF SUCH DELAYS, IT SHALL
BE PAID AT HALF THE AGREED DEMURRAGE RATE.

13.    FORCE MAJEURE

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CHARTERPARTY, NEITHER THE OWNERS
NOR THE CHARTERERS SHALL BE LIABLE FOR DAMAGES FOR DELAY OR FOR ANY FAILURE TO
PERFORM THEIR RESPECTIVE OBLIGATIONS HEREUNDER IF THE DELAY OR FAILURE IS DUE TO
FIRE, EXPLOSION, STRIKES (EXCLUDING FRANCE, VENEZUELA), LOCK-OUTS, SLOWDOWN,
STOPPAGE OR RESTRAINT OF LABOUR, FLOODS, ACT OF GOD, WAR, TERRORIST ACTIVITY,
CIVIL COMMOTION OR ANY OTHER CAUSE BEYOND THAT PARTY'S REASONABLE CONTROL. TIME
LOST AS A RESULT OF ANY OF THE AFOREMENTIONED CLAUSES SHALL NOT COUNT AS USED
LAYTIME OR TIME ON DEMURRAGE.

14.     THIRD PARTY ARREST
IN THE EVENT OF ARREST OR OTHER SANCTION LEVIED AGAINST THE VESSEL OR CHARTERER
ARISING OUT OF OWNER'S BREACH OR ANY FAULT OF OWNER, OWNER SHALL INDEMNIFY
CHARTERER FOR ANY DAMAGES, PENALTIES, COSTS AND CONSEQUENCES AND ANY TIME VESSEL
IS UNDER ARREST SHALL NOT COUNT AS USED LAYTIME OR TIME ON DEMURRAGE. IN THE
EVENT OF ARREST/DETENTION OR OTHER SANCTION LEVIED AGAINST THE VESSEL THROUGH
NO FAULT OF THE CHARTERERS, CHARTERER SHALL BE ENTITLED, IN CHARTERERS OPTION,
TO TERMINATE THE CHARTER. TERMINATION OR FAILURE TO TERMINATE SHALL BE WITHOUT
PREJUDICE TO ANY CLAIM FOR DAMAGES CHARTERER MAY HAVE AGAINST OWNER.

15.     IN TRANSIT LOSS
IN ADDITION TO ANY OTHER RIGHTS WHICH CHARTERER MAY HAVE, OWNER WILL BE RESPONSIBLE
FOR THE FULL AMOUNT OF ANY IN-TRANSIT LOSS IF THE IN-TRANSIT LOSS EXCEEDS 0.5%
AND CHARTERER SHALL HAVE THE RIGHT TO CLAIM FROM FREIGHT AN AMOUNT EQUAL TO THE
FOB PORT OF LOADING VALUE OF SUCH LOST CARGO PLUS FREIGHT AND INSURANCE DUE WITH
RESPECT THERETO. IN-TRANSIT LOSS IS DEFINED AS THE DIFFERENCE BETWEEN NET VESSEL
VOLUMES AFTER LOADING AT THE LOADING PORT AND BEFORE UNLOADING AT THE DISCHARGE
PORT, AS DETERMINED BY A MUTUALLY AGREED INDEPENDENT INSPECTOR APPOINTED BY
CHARTERERS OR RECEIVERS, WHOSE DETERMINATION SHALL BE FINAL AND BINDING UPON
BOTH PARTIES.

16.     DISCHARGE/RELOAD CLAUSE
CHARTERER SHALL HAVE THE OPTION TO DISCHARGE AND/OR COMINGLE AND/OR RELOAD
AND/OR TOP OFF ALL OR PART CARGO WITHIN THE LOAD/DISCHARGE RANGES. IF EXERCISED,

ANY ADDITIONAL COSTS IN CONNECTION WITH THE RELOAD TO BE FOR CHARTERER'S
ACCOUNT
AND ADDITIONAL TIME CONSUMED TO COUNT AS USED LAYTIME. FOR WORLDSCALE
PURPOSES,
SAID DISCHARGE/RELOAD PORT TO COUNT AS A LOAD PORT UNDER WORLDSCALE.
CHARTERER
TO HAVE THE ADDITIONAL OPTION OF DISCHARGING PART OR ALL CARGO IN ONE SAFE
PORT
AND RELOADING SAME PORT FOR FURTHER DISCHARGE WITHIN THE SAME PORT AND/OR
PORT(S)
WITHIN THE AGREED RANGES. TIME AT THE DISCHARGE/RELOAD PORT TO COUNT AS
LAYTIME
OR IF VESSEL IS ON DEMURRAGE, AS TIME ON DEMURRAGE IN ACCORDANCE WITH
CHARTERPARTY
TERMS AND CONDITIONS. FREIGHT ALWAYS TO BE BASED ON THE HIGHEST BILL OF
LADING
QUANTITY(IES) CARRIED ON ANY ONE PART OF THE VOYAGE OR THE MINIMUM
QUANTITY AS
PER CHARTERPARTY, WHICHEVER IS THE GREATER. WHERE FINAL DISCHARGE IS AT A
PORT
OTHER THAN THE DISCHARGE/RELOAD PORT THE DISCHARGE/RELOAD PORT TO BE
CONSIDERED
AS ADDITIONAL LOADPORT FOR FREIGHT CALCULATION PURPOSES. IF VOYAGE IS
CALCULATED
IN LUMPSUM THEN INTERIM PORT CLS (NO.12 OWNERS ADDITIONAL CLAUSES TO APPLY).
REGARDLESS OF WHETHER CALCULATED AS WORLDSCALE OR LUMPSUM ANY PORT
COSTS/ADDITIONAL
BUNKERS CONSUMED OVER AND ABOVE ONE CARGO OPERATION TO BE FOR
CHARTERERS ACCOUNT.
ALL CARGO DOCUMENTS INCLUDING BUT NOT LIMITED TO BILL OF LADINGS
REPRESENTING
THE NEW COMMINGLED CARGO SHOULD BE ISSUED AND ALL OLD ORIGINAL BILL OF
LADINGS
TO BE HANDED OVER TO OWNERS.

17.     LOSS OF TURN AND DELAY
IF, AS A RESULT OF ANY BREACH OF THIS CHARTERPARTY OR ANY OTHER FAULT ON THE
PART OF THE OWNERS OR THE VESSEL, THE VESSEL LOSES ITS TURN TO BERTH OR, BEING
AT THE BERTH, HAS TO WAIT IDLE AT THE BERTH OR IS SENT OFF THE BERTH AND HAS TO
WAIT FOR A FURTHER TURN, ALL TIME LOST FROM THE COMMENCEMENT OF THE
BREACH OR
FAULT AS A RESULT OF HAVING TO WAIT FOR A BERTH UNTIL VESSEL RE-TENDERS A
VALID
NOR AND THE BERTH BECOMES AVAILABLE AFTER BEING VACATED BY THE FIRST
VESSEL
WHICH OCCUPIED THE BERTH AT THE TIME OF RE-TENDERING THE NOR, SHALL BE FOR
OWNERS ACCOUNT AND SHALL NOT COUNT AS LAYTIME OR TIME ON DEMURRAGE. ALL
ADDITIONAL
COSTS OF UNBERTHING AND REBERTHING AND ALL ADDITIONAL BERTH FEES AND ANY
OTHER
EXTRA EXPENSES SHALL LIKEWISE BE FOR OWNERS' ACCOUNT. ALL OTHER TIME LOST
BY
REASON OF OWNERS' BREACH OF ANY TERM OF THIS CHARTERPARTY OR ANY OTHER
FAULT

ON THE PART OF THE OWNERS OF THE VESSEL, SHALL NOT COUNT AS LAYTIME OR TIME ON
DEMURRAGE. LAYTIME TO RESUME ONCE VESSEL COMMENCES CARGO OPERATIONS RE-TENDERS
A VALID NOR + 6 HOURS.

18.     PRIVATE AND CONFIDENTIAL CLAUSE
THE TERMS AND CONDITIONS OF THIS CHARTER PARTY AND ITS NEGOTIATIONS TO BE KEPT
STRICTLY PRIVATE AND CONFIDENTIAL AND SHALL NOT BE REPORTED.

19.     CHARTER PARTY ADMINISTRATION CLAUSE
CHARTER PARTY TERMS AND CONDITIONS ARE EVIDENCE BY THE FIXING CONFIRMATION SENT
BY THE BROKER. OWNER AND CHARTERER SHALL EACH CONFIRM THEIR APPROVAL OF THE
FIXING CONFIRMATION BY RETURN TO THE BROKER AFTER LIFTING SUBJECTS. THE BROKER
SHALL THEN CONFIRM RECEIPT OF SAID CONFIRMATION TO BOTH PARTIES. EXCEPT AS
REQUESTED IN WRITING BY EITHER OWNERS OR CHARTERER, THERE SHALL BE NO FORMAL
WRITTEN AND SIGNED CHARTER PARTY.

SPECIFIC ADDITIONAL CLAUSES
AC1. TURKISH STRAITS CLAUSE FOR VESSELS OVER 200M LOA - N/A
NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE HEREIN CONTAINED, IF THE
VESSEL COMMENCES THE BALLAST VOYAGE (AS PER ITINERARY ADVISED IN MAIN TERMS)
IN TIME TO ARRIVE AT CANAKKALE LATEST (CANAKKALE CANCELLING DATE) BUT IS
DELAYED BECAUSE OF THE TRAFFIC REGULATIONS OR NAVIGATIONAL DIFFICULTIES
(INCL.BAD WEATHER, FOG ETC.) THROUGH THE TURKISH STRAITS NORTH-BOUND SUCH
THAT VESSEL MAY NOT ARRIVE BY THE CANCELLING DATE, CHARTERERS' OPTION TO
CANCEL AS PROVIDED ELSEWHERE HEREIN CANNOT BE EXERCISED.

OWNERS TO NOTIFY CHARTERERS OF THE DATE AND TIME THAT THEY EXPECT THE VESSEL
TO BE READY TO LOAD BASED ON THE ADVISORY POSITION GIVEN BY THE TRAFFIC CONTROL.

NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE HEREIN CONTAINED, IF THE
VESSEL SHOULD BE DELAYED DURING TANKER PASSAGE OR OTHERWISE AS A CONSEQUENCE
OF DIRECT OR INDIRECT ACTION OF THE TURKISH AUTHORITIES AND/OR OBSERVING
TRAFFIC REGULATIONS/RECOMMENDATIONS AND/OR NAVIGATIONAL DIFFICULTIES (INCL.
BAD WEATHER AND/OR ADVERSE CLIMATE CONDITIONS) THROUGH THE TURKISH STRAITS
IN EXCESS OF 48 HRS TOTAL NORTH-BOUND AND SOUTH-BOUND, THE CHARTERERS SHALL
PAY COMPENSATION FOR SUCH DELAY AT THE RATE PROVIDED FOR DEMURRAGE.

EXPENSES IN EXCESS OF CUSTOMARY COSTS PAYABLE BY OWNERS IN CONNECTION
WITH
COMPLYING WITH TRAFFIC REGULATIONS/RECOMMENDATIONS AND/OR CHARTERERS'
VOYAGE
ORDERS AS REGARDS THE PASSAGE OF THE TURKISH STRAITS TO BE FOR CHARTERERS'
ACCOUNT.

IF THE VESSEL FAILS TO ARRIVE CANAKKALE BY ............. CHARTERERS HAVE THE
OPTION TO CANCEL THE CP AS BELOW IN THIS CLAUSE.

IF IT APPEARS TO OWNERS THAT THE VESSEL WILL BE DELAYED BEYOND THE
CANAKKALE
CANCELLING DATE, OWNERS WILL NOTIFY CHARTERERS OF THE DATE ON WHICH THEY
EXPECT THE VESSEL TO BE READY TO LOAD WHEREUPON CHARTERERS HAVE THE
OPTION
TO CANCEL THIS CHARTER AND SUCH OPTION TO BE DECLARED WITHIN 48 HOURS,
SATURDAYS, SUNDAYS AND HOLIDAYS EXCLUDED, OF THE RECEIPT OF SAID
NOTIFICATION
FROM OWNERS. IN THE EVENT THE OWNERS HAVE GIVEN SUCH NOTIFICATION AND
CHARTERERS HAVE NOT EXERCISED THEIR OPTION TO CANCEL WITHIN THE STATED
PERIOD, THE SECOND DAY AFTER READINESS STATED IN OWNER'S NOTIFICATION,
OR SUCH OTHER DATE AS MAY BE MUTUALLY AGREED, SHALL BE THE NEW CANCELLING
DATE.

OWNERS SHALL NOMINATE CHARTERERS APPOINTED AGENTS FOR THE TURKISH STRAITS
PASSAGE.

TURKISH STRAITS CLAUSE FOR VESSELS UNDER 200M LOA

ANY WAITING TIME IN EXCESS OF 48 (36 HOURS IF VSL COMING FROM SEA OF MARMARA,
24 HOURS IF VESSEL COMING FROM BLACK SEA) HOURS AT TURKISH STRAITS (NORTH
AND
SOUTHBOUND) TOTAL IS TO BE FOR CHARTERERS ACCOUNT AND IS TO BE CALCULATED
AT
DEMURRAGE RATE PER DAY PRO RATE.

HOWEVER IN CASE THE VESSEL, IN SPITE OF DELAYS AT THE TURKISH STRAITS, ARRIVES
AT LOADPORT WITHIN LAYCAN OR BEFORE THE COMMENCMENT OF LAYDAYS, THE
ABOVE DOES
NOT APPLY FOR THE BALLAST PASSAGE (I.E. DELAY ALL FOR OWNERS ACCT), BUT THE
TIME FOR OWNERS ACCT ON THE LADEN PASSAGE IS REDUCED TO 24 HRS, THEREAFTER IS
FOR CHARTERERS ACCOUT.

SAID CLAIM IS TO BE SETTLED TOGETHER WITH FREIGHT AGAINST OWNERS E-MAIL
INVOICE
WITH SUPPORTING DOCUMENTS ATTACHED. IF HARD COPY IS NEEDED OWNERS TO
FORWARD
SOONEST POSSIBLE.

ALL DELAYS AT TURKISH STRAIT TO BE ADDED TO LAYCAN.

DEMURRAGE CLAIM IS TO BE KEPT SEPARATE FROM ABOVE CLAIM.

OWNERS SHALL NOMINATE CHARTERERS APPOINTED AGENTS FOR THE TURKISH STRAITS
PASSAGE.
AC2. H2S CLAUSE
(A) OWNERS UNDERTAKE THAT PRIOR TO ARRIVAL AT THE LOAD PORT THE HYDROGEN
SULPHIDE
(H2S) CONTENT IN THE VESSEL'S TANK ATMOSPHERE SHALL BE LESS THAN 10 PPM WHEN
REQUESTED BY CHARTERER IN VOYAGE ORDER.


AC3. BP SUEZ CANAL DISCHARGE, TRANSIT AND RELOAD CLAUSE - N/A
(A) IF THE VESSEL IS NOMINATED TO DISCHARGE WITHIN THE
UK/CONT/MEDITERRANEAN
RANGE, CHARTERERS SHALL HAVE THE OPTION TO ROUTE THE VESSEL THROUGH THE
SUEZ
CANAL.
(B) IF THIS OPTION IS DECLARED, OWNERS SHALL DISCHARGE SUFFICIENT CARGO AT AIN
SUKHNA TO ENABLE THE VESSEL TO SAFELY TRANSIT THE SUEZ CANAL NORTHBOUND.
THE
VESSEL SHALL THEN RELOAD THE SAME QUANTITY, EITHER OF THE SAME GRADE OR OF
A
DIFFERENT GRADE, AT SIDI KERIR FOR ON-CARRIAGE TO THE NOMINATED DISCHARGE
PORT(S).
(C) THE WORLDSCALE FLAT RATE SHALL BE BASED ON THE ACTUAL VOYAGE
PERFORMED FROM
THE LOADING PORT(S) TO THE DISCHARGE PORT(S), BASIS SUEZ/SUEZ, BUT EXCLUDING
ANY
ALLOWANCE FOR SIDI KERIR AND AIN SUKHNA AND THE SUEZ CANAL DIFFERENTIALS.
(D) TIME SPENT FOR DISCHARGING AT AIN SUKHNA AND RELOADING AT SIDI KERIR
SHALL
COUNT AS LAYTIME OR, IF THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE. TIME SPENT
IN
DEVIATING INTO AIN SUKHNA OVER AND ABOVE THE TIME REQUIRED FOR THE DIRECT
PASSAGE
FROM THE ARABIAN GULF TO THE SUEZ CANAL ENTRANCE, AND ANY TIME SPENT IN
DEVIATING
INTO SIDI KERIR OVER AND ABOVE THE TIME REQUIRED FOR THE DIRECT PASSAGE FROM
THE
SUEZ CANAL EXIT TO THE FIRST DISCHARGE PORT WITHIN UK/CONT/MEDITERRANEAN, IN
EITHER
CASE CALCULATED ON THE BASIS OF THE SERVICE SPEED STATED IN THE CHARTER,
SHALL
COUNT AS LAYTIME OR, IF THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE. ANY PORT
COSTS
IN AIN SUKHNA AND SIDI KERIR SHALL BE REIMBURSED AT COST.
(E) SUEZ CANAL TRANSIT COSTS FOR THE LADEN PASSAGE SHALL BE PAID DIRECTLY BY
CHARTERERS, AND CHARTERERS SHALL PAY TO OWNERS THE SUEZ CANAL BALLAST
TRANSIT
DIFFERENTIAL AS PER WORLDSCALE TOGETHER WITH FREIGHT.
(F) SUBJECT ALWAYS TO ANY OBLIGATION THAT THE CHARTERERS MAY HAVE TO PAY
FREIGHT
ON ANY AGREED MINIMUM QUANTITY OF CARGO FOR THE ENTIRE VOYAGE:
 (I) WHERE THE QUANTITY OF CARGO DISCHARGED IN AIN SUKHNA EXCEEDS THE
QUANTITY

OF CARGO LOADED IN SIDI KERIR, CHARTERERS SHALL ONLY BE LIABLE TO PAY FREIGHT
ON THE DIFFERENCE ON THE BASIS OF THE FLAT RATE FROM THE ACTUAL LOADING PORT
TO AIN SUKHNA; AND
(II) WHERE THE QUANTITY OF CARGO LOADED IN SIDI KERIR EXCEEDS THE QUANTITY OF
CARGO DISCHARGED IN AIN SUKHNA, CHARTERERS SHALL ONLY BE LIABLE TO PAY
FREIGHT ON THE DIFFERENCE ON THE BASIS OF THE FLAT RATE FROM SIDI KERIR
TO THE ACTUAL DISCHARGE PORT.

DELETE FOR CPP, TO BE DISCUSSED/AGREED FOR CRUDE/DPP FIXTURES.

AC4. BP WAR RISKS ADDITIONAL EXPENDITURE CLAUSE
(A)  OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND MACHINERY
OF THE VESSEL AND THEIR OTHER INTERESTS (INCLUDING, BUT NOT LIMITED TO, LOSS
OF EARNINGS AND DETENTION, THE CREW AND THEIR PROTECTION AND INDEMNITY RISKS),
AND THE GENERAL PREMIUMS AND/OR CALLS THEREFORE SHALL BE FOR THEIR ACCOUNT.

(B)  WAR RISK INSURANCE ADDITIONAL PREMIUMS ("ADDITIONAL PREMIUMS") INCURRED AS
A RESULT OF THE VESSEL ENTERING AN EXCLUDED AREA NECESSARY TO PERFORM UNDER
THIS CHARTER SHALL BE FOR CHARTERERS' ACCOUNT, NET OF ALL DISCOUNTS OR
REBATES OR NO CLAIMS BONUS, AND ALWAYS PROVIDED THAT CHARTERERS ARE GIVEN
WRITTEN NOTICE OF THE AMOUNT OF SUCH ADDITIONAL PREMIUMS AS SOON AS POSSIBLE
AND, IN ANY EVENT, BEFORE SUCH ADDITIONAL PREMIUMS ARE PAID BY OWNERS.
CHARTERERS SHALL NOT BE RESPONSIBLE FOR ANY ADDITIONAL PREMIUMS SHOULD
OWNERS FAIL TO GIVE SUCH PRIOR NOTICE.

(C)  THE BENEFIT OF DISCOUNTS OR REBATES OR NO CLAIMS BONUS ON ADDITIONAL PREMIUMS
RECEIVED BY OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS
SHALL BE CREDITED TO CHARTERERS IN FULL WHETHER GIVEN AT THE TIME OR CREDITED
TO OWNERS BY THEIR WAR RISKS INSURERS AT LATER DATE. CHARTERERS SHALL REIMBURSE
OWNERS ANY AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE,
TOGETHER WITH FULL SUPPORTING DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT
AND CREDIT NOTES.

(D)  FOR THE AVOIDANCE OF DOUBT ANY "BLOCKING AND TRAPPING", "LOSS OF PROFIT",
"LOSS OF HIRE", "LOSS OF FREIGHT" OR "LOSS OF BUNKERS" INSURANCE TAKEN OUT
BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL PREMIUM RELATING
THERETO, ARISING FROM CHARTERERS TRADING OF THE VESSEL, SHALL BE FOR
OWNERS' ACCOUNT. THIS EXCLUDES GULF OF ADEN CLAUSE.

AC5. ICE STRENGTHENED VESSEL CLAUSE - N/A
(A) THE CHARTERERS SHALL BE ENTITLED TO REQUIRE THE VESSEL TO BREACH IWL LIMITS
   AND/OR FORCE ICE AND/OR FOLLOW ICE BREAKERS, ALWAYS WITHIN THE VESSEL'S CLASS AND DESIGN CAPABILITIES.
(B) THE NAVIGATION AND SAFETY OF THE VESSEL SHALL REMAIN THE RESPONSIBILITY OF
   THE MASTER. HOWEVER, NOTWITHSTANDING THE PROVISIONS OF PARAGRAPH (A) ABOVE,
   THE VESSEL SHALL NOT ENTER AREAS WHERE THE PUBLISHED DATA (AS ISSUED BY THE
   LOCAL COASTGUARD AND/OR OTHER COMPETENT AUTHORITIES) INDICATES THAT THE ICE
   IS THICKER THAN THAT FOR WHICH THE VESSEL IS CLASSED OR AREAS WHERE THERE IS A RISK THAT THE VESSEL SHALL BE FROZEN IN. WITHOUT PREJUDICE TO THE PROVISIONS OF CLAUSE 28 OF THIS CHARTER, UPON RECEIPT OF SUCH DATA, THE MASTER SHALL IMMEDIATELY NOTIFY CHARTERERS BY TELEX OR OTHER SUITABLE MEANS
   REQUESTING REVISED VOYAGE ORDERS. PENDING CHARTERERS' REVISED VOYAGE ORDERS,
   THE VESSEL SHALL REMAIN OUTSIDE THE AREA OF ICE-BOUND WATERS AND ANY PERIOD
   OF DELAY SHALL COUNT AS LAYTIME OR, IF THE VESSEL IS ON DEMURRAGE, AS DEMURRAGE
(D) WHERE APPLICABLE, ANY EXTRA INSURANCE PREMIUM, ALL ICE DUES (WHETHER AT THE
   LOAD OR DISCHARGE PORT) AND THE COSTS OF ANY ICE BREAKERS OR ICE ADVISORS SHALL BE FOR OWNERS ACCOUNT.

TO BE DISCUSSED/AGREED ON A CASE BY CASE BASIS.

AC6. DELAYS AT ICE-BOUND PORTS - N/A
SUBJECT TO THE PROVISIONS OF CLAUSES 28 AND AC5, WHERE THE VESSEL IS DELAYED IN
GETTING TO HER LOADING OR DISCHARGING BERTH ON ACCOUNT OF ICE, THE FOLLOWING
PROVISIONS SHALL APPLY.
1) IN THE EVENT THAT THE VESSEL IS UNABLE TO REACH THE LOADING OR DISCHARGING
   PORT ON ACCOUNT OF ICE, NOR MAY BE TENDERED FROM THE EDGE OF ICE AS NEAR TO
   THE PORT AS THE VESSEL MAY SAFELY REACH, PROVIDED ALWAYS THAT SUCH NOR WOULD
   HAVE BEEN TENDERED AFTER THE COMMENCEMENT DATE STATED IN SECTION G OF PART 1
   HAD THE VESSEL BEEN ABLE TO PROCEED TO THE PORT WITHOUT DELAY DUE TO THE ICE.
2) NOTHING IN THIS CLAUSE SHALL AFFECT THE CHARTERERS' RIGHT TO CANCEL THE CHARTER
   IF THE VESSEL WOULD NOT HAVE ARRIVED AT THE FIRST LOADING PORT BY THE CANCELLING
   DATE STATED IN SECTION G OF PART I BUT FOR THE DELAY DUE TO THE ICE.
3) TIME SPENT WAITING FOR ICE-BREAKERS ALWAYS TO COUNT AS LAYTIME, OR IF THE
   VESSEL IS ON DEMURRAGE, DEMURRAGE.
4) TIME SPEND PROCEEDING TO THE PORT SHALL NOT COUNT AS USED LAYTIME OR TIME ON

DEMURRAGE UNTIL THE VESSEL REACHES THE USUAL PORT LIMIT. ANY ADDITIONAL TIME,
OVER AND ABOVE THE NORMAL SHIFTING TIME, SPENT DUE TO THE ICE ON AN INWARD PASSAGE FROM THE USUAL ANCHORAGE OR USUAL PORT LIMIT TO THE BERTH OVER AND
ABOVE NORMAL SHIFTING TIME, SHALL COUNT AS USED LAYTIME OR, IF THE VESSEL IS ON DEMURRAGE, DEMURRAGE.
5) CHARTERERS ALWAYS TO BE ENTITLED TO THE FULL BENEFIT OF THE 6 HOURS NOTICE PERIOD.

TO BE DISCUSSED/AGREED ON A CASE BY CASE BASIS.

AC7.  PRIMORSK/KOZMINO BALLAST CLAUSE  - N/A
PRIMORSK :
OWNERS / MASTER ARE AWARE THAT ACCORDING TO PRIMORSK PORT REGULATIONS THE BALLAST
WATER IN BALLAST TANKS SHOULD CONTAIN OIL PRODUCTS NOT MORE THAN 0.05 MG / DM3.
IN CASE OF HEIGHTENED CONTENT OF OIL PRODUCT FOUND IN BALLAST TANKS THE DISCHARGE
OF SUCH WATER WILL BE PROHIBITED BY PORT AUTHORITIES. IN VIEW OF THE ABOVE THE
MASTER SHOULD TAKE BALLAST WATER AT THE CONSIDERABLE SEA DEPTH PROVIDING CLEAN
WATER AT BALLAST TANKS ACCORDING TO PRIMORSK REGULATIONS. ANY TIME LOST AND / OR
ANY COSTS DUE TO VESSEL'S FAILURE TO COMPLY WITH ABOVE, TO BE FOR OWNERS ACCOUNT
AND TIME NOT TO COUNT AS LAYTIME OR AS DEMURRAGE, IF ON DEMURRAGE.

KOZMINO:
BALLAST WATER EXCHANGE IS COMPULSORY AND SHOULD BE DONE AT OPEN SEA WITH SEA
DEPTH MORE THAN 200 METERS.  ONLY CLEAN SEA WATER BALLAST TAKEN/CHANGED AT OPEN
SEA IS PERMITTED TO DISCHARGE ALONGSIDE. MASTER HAS TO PREPARE APPLICATION DE-BALLASTING LETTER ADDRESSED TO HARBOUR MASTER, INDICATING QUANTITY OF BALLAST/LOCATION WHERE WAS TAKEN/CHANGED (MUST BE OPEN SEA ONLY), CONDITIONS
(MUST BE CLEAN, CONTENT OF OIL SUBSTANCES LESS THAN 0,05 MG/LTR), WHICH HAVE TO BE HANDED OVER TO ECOLOGICAL INSPECTOR FOR HIS ANALYSES/APPROVAL

AC8.  BLACK SEA BALLAST CLAUSE - N/A
ALL TANKER VESSELS MUST CHANGE BALLAST WATERS INSIDE THE BLACK SEA. AS FROM
1ST MAY 2006 ECOLOGICAL AUTHORITIES IN NOVOROSSIYSK WILL START THE PRACTICE OF CARRYING OUT RANDOM INSPECTIONS AND VESSELS WILL NOT BE ALLOWED TO DISCHARGE
BALLAST IF IT IS DETERMINED THAT THEIR BALLAST WATER WAS NOT CHANGED IN THE BLACK SEA AS REQUIRED. DENSITY OF BALLAST WATER AND SHIP'S LOGS WILL BE CHECKED
ACCORDINGLY.

ANY TIME LOST DUE TO OWNERS NON COMPLIANCE OF ABOVE AND ANY COST AND
CONSEQUENCES
TO BE FOR OWNERS ACCOUNT.

AC9. ADDITIONAL EMPLOYMENT/ STORAGE CLAUSE - DELETE CLAUSE IN FULL
WHERE A RATE FOR USE OF THE VESSEL FOR ADDITIONAL EMPLOYMENT/FLOATING
STORAGE
HAS BEEN AGREED IN THIS CHARTER, THE FOLLOWING SHALL APPLY:
(A) CHARTERERS MAY GIVE ORDERS TO USE THE VESSEL AT THE RATE SPECIFIED FOR
    THE PERIOD SPECIFIED.
(B) CHARTERERS SHALL, WHERE POSSIBLE, GIVE OWNERS 10 15 DAYS APPROXIMATE AND
    10,7, 5, 3, 2, 1 DAYS FIRM NOTICE OF TERMINATION OF ADDITIONAL EMPLOYMENT.
(C) FIRST 15 DAYS OF ADDITIONAL EMPLOYMENT IS PAYABLE IN ADVANCE, AND EVERY
    15 DAYS THEREAFTER. SAID RATE IS EXCLUSIVE OF ALL BUNKERS AND PORT CHARGES
    (WHICH SHALL BE FOR CHARTERERS' ACCOUNT).
(E) CHARTERERS MAY GIVE ORDERS, ONCE VESSEL HAS ARRIVED AT A LOADING PORT OR
    STORAGE AREA, TO ORDER VESSEL INTO OR OUT OF A STORAGE AREA ONE OR MORE
    TIMES TO DISCHARGE OR LOAD ADDITIONAL CARGO. ALL TIME TO AND FROM
STORAGE
    AREA OR WITHIN LOADING OR DISCHARGE RANGES, UNDER SUCH ORDERS, SHALL BE
    AT THE STORAGE RATE WITH CHARTERERS PAYING ALL ADDITIONAL BUNKERS FOR
    STEAMING, HEATING (IF ANY), LOADING AND DISCHARGING AND ALL ADDITIONAL
    PORT CHARGES, PAYABLE AGAINST FULL SUPPORTING DOCUMENTATION
(F) ANY DIMINUTION IN VESSEL'S PERFORMANCE AND ANY ADDITIONAL BUNKERS
CONSUMED
    DURING OR AFTER STORAGE AS A RESULT OF HULL FOULING, AND ANY HULL
CLEANING
    COSTS, SHALL BE FOR OWNERS' ACCOUNT. ANY SUCH FOULING SHALL NOT RELIEVE
    THE OWNERS IN ANY WAY FROM THE PERFORMANCE OF THEIR OBLIGATIONS UNDER
THE
    CHARTER.

AC10.  BP COMMINGLING CLAUSE
(A) OWNERS AGREE, IF SO REQUESTED BY CHARTERERS, TO INSTRUCT THE MASTER TO
    COMMINGLE THE CARGO OR CARGOES LOADED ON BOARD, ALWAYS IN STRICT
COMPLIANCE
    WITH SAFETY RULES, AND SUBJECT TO THE TECHNICAL CHARACTERISTICS OF THE
    VESSEL.
(B) CHARTERERS WARRANT THAT ANY CARGOES TO BE COMMINGLED OR BLENDED ON
BOARD
    SHALL BE STABLE AND COMPATIBLE AND THAT NO PRECIPITATION OF SOLID DEPOSITS
    IN CARGO TANKS, PIPES, PUMPS, VALVES WILL OCCUR.
(C) CHARTERERS WILL HOLD OWNERS HARMLESS AND KEEP THEM FULLY INDEMNIFIED
    AGAINST ALL COSTS, LOSSES, CLAIMS (INCLUDING, BUT NOT LIMITED TO, CLAIMS
    FOR CONTAMINATION OR QUALITY DETERIORATION OR FAILURE TO MEET ANY
    CONTRACTUAL SPECIFICATION) AND EXPENSES (INCLUDING , BUT NOT LIMITED
    TO, LEGAL EXPENSES) CAUSED BY OR IN ANY WAY ARISING FROM CHARTERERS'
    INSTRUCTIONS TO COMMINGLE OR BLEND ON BOARD. ANY ADDITIONAL COSTS
INCURRED
    AS A RESULT OF COMMINGLING/BLENDING OPERATIONS ARE FOR CHARTERERS'
ACCOUNT.
(D) IN THE EVENT OF COMMINGLING OR BLENDING ON BOARD, CHARTERERS SHALL
RETURN
    ALL THREE (3) ORIGINAL COPIES OF ALL BILLS OF LADING ISSUED IN RESPECT OF

THE CARGOES TO BE BLENDED OR COMMINGLED TO OWNERS FOR CANCELLATION. UPON
  RETURN OF THE ORIGINAL COPIES OF THE BILLS OF LADING AS AFORESAID, OWNERS
  WILL ISSUE REPLACEMENT BILLS OF LADING IN RESPECT OF THE COMMINGLED OR
  BLENDED CARGO, WHICH WILL STATE ON THEIR FACE:
 (I) THE DETAILS FROM THE BILL OF LADING PURSUANT TO WHICH THE CARGOES WERE
   ORIGINALLY LOADED, INCLUDING THE NATURE OF THE CARGO, THE ORIGINAL
   QUANTITY LOADED AND THE DATE AND PLACE OF LOADING; AND
 (II) THE PLACE AND DATE OF THE BLENDING OR COMMINGLING TOOK PLACE.


CHARTERER TO HAVE THE RIGHT TO COMMINGLE AND/OR CIRCULATE THE CARGO IN VESSEL'S
TANKS AND/OR ADD CARGO ADDITIVES (INCLUDING BUT NOT LIMITED TO DYE, POUR POINT
DEPRESSANT, ANTI STATIC ADDITIVES, METALS DEACTIVATORS AND H2S SCAVENGERS) AND
MASTER TO EXECUTE THIS OPERATION (THESE OPERATIONS) AS PER CHARTERER'S INSTRUCTIONS
SUBJECT TO SHIP'S SAFETY. CHARTERERS TO ISSUE LOI IN ACCORDANCE WITH OWNERS
P AND I CLUB WORDING.


AC11. ORDERS CLAUSE
NOTWITHSTANDING ANY TERM OF THIS CHARTER TO THE CONTRARY, CHARTERERS SHALL HAVE
THE LIBERTY, AT ANY STAGE OF THE VOYAGE, OF INSTRUCTING THE VESSEL TO STOP AND
WAIT FOR ORDERS AT A SAFE PLACE. IN PARTICULAR AND WITHOUT PREJUDICE TO THE
GENERALITY OF THE FOREGOING, CHARTERERS SHALL BE ENTITLED TO INSTRUCT THE VESSEL
NOT TO TENDER NOR ON ARRIVAL AT OR OFF ANY PORT OR PLACE OR TO DELAY ARRIVING AT
ANY PORT OF PLACE UNTIL CHARTERERS GIVE THE ORDER TO DO SO. TIME TO COUNT AS USED
LAYTIME OR TIME ON DEMURRAGE, IF VESSEL IS ON DEMURRAGE. IF ANY COST, INCUR, WILL
BE CHRTRS ACCOUNT.


AC12. USCG C.O.C CLAUSE - N/A
IF THE VESSEL REQUIRES A C.O.C OR TVEL AND DOES NOT HAVE A VALID ONE, NO NOR CAN
BE TENDERED IN RELATION TO ANY CARGO OPERATION AT ANY PORT IN THE USA OR ITS
CONTROLLED TERRITORIES UNTIL SUCH TIME AS A VALID C.O.C OR TVEL, AS THE CASE MAY
BE, HAS BEEN OBTAINED.


IF THE USCG REQUIRES TO CARRY OUT A PERIODIC INSPECTION DURING THE CURRENCY OF A
VALID C.O.C OR TVEL HELD BY THE VESSEL, THE NOR TENDERED BY THE VESSEL SHALL NOT
BE OR BECOME EFFECTIVE FOR THE PURPOSES OF CALCULATING LAYTIME, OF IF THE VESSEL
IS ON DEMURRAGE, DEMURRAGE UNLESS AND UNTIL THE PERIODIC INSPECTION HAS BEEN
CARRIED OUT AND THE VESSEL HAS BEEN CLEARED FOR CARGO OPERATIONS. THE SAME

PROVISIONS SHALL APPLY MUTATIS MUTANDIS IN RESPECT OF ANY PORT NOT IN THE USA
OR ITS CONTROLLED TERRITORIES WHERE ANY SIMILAR CERTIFICATE IS REQUIRED TO BE
ISSUED AND VESSEL INSPECT TO BE CARRIED OUT BY ANY STATE AUTHORITY

AC13. SPEED CLAUSE - N/A
CHARTERER SHALL ALSO HAVE THE OPTION TO REQUEST THE VESSEL TO REDUCE HER SPEED
ON LADEN PASSAGE. ADDITIONAL VOYAGE TIME SHALL COUNT AGAINST LAYTIME OR TIME ON
DEMURRAGE, IF VESSEL IS ON DEMURRAGE AND THE VALUE OF ANY BUNKERS SAVED SHALL BE
DEDUCTED FROM ANY DEMURRAGE CLAIM OWNER(S) MAY HAVE UNDER THIS CHARTERPARTY WITH
THE VALUE BEING CALCULATED AT LAST INVOICED PRICE. OWNER SHALL PROVIDE DOCUMENTATION
TO FULLY SUPPORT THE CLAIMS AND CALCULATIONS UNDER THIS CLAUSE.

AC14. PROCEED AT UTMOST DISPATCH
VESSEL NOT TO PERFORM INTERIM VOYAGE PRIOR TO ENTRY INTO CHARTERERS SERVICE,
WITHOUT CHARTERERS PRIOR CONSENT WHICH NOT TO BE UNREASONABLY WITHHELD.

AC15. SPLITTING OF BL'S - N/A
CHARTERERS HAVE THE OPTION TO SPLIT B/L DURING LOADING OF CARGO GRADE AND MASTER
TO SIGN ACCORDINGLY, AND STOPPAGE OF CARGO WILL BE REPORTED IN THE TIME SHEET. IF
HOMOGENIOUS CARGO AND THUS A COMMINGLING OF CARGO WILL TAKE PLACE CHARTERERS TO
ISSUE AN LOI DURING OR AFTER THE SPLITTING OF BL'S FOR PRACTICAL REASONS ONLY AS
PER OWNERS P AND I CLUB WORDING.

AC16. TURKISH B/L CLAUSE - N/A
IN CASE NEXT VOYAGE WILL DISCHARGE TURKEY - OWNERS WILL RE-ISSUE "NOT NEGOTIABLE"
COPY OF THE B/L AND/OR CARGO MANIFEST FOR TURKEY CUSTOM CLEARANCE. ONLY CONSIGNEE
IS TO BE CHANGED FOR CUSTOM'S PURPOSES AND ALL OTHER TERMS/DETAILS OF THE B/L
AND/OR CARGO MANIFEST REMAIN UNCHANGED. THE "NOT NEGOTIABLE" COPY MUST BE DULY
MRKED WITH "FOR CUSTOMS PURPOSES ONLY."

THIS CLAUSE TO BE DISCUSSED ON A CASE BY CASE BASIS.

AC17 CARGO SUPERVISORS
KOREA:
IF REQUIRED, A SUPERVISOR WHO IS NOMINATED BY THE TERMINAL IN SOUTH KOREA SHOULD
ATTEND THE SAFE BERTHING AND LOADING/DISCHARGING, FOR OWNER'S ACCOUNT.

JAPAN:

OWNERS TO ARRANGE FOR A JAPANESE SPEAKING SUPERINTENDENT AT THE JAPANESE
PORT(S)
FOR OWNERS ACCOUNT, AND TO ATTEND THE VESSELS FULL CARGO OPERATIONS.

ARABIAN GULF:
OWNERS TO EMBARK CHARTERER'S SURVEYOR AT FUJAIRAH INBOUND AT NO
ADDITIONAL COST
AT THEIR RISK, TIME AND EXPENSE.

AC18.  KOREAN ANCHORAGE
IN CASE VESSEL ARRIVED AT QUARANTINE STATION AT KOREAN PORTS AND TENDER
NOTICE
OF READINESS TO LOAD/DISCHARGE BETWEEN 18:00 AND 24:00 HOURS, LAYTIME SHALL
COUNT
FROM 06:00 HOURS THE NEXT DAY. IN REGARDS TO SOUTH KOREAN ANCHORAGE DUES
FIRST
48 HOURS FOR OWNERS ACCOUNT, THEREAFTER TO BE FOR CHARTERERS ACCOUNT.

AC19.  CHINESE RIVER PORTS CLAUSE
IF THE VESSEL IS REQUIRED TO CALL AT NON-COASTAL CHINESE PORTS/BERTHS, ALL
EXTRA
INBOUND TRANSIT TIME IN THE RIVER IN EXCESS OF ACTUAL STEAMING TIME, IS TO
COUNT
AS LAYTIME OR TIME ON DEMURRAGE IF THE VESSEL IS ON DEMURRAGE. FOR PURPOSES
OF
CALCULATING EXTRA TRANSIT TIME, TIME IS TO COUNT UPON EXPIRY OF 6 HOURS AFTER
ARRIVAL AT FIRST INBOUND PILOT STATION UNTIL ARRIVAL AT CUSTOMARY
ANCHORAGE FOR
SUCH PORT/BERTH. ALL EXTRA TRANSIT TIME UP TO DROPPING OUTBOUND RIVER PILOT,
IN
EXCESS OF ACTUAL OUTBOUND STEAMING TIME IN THE RIVER, IS TO COUNT AS LAYTIME
OR
TIME ON DEMURRAGE. ALL TIME SPENT WAITING FOR TIDE, DAYLIGHT OR WEATHER TO
COUNT
IN FULL.
-------------------------------------------------------------
                    (COMMISSION)


==========================================================
- COMMISSION (ON FREIGHT, DEADFREIGHT AND DEMURRAGE):
- 2.50% ADDRESS COMMISSION TO CHARTERERS AND TO BE DEDUCTIBLE AT SOURCE
- 1.25% BROKERAGE COMMISSION TO BRAEMAR ACM SHIPBROKING PTE LTD
==========================================================


1) CHARTERERS STYLE            : CLEARLAKE SHIPPING PTE LTD.
2) DOMICILE                 :
3) COMPANY REGISTERED IN        : SINGAPORE
4) FULL  REGISTERED POSTAL  ADDRESS : 12 MARINA BOULEVARD
                    #35-02 MBFC TOWER 3
                    SINGAPORE 018982
5) INVOICING ADDRESS IF DIFFERENT TO ITEM NO.4 ABOVE : SAME AS NO.4

NAME       : BRAEMAR ACM SHIPBROKING PTE LTD
ADDRESS    : 1 PICKERING STREET #08-01

GREAT EASTERN CENTRE
SINGAPORE 048659
TEL        : + 65 6516 9589
FAX        : + 65 6533 1632
KARIN WOON (MOB)  : + 65 8399 9073

OPERATIONS      : DIRECT TEL: +65 6579 1060
TANKER.OPS.SG@BRAEMAR.COM
MISHA LIM        : + 65 9862 3504
IRIS CHEN        : + 65 9388 8786
FELIX SEETOH     : + 65 9762 5649
FUSAKO MATSUMOTO : + 65 8133 1570
ERIC CHOO        : + 65 8233 4377
CHIRAQ           : + 44 7824 499562
ALISON LEE       : + 65 9455 7932
----------------------------------------------------------

END RECAP

MANY THANKS AGAIN FOR YOUR SUPPORT.

Best Regards,

**Chris Tan**
**BRAEMAR ACM SHIPBROKING / CPP**
1 Pickering Street #08-01
Great Eastern Building
Singapore 048659

Office   No: +65 6516 9589
Mobile No: +65 9070 8756
Yahoo   ID: chriswltan
Email : ctan@acmshipping.com.sg

This e-mail and any attachments are strictly confidential and intended for the addressee only. If you are not the intended recipient, please immediately notify the sender and then delete this communication and its attachments without reading it or forwarding it. This e-mail and any attachments are believed to be free from viruses but it is your responsibility to carry out all necessary virus checks. Braemar ACM Shipbroking accepts no liability for any damage caused by any virus transmitted by this e-mail.

ALL BUSINESS IS UNDERTAKEN SUBJECT TO OUR STANDARD TRADING TERMS, WHICH INCLUDE PROVISIONS RESTRICTING, LIMITING AND EXCLUDING LIABILITY AND A JURISDICTION AGREEMENT. COPIES AVAILABLE ON REQUEST OR CAN BE VIEWED AT www.braemaracm.com

jysung/성제용/탱커영업팀/2016-07-24 14:12::



# BPVOY4

## VOYAGE CHARTER PARTY



© BP SHIPPING LIMITED
1st Edition - June 1998
Registered in England and Wales: No. 140132



34

lun.klm/강준형/항커영업팀/2016-08-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



Registered Office:-  Breakspear Park, Breakspear Way, Hemel Hempstead, Herts, HP2 4UL

1

리 성

jun.klm/김준형/탱커영업팀/2016-08-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



## INDEX TO CLAUSES - BPVOY4

| Clause | | Page |
|---|---|---|
| 1. | Condition of Vessel | 5 |
| 2. | Chartering Questionnaire | 5 |
| 3. | Loading/Compliance with Charterers' Voyage Orders | 5 |
| 4. | Estimated Times of Arrival | 6 |
| 5. | Loading and Discharge Port/Shifting | 7 |
| 6. | Notice of Readiness ("NOR") | 7 |
| 7. | Laytime/Demurrage | 8 |
| 8. | Cargo Transfers | 9 |
| 9. | Documentation | 11 |
| 10. | Drugs & Alcohol Policy | 11 |
| 11. | Cleaning of Vessel's Tanks, Pumps and Pipelines | 11 |
| 12. | Inert Gas System ("IGS") | 12 |
| 13. | Closed Cargo Operations | 12 |
| 14. | Oily Residues/Clean Ballast | 12 |
| 15. | Agency | 13 |
| 16. | Cancellation | 13 |
| 17. | Half Laytime/Half Demurrage/Force Majeure | 14 |
| 18. | Suspension of Laytime/Demurrage | 14 |
| 19. | Loading and Discharge of Cargo and Crude Oil Washing and Stripping | 15 |
| 20. | Claims Time Bar | 18 |
| 21. | Slack Tanks/Even Keel | 18 |
| 22. | Revised Charterers' Voyage Orders for Loading or Discharge Ports | 19 |
| 23. | Vessel/Cargo Inspections/Bunker Surveys | 19 |
| 24. | Maintenance of Cargo Temperature | 20 |
| 25. | Cargo Heating | 20 |
| 26. | Liberty | 21 |
| 27. | Traffic Separation and Routeing | 21 |
| 28. | Ice on Voyage and Ice at Loading and Discharge Ports | 21 |
| 29. | Quarantine | 22 |
| 30. | Bills of Lading and Indemnities | 22 |
| 31. | Freight Rate | 23 |
| 32. | Address Commission | 24 |
| 33. | Cargo Retention | 24 |
| 34. | Dues and Other Charges | 24 |
| 35. | Cargo Insurance | 25 |
| 36. | Coding of Cargo Documentation - US Customs Regulations | 25 |
| 37. | USCG Certificate of Financial Responsibility/USCG Regulations | 26 |
| 38. | Exceptions | 26 |
| 39. | War Risks | 26 |
| 40. | Both-to-Blame Collision | 28 |
| 41. | General Average | 29 |
| 42. | New Jason | 29 |
| 43. | Clause Paramount | 29 |
| 44. | Oil Pollution Insurance | 29 |
| 45. | Oil Pollution Prevention | 30 |
| 46. | Lien | 30 |
| 47. | Sub-Letting | 31 |
| 48. | Administration | 31 |
| 49. | Law | 31 |

36

iun.kim/김준형/뱅카일업팀/2016-08-09 21:01:00
parksk/박성근/법무1팀/2016-04-02 19:35:00



Codeword for this Charterparty
"BPVOY4"

## VOYAGE CHARTER PARTY

1                                            Date _____

2   *It is this day agreed between*_____

3   of _____

4   _____

5   ("Owners") being owners/disponent owners of the motor/steam tank vessel (delete as

6   applicable) called  _____

7   __("Vessel")

8   and_____

9   of_____

10  _____

11  ("Charterers") that the service for which provision is herein made shall be subject to
12  the terms and conditions of this Charter which comprises PART 1 and PART 2 and the
13  "BP Shipping Questionnaire" (which term shall mean the document attached as
14  Appendix 1 of this Charter or such subsequent editions of the BP Shipping
15  Questionnaire as may be correct as at the date of this Charter).

16  *Unless the context otherwise requires, words denoting the singular include the plural*
17  *and vice versa.*

18  *In the event of any conflict between the provisions of PART 1 and PART 2 of this Charter,*
19  *the provisions of PART 1 shall prevail.*

20  *In the event of any conflict between the provisions of PART 1 or PART 2 of this Charter*
21  *and any provisions in the BP Shipping Questionnaire, the provisions of PART 1 or PART*
22  *2 of this Charter shall prevail.*

23

3

lun.kim/김주원/뭣귀엿엄팀/2016-08-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



23 **PART 1**

24 A. Name of Vessel _____

25 B. **Description of Vessel**
26    Owners undertake that the Vessel conforms to the following description:-

27    (1)   Summer Deadweight (SDWT) on assigned summer freeboard _____ Tonnes
28    (2)   Salt Water draught (on SDWT) _____ Metres
29    (3)   Flag _____
30    (4)   Year Built_____
31    (5)   Length Overall_____ Metres
32    (6)   Beam _____ Metres
33    (7)   Cargo tank capacity at 98% excluding slop tanks_____Cu. Metres
34    (8)   Capacity of slop tanks at 98% _____Cu. Metres
35    (9)   The Vessel is (delete as applicable)___Segregated Ballast Tanker (SBT)/Clean Ballast Tanker
36    (CBT)
37    (10)  Crude Oil Washing (COW) (delete as applicable)_____ YES/NO
38    (11)  Inert Gas System (IGS) (delete as applicable)_____ YES/NO
39    (12)  Closed Cargo Operations (delete as applicable)_____ YES/NO
40    (13)  The Vessel has (delete as applicable)_____Double Bottom/Double
41    Sides
42    (14)  Tonnes Per Centimetre Immersion (TPC)_____ Tonnes
43    (15)  Bow to Centre of Manifold (BCM)_____ Metres
44    (16)  Derricks/Cranes – Number and Capacity_____
45          _____
46          _____
47    (17)  Tongue Type Bow Chain Stoppers:-
48          (a) Number_____
49          (b) Safe Working Load _____ Tonnes
50          (c) Nominal Diameter of Chain _____ Millimetres
51    (18)  Keel to Top of Mast (KTM)_____ Metres
52    (19)  Tank Coatings (Type)_____
53    (20)  Heating Coils (Type) _____
54    (21)  Classification Society and Class Notation_____
55    (22)  Gross Tonnage (GT) _____ Tonnes
56    (23)  Suez Canal Net Registered Tonnage (SCNRT) _____ Tonnes
57    (24)  Panama Canal Net Registered Tonnage (PCNRT)_____ Tonnes
58    (25)  Charter Speed (weather and safe navigation permitting)_____Knots ("Charter Speed")
59    (26)  Maximum Speed (weather and safe navigation permitting)_____Knots ("Maximum Speed")
60    (27)  Last Cargoes:-   (a) Last_____
61                         (b) Second Last_____
62                         (c) Third Last_____
63 C. **Cargo Quantity** _____
64    _____

4

*38*

lim.kim/지주별/법무팀/법무1팀/2018-06-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



65    D. Cargo Description _____
66         _____
67         _____

68    E. Loading Port(s)/Range(s) at Charterers' option _____
69         _____
70         _____

71    F. Discharge Port(s)/Range(s) at Charterers' option _____
72         _____
73         _____
74         _____
75         _____

76    G. Laydays

77         Commencing: 0001 hours local time on _____ ("Commencement Date")
78         Cancelling: 1600 hours local time on _____ ("Cancelling Date")
79         Vessel expected ready to load _____ hours local time on _____ based
80         on following current itinerary _____
81         _____

82    H. Freight Rate _____
83         _____ ("Freight Rate")

84         Increase of Freight Rate applicable to increased speed per knot, or pro rata, between
85         Charter Speed and Maximum Speed:-
86         _____

87         Overage (if any) at 50% of Freight Rate

88    I. Laytime _____ running hours

89    J. Demurrage _____ US $ per day or pro rata

90    K. Owners' Payment Details _____
91         _____
92         _____
93         _____
94         _____

95    L. Additional Clauses _____
96         _____
97         _____
98         _____
99         _____

100   M. The "BP Shipping Questionnaire" was last completed and submitted to Charterers on _____
101        _____ and, where applicable, was confirmed as accurate on _____
102

5

39

Jun_kim/김준원/용차팀/2018-04-06 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



102                                    **PART 2**

103     **1.     CONDITION OF VESSEL**

104          Owners shall, before, at the commencement of, and throughout the voyage carried out
105          hereunder, exercise due diligence to make and maintain the Vessel, her tanks, pumps,
106          valves and pipelines tight, staunch, strong, in good order and condition, in every way
107          fit for the voyage and fit to carry the cargo stated in Sections C and D of PART 1, with
108          the Vessel's machinery, boilers and hull in a fully efficient state, and with a full
109          complement of Master, officers and crew who are fully qualified (as evidenced by
110          internationally recognised certification and, where applicable, endorsements), and are
111          experienced and competent to serve in the capacity for which they are hired.  Owners
112          undertake that the Vessel shall be operated in accordance with the recommendations
113          set out in the 1996 Edition of ISGOTT, as amended from time to time.

114     **2.     CHARTERING QUESTIONNAIRE**

115     2.1     Prior to agreement being reached between Owners and Charterers on the terms
116             and conditions of this Charter, Owners have either:-

117             2.1.1   completed and submitted, or have authorised their brokers to complete
118                     and submit, the BP Shipping Questionnaire; or

119             2.1.2   confirmed, or have authorised their brokers to confirm, in writing to
120                     Charterers that each and every response given by Owners in the BP
121                     Shipping Questionnaire last completed and submitted to Charterers in
122                     respect of the Vessel remains correct and accurate in every particular;

123             in each case on the date stated in Section M of PART 1.

124     2.2     Notwithstanding the date on which the BP Shipping Questionnaire was last
125             completed by Owners and submitted to Charterers in respect of the Vessel, it is
126             a condition of this Charter that the responses in the BP Shipping Questionnaire
127             are correct as at the date hereof.  If any response proves to be incorrect, and as
128             a consequence Charterers are likely to, or do, suffer prejudice or are likely to,
129             or do, incur loss, damage, cost or expense, Charterers shall be entitled either:-

130             2.2.1   to cancel this Charter forthwith without prejudice to any other rights
131                     available to them under this Charter or otherwise under English law; or

132             2.2.2   to recover, by deduction from freight or otherwise, the said loss, damage,
133                     cost and expense.

134     **3.     LOADING/COMPLIANCE WITH CHARTERERS' VOYAGE ORDERS**

135     3.1     Subject to the provisions of this Charter the Vessel shall proceed to the loading
136             port (the term "port" shall include any port, berth, dock, loading or discharging
137             anchorage or offshore location, submarine line, single point or single buoy
138             mooring facility, alongside vessels or lighters, or any other place whatsoever as
139             the context requires) stated in Section E of PART 1, or to such other port
140             (always within the Ranges stated in Section E of PART 1) as is separately or
141             subsequently identified in Charterers' Voyage Orders (which term shall mean
142             any written instruction issued by Charterers in respect of the Vessel at any time
143             during the period of this Charter, including any amendments, corrections or
144             revisions thereto), or so near thereto as she may safely reach and there load the
145             cargo stated in Sections C and D of PART 1 subject to any clarification of cargo
146             loading instructions as may be provided in Charterers' Voyage Orders.

147     3.2     Owners undertake that the Vessel is able to load, carry and discharge the
148             quantities, grades and segregations of cargo stated in Sections C and D of PART

                                          6

                                                                              40



149   1, without loading on top of tank washings ("slops"). Charterers shall not be
150   liable for any loss, damage (including deadfreight), cost or expense incurred by
151   Owners by reason of the Vessel being unable to load in accordance with this
152   undertaking.   Loading on top of slops shall not be permitted without
153   Charterers' prior agreement in writing.

154   The cargo loaded on board the Vessel shall not exceed the quantity which she
155   can reasonably stow and carry over and above her equipment and provisions
156   and shall in any case not exceed the quantity permitted by the International
157   Load Line Convention, 1966, or any modification or amendment thereof as may
158   be applicable to the voyage to be performed hereunder.

159   3.3   Owners undertake that the Vessel shall, upon completion of loading the cargo,
160         proceed at the speed stated in Section B.25 of PART 1 ("Charter Speed"), or at
161         such other speed, not exceeding the speed stated in Section B.26 of PART 1
162         ("Maximum Speed"), as may be stated in Charterers' Voyage Orders, to the
163         discharge port stated in Section F of PART 1, or to such other port or location
164         permitted under this Charter, in accordance with Charterers' Voyage Orders, or
165         so near thereto as she may safely reach, and deliver the cargo in consideration
166         of the payment of freight as provided in Clause 31.

167   3.4   Charterers shall have the right at any time during the voyage to instruct Owners
168         to adjust the Vessel's speed.  Charterers shall not instruct Owners to increase
169         the Vessel's speed such as to require the Vessel to proceed in excess of the
170         Maximum Speed.  If Owners increase the speed of the Vessel in accordance
171         with Charterers' Voyage Orders, any increase in the freight rate consequent
172         thereon shall be calculated in accordance with the Example set out in Clause
173         31.

174   3.5   If the Vessel fails to maintain Charter Speed, or Owners fail to comply with any
175         instructions in Charterers' Voyage Orders requiring an increase of speed
176         pursuant to this Clause 3, Owners shall, subject to Clause 38, be liable for all
177         loss, damage, cost and expense arising as a direct consequence thereof save to
178         the extent that Owners can prove that such failure was attributable either to
179         adverse weather conditions and sea state or to the requirements for the safe
180         navigation of the Vessel.  Charterers shall be entitled to deduct any such loss,
181         damage, cost and expense from any demurrage due to Owners hereunder
182         without prejudice to any other rights available to Charterers under this Charter
183         or otherwise under English law.

184   4.   ESTIMATED TIMES OF ARRIVAL

185   4.1   If the Master fails to comply with any of the following provisions any delay
186         resulting therefrom, either at the loading or discharge port, shall not count as
187         laytime or, if the Vessel is on demurrage, as demurrage and Owners shall be
188         responsible for any additional loss, damage, cost and expense incurred by
189         Charterers arising from such non-compliance.

190   4.2   The Master shall send messages by telex to Charterers, the Agents (which term
191         wherever used in this Charter shall mean the Vessel's agents under Clause 15)
192         and to any other parties as required by Charterers (hereafter referred to
193         collectively as the "ETA Notify Parties"), advising the date and estimated time
194         of the Vessel's arrival ("ETA").  Such messages shall be sent upon the Vessel's
195         sailing from the last discharge port and seven (7) days and seventy-two (72),
196         forty-eight (48) and twenty-four (24) hours prior to the Vessel's ETA at each
197         loading port.  If the Vessel is at sea or elsewhere when ordered by Owners to
198         proceed to a loading port the Master shall, if the Vessel is less than seven (7)
199         days or seventy-two (72), forty-eight (48) or twenty-four (24) hours from that
200         loading port, immediately notify the ETA Notify Parties of the Vessel's ETA at
201         that loading port.  Thereafter, the Master shall advise the ETA Notify Parties of

7



202  the Vessel's ETA at such of the times as aforesaid as are applicable or
203  immediately provide them with such other ETAs as Charterers may require.

204  4.3  The Master shall send messages by telex to the ETA Notify Parties advising the
205  Vessel's ETA at each discharge port, together with information as to the Vessel's
206  expected arrival draught on even keel, immediately upon the Vessel leaving the
207  final loading port and thereafter, where applicable, seven (7) days, seventy-two
208  (72), forty-eight (48) and twenty-four (24) hours prior to the Vessel's ETA at
209  each discharge port or immediately provide the ETA Notify Parties with such
210  other ETAs as Charterers may require.

211  4.4  The Master shall also advise the ETA Notify Parties by telex of any variation of
212  more than six (6) hours in estimated times of arrival at the loading and/or
213  discharge ports.

214  4.5  Charterers may require Owners to provide them with copies of all telexes
215  (showing answerbacks) to be sent under this Clause 4 and Owners shall
216  promptly comply with such requirement.

217  5.  LOADING AND DISCHARGE PORT/SHIFTING

218  5.1  The Vessel shall be loaded and discharged at any port in accordance with
219  Charterers' Voyage Orders.  Before instructing Owners to direct the Vessel to
220  any port, Charterers shall exercise due diligence, to ascertain that the Vessel
221  can always lie safely afloat at such port, but Charterers do not warrant the
222  safety of any port and shall be under no liability in respect thereof except for
223  loss or damage caused by Charterers' failure to exercise due diligence.

224  5.2  Charterers shall have the option of instructing Owners to load the Vessel at
225  more than one berth at each loading port and to discharge at more than one
226  berth at each discharge port in which event Owners shall, in the first instance,
227  pay expenses arising from any of the following movements of the Vessel:-

228  5.2.1  unmooring at, and pilotage and towage off, the first loading or discharge
229  berth;

230  5.2.2  mooring and unmooring at, and pilotage and towage on to and off, any
231  intermediate loading or discharge berth; and

232  5.2.3  mooring at, and pilotage and towage on to, the last loading or discharge
233  berth.

234  Charterers shall reimburse Owners in respect of expenses properly incurred,
235  arising from any of the aforementioned movements, upon presentation by
236  Owners of all supporting invoices evidencing prior payment by Owners.

237  5.3  Charterers shall reimburse Owners in respect of any dues and/or other charges
238  incurred in excess of those which would have been incurred if all the cargo
239  required to be loaded or discharged at the particular port had been loaded or
240  discharged at the first berth only.  Time used on account of shifting shall count
241  as laytime or, if the Vessel is on demurrage, as demurrage, except as otherwise
242  provided in Clauses 17 and 18.2.

243  5.4  For the purpose of the payment of freight, the places grouped in the section
244  "Port and Terminal Combinations", in the "New Worldwide Tanker Nominal
245  Freight Scale" as amended from time to time ("Worldscale"), shall be considered
246  as berths within a single port and Charterers shall pay shifting expenses in
247  accordance with the provisions of this Clause 5.

248  6.  NOTICE OF READINESS ("NOR")

8



| 249 | 6.1 | Upon arrival of the Vessel at each loading or discharge port the Master or |
| 250 | | Agents shall tender NOR to Charterers or to their order when the Vessel is |
| 251 | | ready in all respects to carry out Charterers' orders in accordance with the |

6.1 Upon arrival of the Vessel at each loading or discharge port the Master or Agents shall tender NOR to Charterers or to their order when the Vessel is ready in all respects to carry out Charterers' orders in accordance with the provisions of this Charter. Such NOR may be tendered either by letter, telex, facsimile or telephone (but if NOR is tendered by facsimile or telephone it shall subsequently be confirmed promptly by telex). Owners shall provide Charterers with an NOR Certificate signed by the Master and a Terminal representative in respect of each port at which the Vessel loads or discharges.

6.2 NOR shall not be tendered, nor shall the Vessel proceed to berth, prior to the Commencement Date stated in Section G of PART 1 without Charterers' prior agreement in writing.

6.3 Notwithstanding tender of a valid NOR by the Vessel such NOR shall not be effective, or become effective, for the purposes of calculating laytime, or if the Vessel is on demurrage, demurrage unless and until the following conditions have been met:-

6.3.1 in the case of the Vessel proceeding directly to the loading or discharging place, she is securely moored and her gangway, if it is to be used, is in place; or

6.3.2 in the case of the Vessel not berthing upon arrival and being instructed to anchor, she has completed anchoring at an anchorage where vessels of her type customarily anchor at the port or, if she has been instructed to wait, she has reached the area within the port where vessels of her type customarily wait; and

6.3.3 free pratique has been granted or is granted within six (6) hours of the Master tendering NOR. If free pratique is not granted within six (6) hours of the Master tendering NOR, through no fault of Owners, Agents, or those on board the Vessel, the Master shall issue a protest in writing ("NOP") to the port authority and the facility at the port ("Terminal") failing which laytime or, if the Vessel is on demurrage, demurrage shall only commence when free pratique has been granted; and

6.3.4 in the case of calls at US ports, a US Coast Guard Tanker Vessel Examination Letter ("TVEL") has been issued, or in the case of calls at non-US ports where any similar certificate is required to be issued by a state authority at those ports prior to loading or discharging of cargo, such certificate has been issued.

## 7. LAYTIME/DEMURRAGE

7.1 Charterers shall be allowed the number of hours stated in Section I of PART 1, together with any period of additional laytime arising under Clause 7.3.1, as laytime for loading and discharging and for any other purposes of Charterers in accordance with the provisions of this Charter.

7.2 Sundays and holidays shall be included in respect of laytime for loading and discharging, unless loading or discharging on the Sunday or holiday in question is prohibited by law or regulation at the loading or discharge port. Charterers shall have the right to require the Vessel to load and discharge during the night, unless loading or discharging at night is prohibited by law or regulation at the loading or discharge port.

7.3 Subject as provided elsewhere in this Charter:-

9

Jun kim/김주현/행커영업팀/2016-08-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



296   7.3.1   laytime for the purposes of loading shall not commence before 0600
297            hours local time on the Commencement Date stated in Section G of PART
298            1, unless with Charterers' prior agreement in writing, in which event
299            laytime shall commence when the Vessel commences loading. If the
300            Vessel, with Charterers' prior agreement in writing, has commenced
301            loading prior to 0600 hours local time on the Commencement Date, then
302            the time from the commencement of loading to 0600 hours local time on
303            the Commencement Date shall constitute additional laytime.

304   7.3.2   Laytime or, if the Vessel is on demurrage, demurrage shall commence, at
305            each loading and each discharge port, upon the expiry of six (6) hours
306            after a valid NOR has become effective as determined under Clause 6.3,
307            berth or no berth, or when the Vessel commences loading, or
308            discharging, whichever first occurs.

309   7.3.3   Laytime or, if the Vessel is on demurrage, demurrage shall run until the
310            cargo hoses have been finally disconnected upon completion of loading
311            or discharging, and the Master shall procure that hose disconnection is
312            effected promptly; provided always that if the Vessel is detained solely
313            for the purposes of awaiting cargo documents at loadport for more than
314            three (3) hours beyond the final disconnection of cargo hoses, laytime or
315            if the Vessel is on demurrage, demurrage shall recommence after such
316            period of three (3) hours and terminate upon the completion of cargo
317            documentation. If, after completion of loading or discharging, the Vessel
318            is required to proceed to an anchorage for Charterers' purposes, then the
319            time spent moving from the berth to the anchorage shall not count as part
320            of the period of three (3) hours referred to above or as laytime or, if the
321            Vessel is on demurrage, as demurrage.

322   7.4   Charterers shall pay demurrage at the rate stated in Section J of PART 1 per
323         running day, and pro rata for part of a running day, for all time that loading and
324         discharging and any other time counting as laytime exceeds laytime under this
325         Clause 7. If, however, demurrage is incurred by reason of the causes specified
326         in Clause 17, the rate of demurrage shall be reduced to one-half of the rate
327         stated in Section J of PART 1 per running day, or pro rata for part of a running
328         day, for demurrage so incurred.

329   8.   CARGO TRANSFERS

330   8.1   Charterers shall have the option of transferring the whole or part of the cargo
331         (which shall include topping-off and lightening) to or from any other vessel
332         including, but not limited to, an ocean-going vessel, barge and/or lighter (the
333         "Transfer Vessel"). Such transfers may take place at an In-port Transfer
334         Position, an Additional Port Transfer Position or a Transshipment Area,
335         which terms shall have the following meanings when used in this Charter:-

336         8.1.1   "In-port Transfer Position":-
337                 A position within a nominated loading or discharge port within the
338                 Ranges stated in Sections E and F of PART 1 where part of the cargo is
339                 transferred to or from a Transfer Vessel, provided that cargo operations
340                 other than transfers to or from Transfer Vessels also take place within
341                 this port.

342         8.1.2   "Additional Port Transfer Position":-
343                 A position at a port in the Ranges stated in Sections E and F of PART 1, or
344                 en route thereto, where part of the cargo is transferred to or from a
345                 Transfer Vessel, provided that the only cargo operations taking place at
346                 this port are transfers to or from Transfer Vessels, but the position is not
347                 the first or sole loading position or last or sole discharge position under
348                 this Charter.

10



349  8.1.3  "Transshipment Area":-
350        A position at a port in the Ranges stated in Sections E and F of PART 1,
351        where the whole or part of the cargo is transferred to or from a Transfer
352        Vessel, provided that the only cargo operations taking place at this port
353        are transfers to or from Transfer Vessels, and the position is the first or
354        sole loading position or last or sole discharge position under this
355        Charter.

356        All transfers of cargo to or from Transfer Vessels shall be carried out in
357        accordance with the recommendations set out in the latest edition of the
358        "ICS/OCIMF Ship to Ship Transfer Guide (Petroleum)". Owners undertake that
359        the Vessel and her crew shall comply with such recommendations, and
360        similarly Charterers undertake that the Transfer Vessel and her crew shall
361        comply with such recommendations. Charterers shall provide and pay for all
362        necessary equipment including suitable fenders and cargo hoses. Charterers
363        shall have the right, at their expense, to appoint supervisory personnel to
364        attend on board the Vessel, including a mooring master, to assist in such
365        transfers of cargo.

366  8.2  In-port Transfer Position.
367        An In-port Transfer Position shall not constitute an additional loading or
368        discharge port for the purposes of calculating freight and the freight rate for the
369        voyage shall be the same as if no cargo transfer at such In-port Transfer Position
370        had taken place. If the Vessel moves from an In-port Transfer Position to berth,
371        or vice versa, such movement shall not be deemed to constitute shifting under
372        Clause 5. Charterers shall reimburse Owners for any additional port costs
373        incurred by Owners in complying with Charterers' instructions under this
374        Clause 8.2.

375        Subject to the exceptions and exclusions of laytime and/or demurrage found
376        elsewhere in this Charter, including but not limited to those under Clauses 17
377        and 18, the time used at an In-port Transfer Position shall count as laytime or, if
378        the Vessel is on demurrage, as demurrage. If an In-port Transfer Position is the
379        first position at which loading or discharge takes place within that port then
380        laytime shall commence in accordance with Clauses 7.3.1 and 7.3.2. If an In-
381        port Transfer Position is the last position at which loading or discharge takes
382        place within that port then laytime shall end when unmooring has been
383        completed and fenders have been removed from the Vessel.

384  8.3  Additional Port Transfer Position.
385        Except for the purposes of calculating laytime and/or demurrage, the Additional
386        Port Transfer Position shall not constitute an additional loading or discharge
387        port and the freight rate for the voyage shall be the same as if no cargo transfer
388        at such Additional Port Transfer Position had taken place.

389        Subject to the exceptions and exclusions of laytime and/or demurrage found
390        elsewhere in this Charter (save that the provisions of Clause 18.1 shall not
391        apply to this Clause 8.3), the time used at an Additional Port Transfer Position
392        shall count as laytime or, if the Vessel is on demurrage, as demurrage. Laytime
393        or, if the Vessel is on demurrage, demurrage, shall commence when a valid
394        NOR has been tendered at the Additional Port Transfer Position and has
395        become effective as determined under Clause 6.3, and shall end when
396        unmooring has been completed and fenders have been removed from the
397        Vessel. For this purpose Charterers shall not have the benefit of the period of
398        six (6) hours provided in Clause 7.3.2.

399        Any additional period by which the steaming time taken to reach the next
400        loading or discharge port via an Additional Port Transfer Position exceeds the
401        time that should have been taken had the Vessel proceeded to the next port

11



402 directly shall count as laytime or, if the Vessel is on demurrage, as demurrage.
403 Such additional period shall be the time required for the Vessel to steam the
404 additional distance at the average speed actually achieved by the Vessel during
405 the voyage or the Charter Speed as stated in Section B.25 of PART 1, whichever
406 is the higher.

407 Charterers shall pay Owners for additional bunkers consumed for steaming the
408 additional distance at the price paid by Owners, net of all discounts and
409 rebates, for the last bunkers lifted.

410 Charterers shall reimburse Owners for any additional port costs incurred by
411 Owners in complying with Charterers' instructions under this Clause 8.3.

46

im kim/김주형/외키외외외/2018-08-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



412   8.4   **Transshipment Area.**
413         A Transshipment Area shall be deemed to be a port for the purposes of
414         calculating freight and the freight rate for the voyage shall be the rate as
415         published in Worldscale for the relevant Transshipment Area. If a rate is not
416         already published for the relevant Transshipment Area the rate shall be the rate
417         determined by Worldscale on the application of either party.

418         Subject to the exceptions and exclusions of laytime and/or demurrage found
419         elsewhere in this Charter, including but not limited to those under Clauses 17
420         and 18, the time used at a Transshipment Area shall count as laytime or, if the
421         Vessel is on demurrage, as demurrage. Laytime or, if the Vessel is on
422         demurrage, demurrage, shall commence and end in accordance with Clause 7.3.

423   9.   **DOCUMENTATION**

424   9.1   Owners undertake that for the duration of this Charter the Vessel shall have on
425         board all such valid documentation as may, from time to time, be required to
426         enable the Vessel to enter, carry out all required operations at, and leave,
427         without let or hindrance, all ports to which the Vessel may be directed under
428         the terms of this Charter and Owners hereby expressly undertake that:-

429         9.1.1 they shall be responsible for any loss, damage, delay, cost or expense;
430               and

431         9.1.2 time shall not count as laytime or, if the Vessel is on demurrage, as
432               demurrage, during any period in which the Vessel is not fully and freely
433               available to Charterers,

434         as a result of action, or the threat thereof, taken against her by any government,
435         government organisation, competent authority, person or organisation, owing
436         to her flag, failure to have on board valid documentation as aforesaid or any
437         dispute relating to the wages, or crew employment policy of Owners or to the
438         condition of the Vessel or her equipment.

439   10.  **DRUGS AND ALCOHOL POLICY**

440   10.1  Owners undertake that they have, and shall maintain for the duration of this
441         Charter, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D
442         & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for
443         the Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to
444         time.

445   10.2  Owners shall exercise due diligence to ensure that the D & A Policy is
446         understood and complied with on and about the Vessel. An actual impairment,
447         or any test finding of impairment, shall not in and of itself mean that Owners
448         have failed to exercise due diligence.

449   10.3  Owners undertake that to the best of their knowledge, information and belief,
450         having made due inquiry, neither the Master, nor any officer or crew member
451         has any un-spent convictions whatsoever concerning drug or alcohol abuse.

452   11.  **CLEANING OF VESSEL'S TANKS, PUMPS AND PIPELINES**

453         Without prejudice to Clause 1, Owners shall exercise due diligence to ensure that the
454         Vessel presents for loading with her tanks, pumps and pipelines properly cleaned to
455         the satisfaction of any inspector appointed by or on behalf of Charterers and ready for
456         loading the cargo described in Sections C and D of PART 1. Any time used to clean
457         tanks, pumps and pipelines to Charterers' inspector's satisfaction shall not count as

13



44



458  laytime or, if the Vessel is on demurrage, as demurrage and shall, together with any
459  costs incurred in the foregoing operations, be for Owners' account.

460  **12.   INERT GAS SYSTEM ("IGS")**

461  12.1  Owners undertake that the Vessel is equipped with a fully functional IGS which
462  is in full working order, and is or is capable of being fully operational on the
463  date hereof and that they shall so maintain the IGS for the duration of this
464  Charter, and that the Master, officers and crew are properly qualified (as
465  evidenced by appropriate certification) and experienced in, the operation of the
466  IGS. Owners further undertake that the Vessel shall arrive at the loading port
467  with her cargo tanks fully inerted and that such tanks shall remain so inerted
468  throughout the voyage and the subsequent discharging of the cargo. Any time
469  lost owing to deficient or improper operation of the IGS shall not count as
470  laytime or, if the Vessel is on demurrage, as demurrage.

471  12.2  The Vessel's IGS shall fully comply with Regulation 62, Chapter II-2 of the
472  SOLAS Convention 1974 as modified by its Protocol of 1978 and any
473  subsequent amendments and Owners undertake that the IGS shall be operated
474  by the Master, officers and crew in accordance with the operational procedures
475  as set out in the IMO publication entitled "Inert Gas Systems" (IMO 860E) as
476  amended from time to time.

477  12.3  If Charterers so require, Owners shall arrange for the Vessel's tanks to be de-
478  pressurised to facilitate gauging and sampling or to be de-inerted or gas freed to
479  facilitate inspection, in each case in accordance with the operational procedures
480  referred to in Clause 12.2. Any time taken to de-pressurise, gauge, sample and
481  re-pressurise, or to de-inert or gas free, inspect and re-inert thereafter shall
482  count as laytime or, if the Vessel is on demurrage, as demurrage.

483  **13.   CLOSED CARGO OPERATIONS**

484  13.1  Owners undertake that the Vessel complies with, and shall be operated for the
485  duration of this Charter in accordance with, the recommendations regarding
486  closed loading and closed discharging operations as set out in the 1996 Edition
487  of ISGOTT as amended from time to time.

488  13.2  If the Vessel has closed sampling equipment, such equipment shall be used,
489  when appropriate, during this Charter.

490  **14.   OILY RESIDUES/CLEAN BALLAST**

491  14.1  The Vessel shall arrive at the loading port with clean ballast as defined in
492  Regulation 1 (16) of Regulations for the Prevention of Pollution by Oil in Annex
493  1 of MARPOL unless otherwise agreed. Owners shall instruct the Master to
494  retain on board all oily residues of a persistent nature remaining in the Vessel
495  from the previous cargo. The Master shall, during tank washing, collect the
496  resultant slops into one cargo tank and after maximum separation of the free
497  water, discharge the water so separated overboard. Upon completion of this
498  operation the Master shall notify Charterers by telex of the origin and estimated
499  tonnage of the slops remaining in the said cargo tank, giving a separate
500  estimated quantity for both oil and water. The Master shall further advise
501  whether during deballasting operations it will be necessary to transfer any
502  quantity of ballast water into the cargo tank containing slops. The Master shall
503  minimise the quantity of water retained which in any event shall not exceed
504  0.15% of the Vessel's current summer deadweight tonnage. In discharging all
505  water separated as aforesaid the Master shall comply with the requirements of
506  the International Convention for the Prevention of Pollution from Ships 1973, as
507  amended by its Protocol of 1978 (MARPOL 73/78), insofar as these do not
508  conflict with any applicable law.

14

lim kim/김종필/병커영업팀 2016-04-02 21:01:06
parksk/박성근/법무1팀/2016-04-02 19:35:00



509    14.2  Upon the Vessel's arrival at the loading port the Master, in conjunction with
510          cargo suppliers, shall arrange for the quantity of all segregated slops to be
511          measured (inclusive of any ballast water) and shall make a note in the Vessel's
512          ullage record of the quantity so measured. The Master shall provide Charterers
513          with a slops certificate countersigned by a Terminal representative.

514    14.3  Without prejudice to the provisions of Clause 3.2 Charterers shall be entitled to
515          instruct Owners to load the cargo on top of slops from previous voyages and to
516          discharge such slops together with the cargo loaded hereunder, in which case
517          freight shall be paid under Clause 31 at 50% of the Freight Rate stated in Section
518          H of PART 1 on the net oil quantity of slops, up to a tonnage equivalent to 1%
519          of the Vessel's summer deadweight; otherwise no freight shall be payable on
520          slops. Notwithstanding the foregoing, if the provision for freight for the voyage
521          is on a lump sum basis then Charterers shall have no liability to pay freight on
522          slops. Irrespective of whether Charterers exercise their right to determine the
523          disposal of slops, nothing herein shall give, or be construed as giving, Owners
524          permission to contravene any applicable laws, conventions or regulations
525          regarding the discharge of slops or oily residues. If Charterers instruct Owners
526          to discharge slops ashore at a loading port where slop reception facilities are
527          available, the time used for discharging slops shall not count against laytime or,
528          if the Vessel is on demurrage, as demurrage and all expenses incurred shall be
529          for Owners' account.

530          If a Terminal representative insists that ballast is discharged ashore and, as a
531          result thereof, a freight differential in Worldscale applies, Charterers shall not
532          be liable to pay the freight differential but, in lieu thereof, shall reimburse
533          Owners in respect of the cost actually incurred by them, upon receipt by
534          Charterers of full supporting documentation from Owners.  Charterers shall
535          only be liable to reimburse Owners for quantities of ballast discharged up to a
536          maximum equivalent to 30% of the Vessel's current summer deadweight.

537    14.4  Charterers shall have no liability to pay deadfreight to Owners pursuant to this
538          Clause 14 unless Charterers have initially instructed Owners to load the cargo
539          on top of slops but have subsequently instructed Owners to keep slops
540          segregated.

541  15.  AGENCY

542        Charterers shall nominate Agents at loading and discharge ports but such Agents shall
543        be employed, instructed and paid by Owners.

544  16.  CANCELLATION

545    16.1  Time shall be of the essence in relation to the arrival of the Vessel at the first
546          loading port under this Charter.  Owners undertake to advise Charterers
547          promptly if at any time Owners or the Master have reason to believe that the
548          Vessel may not arrive at the first loading port by the Cancelling Date stated in
549          Section G of PART 1 or by any new cancelling date determined under this
550          Clause 16.

551    16.2  If the Vessel is not ready to load by the Cancelling Date stated in Section G of
552          PART 1 or by any new cancelling date determined under this Clause 16
553          Charterers shall have the option of cancelling this Charter which option shall be
554          exercisable within forty-eight (48) hours after the Cancelling Date or any new
555          cancelling date determined under this Clause 16.

556    16.3  If at any time it appears to Charterers that the Vessel's arrival at the first loading
557          port will be delayed beyond the Cancelling Date, or beyond any new cancelling
558          date determined under this Clause 16, Charterers may require Owners to notify

49

jun kim/김준형/뱅키 엔진팀/2018-04-02 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



559    Charterers in writing of the date and time that they expect the Vessel to be
560    ready to load. In such case, Owners shall provide such information in writing
561    within twelve (12) hours of Charterers' request.

562    If the date and time so notified by Owners falls after the Cancelling Date then
563    Charterers shall have the option of cancelling this Charter which option shall be
564    exercisable within ninety-six (96) hours (Sundays and holidays excepted) of
565    receipt of the said notice from Owners or within forty-eight (48) hours after the
566    Cancelling Date, whichever is earlier.

567    If Charterers do not exercise their option to cancel this Charter then the new
568    cancelling date for the purpose of this Clause 16 shall be twelve (12) hours after
569    the date and time notified by Owners, or such other date and time as may be
570    mutually agreed.

571    16.4   If Owners fail, or fail timeously, to respond in writing to Charterers when
572         required to do so under Clause 16.3, Charterers shall have the option of
573         cancelling this Charter, which option shall be exerciseable within ninety-six
574         (96) hours (Sundays and holidays excepted) after the period allowed for
575         Owners' response under Clause 16.3.

576    16.5   Whether or not Charterers exercise their option to cancel this Charter shall be
577         entirely without prejudice to any claim for damages which Charterers may have
578         in respect of the Vessel not being ready to load by the Cancelling Date stated in
579         Section G of PART 1 or by any new cancelling date determined under this
580         Clause 16.

581    16.6   Where the Vessel arrives after the Cancelling Date, or if the Vessel arrives by or
582         after any new cancelling date determined under this Clause 16, laytime shall
583         commence either when the Vessel commences loading or twenty-four (24) hours
584         after tendering of a valid NOR that has become effective under Clause 6.3,
585         whichever first occurs. However, where the arrival of the Vessel after the
586         Cancelling Date, or after the new cancelling date as the case may be, results
587         solely from Charterers' instructions under Clause 22.1, laytime shall commence
588         in accordance with the provisions of Clauses 7.3.1 and 7.3.2.

589   17.    HALF LAYTIME/HALF DEMURRAGE/FORCE MAJEURE

590    Any delay arising from adverse tidal conditions which could not reasonably have
591    been predicted, adverse weather, adverse sea state conditions, blockage of access to a
592    port due to casualty or wreck, fire, explosion, breakdown or failure of equipment,
593    plant or machinery in or about any loading or discharge port, Act of God, act of war,
594    labour dispute, strike, riot, civil commotion, or arrest or restraint of princes, rulers or
595    peoples shall count as one half laytime or, if the Vessel is on demurrage, at one half
596    of the demurrage rate provided always that the cause of the delay was not within the
597    reasonable control of Charterers or Owners, as the case may be, or their respective
598    servants or agents.

599   18.    SUSPENSION OF LAYTIME/DEMURRAGE

600    18.1   Time shall not count against laytime or, if the Vessel is on demurrage, as
601         demurrage when spent or lost:-

602         18.1.1   on an inward passage, including awaiting daylight, tide, opening of
603                    locks, pilot or tugs or moving from an anchorage, even if topping
604                    off and/or lightening has taken place at that anchorage, until the
605                    Vessel is securely moored and the Vessel's gangway, if it is to be
606                    used, is in place at the berth or other loading or discharge port as
607                    ordered by Charterers;

16



| 608 | | 18.1.2 | on an outbound passage to an In-port Transfer Position, which |
| 609 | | | passage shall be deemed to commence upon the disconnection of |
| 610 | | | cargo hoses and end upon the Vessel's arrival at such In-port |
| 611 | | | Transfer position; or |

| 612 | | 18.1.3 | as a result of a labour dispute, or strike, involving tugs or pilots. |

613  18.2  Nor shall time count against laytime or, if the Vessel is on demurrage, as
614        demurrage when spent or lost:-

| 615 | | 18.2.1 | as a result, whether directly or indirectly, of breakdown, defect, |
| 616 | | | deficiency or inefficiency of, or other cause attributable to, the |
| 617 | | | Vessel, Master, officers, crew, Owners or their servants or agents; |

| 618 | | 18.2.2 | as a result of a labour dispute, or strike, involving the Master, |
| 619 | | | officers or crew of the Vessel; |

| 620 | | 18.2.3 | in, or in connection with, the handling of ballast unless this is |
| 621 | | | carried out concurrently with loading or discharging of cargo such |
| 622 | | | that no loss of time is involved; |

| 623 | | 18.2.4 | in, or in connection with, the discharging of slops unless the |
| 624 | | | discharging is carried out concurrently with loading or discharging |
| 625 | | | of cargo such that no loss of time is involved; or |

| 626 | | 18.2.5 | in cleaning tanks, pumps and pipelines under Clause 11. |

627  18.3  Nothing contained in this Clause 18 shall be affected by the provisions of
628        Clause 38.

629  **19.   PART A. LOADING AND DISCHARGE OF CARGO**

630  19.1  For the purposes of this Clause 19:-

| 631 | | "full cargo" | shall mean the quantity of cargo stated in Section C of PART |
| 632 | | | 1 or the total cargo actually loaded as ascertained by adding |
| 633 | | | together the quantities of cargo loaded under each Bill of |
| 634 | | | Lading issued under this Charter, whichever is the greater; |

| 635 | | "part cargo" | shall mean either the total cargo actually loaded, if less than |
| 636 | | | the quantity stated in Section C of PART 1, or the quantity of |
| 637 | | | each parcel loaded or discharged separately, as the context |
| 638 | | | may require; |

| 639 | | "bulk discharge" | shall mean the period of time taken by the Vessel to |
| 640 | | | discharge the full cargo or part cargo, as the case may be, |
| 641 | | | excluding any time during which only tank stripping and/or |
| 642 | | | crude oil washing operations are being performed. |

643  19.2  The cargo shall be pumped into the Vessel at the expense and risk of Charterers
644        and pumped out of the Vessel at the expense and risk of Owners, in each case
645        only as far as the Vessel's manifold.

646        Owners shall, if requested, make available the personnel, equipment and
647        facilities on board the Vessel which are required for the connection and
648        disconnection of hoses for loading and discharging. Any delay resulting from
649        the failure by Owners to provide such personnel, equipment and facilities shall
650        not count as laytime or, if the Vessel is on demurrage, as demurrage. The
651        Master may require shore supervision of, and approval for, the connection and
652        disconnection of hoses.

17

51



653   19.3   Owners undertake that:-

654       19.3.1   the Vessel shall load cargo at the maximum safe rate and in any
655                event shall load a full cargo within a maximum period of twenty-
656                four (24) hours, or pro-rata in the case of a part cargo, provided
657                always that the cargo is capable of being supplied within such
658                time; and

659       19.3.2   the Vessel shall discharge cargo at the maximum safe rate and in
660                any event shall, in the case of cargoes of one or more segregated
661                grades/parcels discharged concurrently or consecutively, discharge
662                a full cargo within twenty-four (24) hours, or pro rata in the case of
663                a part cargo, or shall maintain a minimum discharge pressure of
664                seven (7) bar at the Vessel's manifold throughout the bulk
665                discharge provided always that the cargo is capable of being
666                received within such time or at such pressure.  If restrictions are
667                imposed by the Terminal during discharge, or if physical attributes
668                of the Terminal restrict the discharge rate or pressure, Owners shall
669                only be relieved of the aforesaid obligation for the period and to
670                the extent such restrictions or attributes impede the discharge rate
671                or pressure.  The Terminal shall have the right to gauge discharge
672                pressure at the Vessel's manifold.

673   19.4   Any additional time used as a result of the inability of the Vessel to discharge
674          the full cargo within twenty-four (24) hours, or pro rata in the case of a part
675          cargo, or to maintain a minimum discharge pressure of seven (7) bar at the
676          Vessel's manifold throughout the discharge or failure by the Vessel to meet any
677          lesser performance required pursuant to a restriction imposed by the Terminal,
678          shall be for Owners' account and shall not count as laytime or, if the Vessel is
679          on demurrage, as demurrage.

680   19.5   In the case of multiple grades of cargoes where the total time taken to discharge
681          the full cargo is in excess of twenty-four (24) hours (or pro rata in the case of a
682          part cargo) and the Vessel fails to maintain a minimum discharge pressure of
683          seven (7) bar throughout the discharge, each grade carried will be assessed
684          separately as follows:-

685       19.5.1   The twenty-four (24) hours' allowance (pro rated in the case of a
686                part cargo) plus the appropriate crude oil washing allowance, if
687                any, calculated in accordance with Clause 19.8, shall be
688                apportioned to each grade, which is discharged consecutively, in
689                the ratio that the quantity of that grade discharged bears to the total
690                quantity of all grades of cargo discharged consecutively.  This ratio
691                shall be calculated by dividing the quantity of each grade that is
692                discharged consecutively by the aggregate bill of lading quantities
693                for all grades discharged consecutively.  For the purposes of this
694                apportionment, where two (2) or more grades are discharged
695                concurrently, the quantities so discharged shall be aggregated and
696                treated as one grade.

697       19.5.2   The allowance apportioned to each grade pursuant to Clause 19.5.1
698                shall then be offset against the total time actually taken to
699                discharge that grade.  Any excess time will not count against used
700                laytime or, if the Vessel is on demurrage, as demurrage.  However,
701                if the Vessel maintains a minimum discharge pressure of seven (7)
702                bar throughout the bulk discharge of a particular grade then the
703                time taken to discharge that grade will count in full against used
704                laytime or, if the Vessel is on demurrage, as demurrage.

18

52



755 concurrently with discharge of another grade/parcel. Any time taken for final
756 draining and stripping purposes in excess of such allowance shall not count as
757 used laytime or, if the Vessel is on demurrage, as demurrage.

758      PUMPING ASSESSMENT - EXAMPLE
759      3 GRADES
760          (1) Fuel Oil   35,000 B/L  <7 BAR
761      COW (2) Arab Heavy 40,000 B/L  <7 BAR
762      COW (3) Arab Light 45,000 B/L  ≥ 7 BAR

763      DISCHARGE TIME

764    (1)   00.00 1ST June   11.50 1ST June
765          11.50 1ST June   12.00 1ST June  Change Grade

766    (2)   12.00 1ST June   04.50 2ND June
767          04.50 2ND June   05.00 2ND June  Change Grade

768    (3)   05.00 2ND June  20.00 2ND June
769          Full COW required therefore additional 25% Pumping Time allowed

770                   Hrs   Mins
771     Grade (1) 35,000 MT
772        120,000 MT X 24 Hours   07   00   Time Allowed
773                           11   50   Time Taken
774               (A)   Excess   04   50   <7 BAR

775     Grade (2) 40,000 MT
776        120,000 MT X 30 Hours   10   00   Time Allowed
777                           16   50   Time Taken
778               (B)   Excess   06   50   <7 BAR

779     Grade (3) 45,000 MT
780        120,000 MT X30 Hours   11   15   Time Allowed
781                           15   00   Time Taken
782               (C) Excess  00   00   ≥7 BAR

783     Stripping allowance given for grade (3) pumping in excess of seven (7) bar

784                   Hrs   Mins
785     Total Excess Pumping Time =
786        (A) + (B) + (C)      11   40

787 **20.  CLAIMS TIME BAR**

788    20.1  Charterers shall be discharged and released from all liability in respect of any
789        claim for demurrage, deviation or detention which Owners may have under this
790        Charter unless a claim in writing has been presented to Charterers, together
791        with all supporting documentation substantiating each and every constituent
792        part of the claim, within ninety (90) days of the completion of discharge of the
793        cargo carried hereunder.

794    20.2  Any other claim against Charterers for any and all other amounts which are
795        alleged to be for Charterers' account under this Charter shall be extinguished,
796        and Charterers shall be discharged from all liability whatsoever in respect
797        thereof, unless such claim is presented to Charterers, together with full
798        supporting documentation substantiating each and every constituent part of the
799        claim, within one hundred and eighty (180) days of the completion of discharge
800        of the cargo carried hereunder.

801 **21.  SLACK TANKS/EVEN KEEL**

20



802  21.1  Notwithstanding the provisions of Clause 31, if Charterers are unable to supply
803        the quantity of cargo stated in Section C of PART 1 the Vessel shall not be
804        required to proceed to sea until such of her tanks are filled as will place her in
805        a seaworthy condition, and freight shall be paid as if the Vessel had loaded the
806        quantity of cargo stated in Section C of PART 1.

807  21.2  If for any reason the Vessel is unable to trim to even keel for arrival at a
808        discharge port Owners shall notify Charterers by telex stating the Vessel's
809        expected arrival draught forward and aft.  Such notification shall be given as
810        soon as practicable after Owners have received Charterers' Voyage Orders and
811        no later than the Vessel's departure from the loading port.

53

parksk/박성근/법무1팀/2018-04-02 19:35:00



812   22.   REVISED CHARTERERS' VOYAGE ORDERS FOR LOADING OR DISCHARGE PORTS

813   22.1   If at any time after the date of this Charter, Charterers, notwithstanding that they
814         may have nominated a loading or discharge port, wish to issue revised
815         Charterers' Voyage Orders and instruct Owners to stop and/or divert the Vessel
816         to an alternative port within any Ranges stated in Section E or F of PART 1, or
817         cause her to await orders at one or more locations, Owners shall issue such
818         revised instructions to the Master as are necessary to give effect to such revised
819         Charterers' Voyage Orders and the Master shall comply with such revised
820         instructions as soon as the Vessel is free of any previous charter commitments.

821   22.2   If-

822         22.2.1   solely by reason of Owners' compliance with such revised
823                   Charterers' Voyage Orders, the Vessel suffers delay causing her to
824                   arrive at the nominated port after the Cancelling Date stated in
825                   Section G of PART 1 or any new cancelling date determined under
826                   Clause 16.1, then the Cancelling Date or the new cancelling date,
827                   as the case may be, shall be extended by the period of such delay.

828         22.2.2   the Vessel arrives at the nominated port after the Commencement
829                   Date stated in Section G of PART 1, then any period during which
830                   the Vessel has been awaiting orders prior to her arrival, less any
831                   time by which the Vessel's arrival at the nominated port would, but
832                   for Charterers' instructions to await orders, have preceded the
833                   Commencement Date, shall count as laytime or, if the Vessel is on
834                   demurrage, as demurrage.

835         22.2.3   the Vessel is, after loading, instructed by Owners to stop and await
836                   orders at Charterers' request then all time spent by the Vessel
837                   awaiting orders shall count as laytime or, if the Vessel is on
838                   demurrage, as demurrage.

839   22.3   Any additional period by which the steaming time taken to reach the alternative
840         port exceeds the time that should have been taken had the Vessel proceeded to
841         such port directly shall count as laytime or, if the Vessel is on demurrage, as
842         demurrage. Such additional period shall be the time required for the Vessel to
843         steam the additional distance at the average speed actually achieved by the
844         Vessel during the voyage or the Charter Speed as stated in Section B.25 of
845         PART 1, whichever is the higher. Charterers shall pay Owners for additional
846         bunkers consumed for steaming the additional distance at the price paid by
847         Owners, net of all discounts or rebates, for the last bunkers lifted.

848   23.   VESSEL/CARGO INSPECTIONS/BUNKER SURVEYS

849   23.1   Charterers shall be entitled to cause their representative (which term includes
850         any independent surveyor appointed by Charterers) to carry out inspections of
851         the Vessel and/or observe cargo operations and/or ascertain the quantity and
852         quality of the cargo, water and residues on board, including the taking of cargo
853         samples, inspection and copying of the Vessel's logs, documents and records
854         (which shall include the personal notes of the crew, the rough log book and
855         computer generated data) at any loading and/or discharge port. Charterers'
856         representative may also conduct any of the aforementioned operations at or off
857         any other port to which Charterers may require the Master to divert the Vessel
858         at any time after leaving any loading port. Charterers shall obtain the consent
859         of the owners of any cargo on board at the time before requiring the Vessel to
860         be diverted.

22

jun kim/김준현/팀리더위터/2018-08-09 21:01:00
parksk/박성근/법무1팀/2018-04-02 19:35:00



861     Charterers' representative shall be entitled to survey, and take samples from,
862     any or all of the Vessel's cargo tanks, bunker fuel tanks and non-cargo spaces
863     at any place referred to above.

864    23.2   Charterers' exercise of, or failure to exercise, any of their rights under the
865         foregoing provisions shall be entirely without prejudice to the respective rights
866         and obligations of the parties.

867    23.3   Any delay arising solely as a result of any inspection, survey or sampling under
868         Clause 23.1 shall count as laytime or, if the Vessel is on demurrage, as
869         demurrage.

870    23.4   Any delay arising from instructions from Charterers to Owners to divert the
871         Vessel shall be calculated by reference to the additional period by which the
872         steaming time taken to reach the next loading or discharge port exceeds the
873         time that would have been taken had the Vessel proceeded to such port directly
874         and Owners shall be compensated for such delay and bunkers consumed for
875         steaming during such additional period in accordance with the provisions of
876         Clause 22.3.

877    23.5   Charterers shall also reimburse Owners in respect of port expenses reasonably
878         incurred solely by reason of Charterers' instructions to divert the Vessel.

879   24.   **MAINTENANCE OF CARGO TEMPERATURE**

880     Charterers shall have the right to instruct Owners to maintain the loaded temperature
881     of the cargo up to a maximum of 60°C. Owners undertake that the Vessel is capable
882     of maintaining the cargo temperature up to 60° throughout the laden voyage and
883     discharge of the cargo and that the Master shall advise Charterers, daily at noon local
884     time, of the temperature of such cargo in each of the Vessel's tanks. If the Vessel fails
885     to maintain the required temperature Owners shall be responsible for any resulting
886     loss, damage, cost or expense incurred by Charterers (including, without limitation,
887     any requirement that the Vessel must vacate the berth) and any time lost thereby shall
888     not count as laytime or, if the Vessel is on demurrage, as demurrage.

889   25.   **CARGO HEATING**

890     Charterers shall have the right to instruct Owners to raise the temperature of the cargo
891     above the loaded temperature up to a maximum temperature of 60°C in each of the
892     Vessel's cargo tanks provided always that the length of the voyage is such as to permit
893     the temperature rise required. In such case the Master shall advise Charterers daily, at
894     noon local time, of the temperature of the cargo in each of the Vessel's tanks.
895     Charterers shall reimburse Owners for the cost of additional bunkers consumed to
896     raise the temperature of the cargo as aforesaid. The quantity of bunkers so consumed
897     shall be calculated in accordance with the following formulae, as substantiated by
898     copies of the Vessel's cargo ullage and tank temperature records for the entire laden
899     voyage, copies of which are to be provided with Owners' claim for reimbursement.

900       Single Hull:-
901        Bunkers consumed (MT) = Quantity of cargo (MT) subject to temperature increase
902                       X
903          Increase in cargo temperature (°C) X 0.0001

904       Double Hull:-
905        Bunkers consumed (MT) = Quantity of cargo (MT) subject to temperature increase
906                       X
907          Increase in cargo temperature (°C) X 0.00007

908     The price for the additional bunkers consumed shall be the price paid by Owners, net
909     of all discounts or rebates, for the last bunkers lifted. Upon presentation of their

23



910  claim Owners shall provide Charterers with the invoices for the last bunkers lifted
911  and evidence of payment of same.

912  **26.   LIBERTY**

913  The Vessel shall have liberty to sail with or without pilots, to tow or go to the
914  assistance of vessels in distress and to deviate for the purpose of saving life and
915  property, or for any other reasonable purpose.

916  Unless specifically agreed to the contrary by Charterers, Owners undertake that the
917  Vessel will not stop or deviate for the purpose of replenishing bunkers on a laden
918  passage.

919  **27.   TRAFFIC SEPARATION AND ROUTEING**

920  Owners shall instruct the Master to observe regulations and recommendations as to
921  traffic separation and routeing as issued, from time to time, by responsible
922  organisations or regulating authorities including, but not limited to, the IMO, the UK
923  Chamber of Shipping (or equivalent), or as promulgated by the State of the flag of the
924  Vessel or the State in which management of the Vessel is exercised.

925  **28.   ICE ON VOYAGE AND ICE AT LOADING OR DISCHARGE PORTS**

926  28.1  If on passage to the loading or discharge port the Master finds that the port is
927  inaccessible owing to ice he shall immediately request Charterers by telex to
928  revise Charterers' Voyage Orders and pending a response from Charterers the
929  Vessel shall remain outside the area of ice-bound water. Any time lost awaiting
930  such revised Charterers' Voyage Orders shall count as laytime or, if the Vessel
931  is on demurrage, as demurrage.

932  28.2  Upon receipt of such request Charterers shall instruct Owners to order the
933  Vessel to proceed to an alternative ice-free and accessible port within the
934  Ranges stated in Sections E and F of PART 1 and where there are facilities for
935  loading or discharging the cargo, as the case may be. In this event freight shall
936  be paid at the rate applicable under this Charter to such alternative loading or
937  discharge port. Any additional period by which the steaming time taken to
938  reach the alternative port exceeds the time that should have been taken had the
939  Vessel proceeded to such port directly shall count as laytime or, if the Vessel is
940  on demurrage, as demurrage. Such additional period shall be the time required
941  for the Vessel to steam the additional distance at the average speed actually'
942  achieved by the Vessel during the voyage or the Charter Speed as stated in
943  Section B.25 of PART 1, whichever is the higher. Charterers shall pay Owners
944  for additional bunkers consumed for steaming the additional distance at the
945  price paid by Owners, net of all discounts or rebates, for the last bunkers lifted.

946  28.3  If, on or after the Vessel's arrival at the loading or discharge port, there is a
947  danger of her being frozen in, the Vessel shall proceed to the nearest safe and
948  ice-free position and at the same time the Master shall request Charterers by
949  telex to revise Charterers' Voyage Orders. Upon receipt of such request
950  Charterers shall instruct Owners to order the Vessel either to proceed to an
951  alternative ice-free and accessible port, within the Ranges stated in Sections E
952  and F of PART 1, where there is no danger of the Vessel being frozen in and
953  where there are facilities for loading or discharging cargo, or to return to and
954  load or discharge at the port originally nominated, or to remain at the safe and
955  ice-free position to await orders. If the Vessel is ordered to such an alternative
956  port the sums to be paid by Charterers to Owners in respect of freight,
957  additional steaming time and additional bunkers shall be calculated and
958  compensated in accordance with the provisions of Clause 28.2, but if Charterers
959  instruct Owners to load or discharge the Vessel at the port originally
960  nominated, then, subject to Clauses 7, 8, 17, 18 and 19 the whole of the time

24



961 from the receipt of NOR to load or discharge on the Vessel's first arrival at the
962 port originally nominated until the cargo hoses have been disconnected after
963 the completion of loading or discharging shall count as laytime or, if the Vessel
964 is on demurrage, as demurrage. Any delay caused by ice at the port originally
965 nominated after the final disconnection of the cargo hoses shall count as
966 laytime or, if the Vessel is on demurrage, as demurrage.

967 If Charterers instruct Owners to order the Vessel to remain at the safe and ice-
968 free position and await orders then any time lost awaiting orders shall count as
969 laytime or, if the Vessel is on demurrage, as demurrage.

970 **29.   QUARANTINE**

971 If Charterers require the Vessel to proceed to any port at which, at the time when the
972 Vessel is ordered to that port, there is quarantine then time spent or lost whilst the
973 Vessel is detained due to such quarantine shall count as laytime or, if the Vessel is on
974 demurrage, as demurrage. However, if quarantine is subsequently declared whilst the
975 Vessel is on passage to such port Charterers shall not be liable for any delay caused
976 by such quarantine.

977 **30.   BILLS OF LADING AND INDEMNITIES**

978 30.1 Bills of Lading shall be signed as Charterers direct, without prejudice to this
979 Charter. Charterers hereby indemnify Owners:-

980 30.1.1 against all liabilities that may arise from the signing of Bills of
981 Lading in accordance with the directions of Charterers to the extent
982 that the terms of such Bills of Lading impose more onerous
983 liabilities than those assumed by Owners under the terms of this
984 Charter; and

985 30.1.2 against claims brought by holders of Bills of Lading against Owners
986 by reason of any deviation required by Charterers under Clauses
987 22, 23 or 28.

988 30.2 All Bills of Lading issued under this Charter shall be deemed to contain War
989 Risks, Both-to-Blame Collision and New Jason clauses.

990 30.3 If a Bill of Lading is not available at any discharge port to which the Vessel may
991 be ordered by Charterers under this Charter or if Charterers require Owners to
992 deliver cargo to a party and/or at a port other than as set out in the Bills of
993 Lading, then Owners shall nevertheless discharge such cargo in compliance
994 with Charterers' instructions, upon presentation by the consignee nominated by
995 Charterers ("the Receiver") of reasonable identification to the Master and in
996 consideration of Charterers undertaking:-

997 30.3.1 to indemnify Owners (which term shall, for the purpose of this
998 Clause, include Owners' servants and agents) and to hold Owners
999 harmless in respect of any liability, loss, damage, cost or expense
1000 of whatsoever nature which Owners may sustain by reason of
1001 delivering the cargo to the Receiver in accordance with Charterers'
1002 instructions;

1003 30.3.2 to provide Owners on demand, in the event of any proceedings
1004 being commenced against Owners in connection with the delivery
1005 of the cargo as aforesaid, from time to time, with sufficient funds to
1006 defend the same;

1007 30.3.3 to provide Owners on demand with such bail or other security as
1008 may be required if, in connection with the delivery of the cargo as

25

| | | |
|---|---|---|
| 1009 | | aforesaid, the Vessel, or any other vessel or property belonging to |
| 1010 | | Owners, should be arrested or detained or, if the arrest or |
| 1011 | | detention thereof should be threatened, in order to prevent such |
| 1012 | | arrest or detention, or to secure the release of such Vessel or |
| 1013 | | property and to indemnify Owners in respect of any loss, damage, |
| 1014 | | cost or expense caused by such arrest or detention whether or not |
| 1015 | | the same be justified; and |
| | | |
| 1016 | 30.3.4 | to produce and deliver to Owners all original Bills of Lading in |
| 1017 | | respect of the cargo loaded by the Vessel as soon as same shall |
| 1018 | | have arrived and/or come into the possession of Charterers |
| 1019 | | whereupon Charterers' liability hereunder shall cease. |
| | | |
| 1020 | | The provisions of the foregoing undertakings shall be governed by English |
| 1021 | | Law. |
| 1022 | | |

1023 **31. FREIGHT RATE**

1024    31.1    The Freight Rate shall be that stated in Section H of PART 1. If the cargo
1025            quantity stated in Section C of PART 1 is a minimum quantity, then the freight
1026            payable for any cargo loaded in excess of the said minimum quantity shall,
1027            notwithstanding this Clause 31, be at the Overage rate stated in Section H of
1028            PART 1, unless a lump sum freight has been agreed in which case no Overage
1029            shall be payable. Where the Freight Rate stated in Section H of PART 1 is
1030            expressed as a percentage of Worldscale the Worldscale rate shall be the rate in
1031            force at the date of this Charter.

1032    31.2    If Charterers instruct Owners to order the Vessel to increase speed under
1033            Clause 3 the Freight Rate shall be increased as provided in Section H of PART 1
1034            for each knot of increased speed above the Charter Speed and pro rata for
1035            fractions of a knot up to the Maximum Speed. Such increase shall be calculated
1036            in accordance with the following example:

1037            Example:   The Vessel proceeds at Charter Speed of 10 knots, the rate
1038            for which is Worldscale 40. After 10 days the Master is instructed to
1039            complete the voyage at 12 knots. The remainder of the voyage takes 20
1040            days. The increased speed option provides for a premium of 0.5 of a
1041            Worldscale point per knot of increased speed over Charter Speed.

1042            The freight rate for the above voyage would be calculated as follows:
1043            Voyage freight rate    =   (W40 x 10 days) + W41* x 20 days)
1044                                        30 (total voyage days)
1045                                    =   W40.67
1046            (*1 point premium for 12 knots Maximum Speed)

1047            If the Vessel fails to maintain the speed ordered, due to breakdown or any
1048            other reason whatsoever beyond Charterers' control, the freight rate shall be
1049            calculated based on the average speed actually achieved by the Vessel using BP
1050            Worldwide Marine Distance Tables to assess the length of the voyage between
1051            pilot stations at the loading and discharge ports but the freight rate shall not be
1052            less than the Freight Rate at Charter Speed.

1053    31.3    If a lump sum freight is agreed for the voyage this shall be in respect of the
1054            overall voyage of the Vessel from the first loading port to the final discharge
1055            port.

1056            Charterers shall be entitled to load and discharge at additional ports within the
1057            Ranges stated in Sections E and F of PART 1. If the lump sum freight stated in
1058            Section H of PART 1 specifically includes additional loading or discharge ports
1059            or if a further lump sum payment is agreed for additional loading or discharge

26



1060        ports then no other payment shall, subject to Clauses 5 and 34, be made by
1061        Charterers and laytime or, if the Vessel is on demurrage, demurrage shall count
1062        in accordance with the provisions of this Charter.

1063        In the absence of any agreement in respect of lump sum freight for additional
1064        loading or discharge ports Charterers shall reimburse Owners for any
1065        additional port costs incurred by Owners in complying with Charterers'
1066        instructions. Time used at the additional ports, including time which would
1067        otherwise be excluded under Clause 18.1 (subject to the exceptions and
1068        exclusions of laytime and/or demurrage found elsewhere in this Charter,
1069        including but not limited to those under Clauses 17 and 18) shall count as
1070        laytime or, if the Vessel is on demurrage, as demurrage. Laytime, or, if the
1071        Vessel is on demurrage, demurrage shall commence upon tender of a valid NOR
1072        which has become effective as determined under Clause 6.3 and shall end when
1073        cargo hoses have been finally disconnected. The provisions of Clause 22.3 shall
1074        also apply, and reference in Clause 22.3 to the term "alternative port" shall for
1075        the purposes of this Clause 31.3 be deemed to be a reference to "additional
1076        port".

1077   31.4  Freight shall be payable immediately after completion of discharge, on the gross
1078        quantity of cargo loaded by the Vessel as evidenced by the Bills of Lading
1079        furnished by the shippers, less any sum derived from the operation of Clauses
1080        2, 32 and 33 and less any disbursements or advances made to the Master or
1081        Agents at loading and/or discharge ports, any sums payable by Owners under
1082        Clause 34, and any additional cargo insurance premium for Owners' account
1083        under Clause 35, provided that no freight shall be payable on any quantity that
1084        submerges, at any stage of the voyage, the marks appropriate under the
1085        International Load Line Convention, 1966, or any modification or amendment
1086        thereof, to the voyage to be performed under this Charter.

1087   31.5  All payments due to Owners under this Charter shall be remitted by Charterers
1088        to the account stated in Section K of PART 1.

1089  **32.**  **ADDRESS COMMISSION**

1090        Charterers shall deduct 1.25% address commission from freight (including fixed and
1091        variable freight differentials), and any deadfreight and demurrage payable under this
1092        Charter.

1093  **33.**  **CARGO RETENTION**

1094   33.1  If any quantity of cargo remaining on board the Vessel ("ROB") upon
1095        completion of discharge is judged by an independent surveyor appointed by
1096        Charterers to be liquid, or if Charterers can show that the ROB would have
1097        been liquid if Owners and/or the Master, officers and crew had followed
1098        Charterers' instructions for the management of the cargo, then Charterers shall
1099        be entitled to deduct from freight the value of such quantity of cargo calculated
1100        on the basis of the free on board ("FOB") value at the loading port plus freight
1101        thereon calculated in accordance with Clause 31 hereof.

1102   33.2  For the purpose of this Clause 33, any quantity of ROB shall be regarded as
1103        liquid if sampling and testing, which testing shall be performed as soon as
1104        practicable after sampling, shows the ROB to have had a dynamic viscosity of
1105        less than 600 centipoise at its temperature when sampled from the Vessel's tank
1106        or, if Charterers' heating instructions have not been complied with, at the
1107        temperature that would have been applicable in the Vessel's tank if such
1108        instructions had been complied with.

1109        Any quantity of ROB which is of insufficient depth to be sampled shall also be
1110        regarded as liquid if the independent surveyor judges it to be liquid after using

61

parksk/박성근/법무1팀/2018-04-02 19:35:00

| | | |
|---|---|---|
| 1111 | | other means of testing including, without limitation, a representative number of |
| 1112 | | dips across each tank. |

| 1113 | 33.3 | The independent surveyor's findings shall be final and binding upon Owners |
|---|---|---|
| 1114 | | and Charterers save for instances of arithmetical error in calculation. |

1115  33.4  Charterers hereby agree to indemnify Owners against any liability to a Bill of
1116  Lading holder resulting from non-delivery of any such cargo in respect of which
1117  a deduction from freight is made under this Clause 33 provided always that
1118  Charterers shall under no circumstances be liable to indemnify Owners in an
1119  amount greater than the amount of freight so deducted.

1120  33.5  For the purpose of this Clause 33, slops shall not be included in the measured
1121  and reported liquid volume of oil on board the Vessel prior to loading.

1122  33.6  For the avoidance of doubt this Clause 33 refers solely to liquid cargo ROB from
1123  the cargo loaded hereunder and any measured volume of liquid oil on board
1124  the Vessel prior to loading shall be deducted from any calculation made under
1125  this Clause 33.

1126  **34.  DUES AND OTHER CHARGES**

1127  34.1  If, under Sections 4 and 5 of Part B of the Preamble of Worldscale, a due or
1128  charge is expressly stated to be for the account of Owners or Charterers then
1129  such due or charge shall be payable accordingly. Dues and other charges
1130  payable by Charterers under Section 5 of Part B of the Preamble of Worldscale
1131  shall in the first instance be paid by Owners and Charterers shall reimburse
1132  Owners upon presentation of all supporting invoices by Owners.

1133  34.2  If freight for a voyage is not based on Worldscale but is calculated on some
1134  other basis such as, without limitation, an agreed lump sum amount or a per
1135  tonne amount, Charterers shall not be liable for any costs covered by
1136  Worldscale, under a fixed or variable freight differential (Section D of
1137  Worldscale), such costs being deemed to be included in the agreed freight.
1138  However Sections 4 and 5 of Part B of the Preamble of Worldscale shall still
1139  apply.

1140  34.3  If a charge is imposed upon Charterers by the owner of a berth by reason of
1141  prolonged occupation of the berth by the Vessel for reasons beyond the control
1142  of Charterers, their servants or agents then such charge shall be paid by
1143  Owners.

1144  **35.  CARGO INSURANCE**

1145  Any additional premiums which may be charged by cargo underwriters on any cargo
1146  insurance in respect of the cargo carried hereunder by reason of the Vessel's age
1147  and/or condition shall be for Owners' account, and Charterers shall be entitled to
1148  deduct the cost of any such additional premium from freight payable under Clause 31.

1149  **36.  CODING OF CARGO DOCUMENTATION - US CUSTOMS REGULATIONS**

1150  36.1  If Charterers require the Vessel to discharge at a port within the jurisdiction of
1151  the US Customs Service, the Master shall insert Owners' Unique Identifier on
1152  each Bill of Lading accompanying a shipment of imported cargo in accordance
1153  with US Customs Regulations (19 CFR Parts 4 and 178). Owners shall provide
1154  Charterers and Agents on request with details of their Unique Identifier in
1155  respect of any cargo carried hereunder.

1156  36.2  If the Master fails to insert Owners' Unique Identifier under this Clause 36
1157  Owners shall be liable for any delays resulting therefrom and any time lost

28



1158
1159

thereby shall not count as laytime or, if the Vessel is on demurrage, as
demurrage.

parksk/박성근/법무1팀/2018-04-02 19:35:00



1160 37.  **UNITED STATES COAST GUARD ("USCG") CERTIFICATE OF FINANCIAL**
1161     **RESPONSIBILITY/UNITED STATES COAST GUARD REGULATIONS**

1162     37.1  Owners undertake that the Vessel shall carry on board a valid USCG Certificate
1163           of Financial Responsibility ("COFR") as required under the US Federal Oil
1164           Pollution Act 1990 and that for the duration of this Charter the said COFR shall
1165           be maintained in all respects valid for trading to ports in the USA. Owners
1166           further undertake that the Vessel shall carry on board copies of the Vessel's
1167           Federal Oil Spill Response Plan and any US State specific Response Plan
1168           (individually and collectively "Response Plan") that have been approved by the
1169           USCG or by the appropriate State Authority respectively and that the Master
1170           shall operate the Vessel fully in accordance with the said Response Plan.

1171     37.2  Owners undertake that the Vessel shall for the duration of this Charter either
1172           comply with all applicable USCG Regulations or carry on board appropriate
1173           waivers from the USCG if in any respect whatsoever the Vessel does not so
1174           comply.

1175 38.  **EXCEPTIONS**

1176     38.1  The provisions of Articles III (other than Rule 8), IV, IV bis and VIII of the
1177           Schedule to the Carriage of Goods by Sea Act, 1971 of the United Kingdom shall
1178           apply to this Charter and shall be deemed to be inserted *in extenso* herein. This
1179           Charter shall be deemed to be a contract for the carriage of goods by sea to
1180           which the said Articles apply, and Owners shall be entitled to the protection of
1181           the said Articles in respect of any claim made hereunder.

1182     38.2  Charterers shall not, unless expressly provided otherwise in this Charter, be
1183           responsible for any loss, damage, cost, expense, delay or failure in performance
1184           hereunder arising or resulting from Act of God, act of war, hostilities, seizure
1185           under legal process, quarantine restrictions, labour disputes or strikes
1186           threatened or actual, riots, civil commotions, arrest or restraint of princes, rulers
1187           or people.

1188 39.  **WAR RISKS**

1189     39.1  For the purpose of this Clause 39 the words:-

1190           "Owners"   shall include the shipowners, bareboat charterers, disponent
1191                      owners, managers or other operators who are charged with the
1192                      management and/or operation of the Vessel, and the Master; and

1193           "War Risks" shall include any war (whether actual or threatened), act of war,
1194                      civil war, hostilities, revolutions, rebellion, civil commotion,
1195                      warlike operations, the laying of mines (whether actual or
1196                      reported), acts of piracy, acts of terrorists, acts of hostility or
1197                      malicious damage, blockades (whether imposed against all vessels
1198                      or imposed selectively against vessels of certain flags or
1199                      ownership, or against certain cargoes or crews or otherwise
1200                      howsoever), by any person, body, terrorist or political group, of
1201                      the Government of any state whatsoever, which, in the reasonable
1202                      judgment of the Master and/or Owners, may be dangerous or are
1203                      likely to be or to become dangerous to the Vessel, her cargo, crew
1204                      or other persons on board the Vessel.

1205     39.2  If at any time before the Vessel commences loading, it appears, in the
1206           reasonable judgement of the Master and/or Owners, that performance of the
1207           contract of carriage, or any part of it, may expose, or is likely to expose, the
1208           Vessel, her cargo, crew or other persons on board the Vessel to War Risks,

30

*14*

1209  Owners may give notice to Charterers cancelling this Charter, or may refuse to
1210  perform such part of it as may expose, or may be likely to expose, the Vessel,
1211  her cargo, crew or other persons on board the Vessel to War Risks provided
1212  always that if either Section E or F of PART 1 provides for a loading or
1213  discharging Range, as the case may be, and the Vessel, her crew, other persons
1214  on board, or cargo may be exposed, or may be likely to be exposed, to War
1215  Risks, at the port originally nominated by Charterers, then Owners shall first
1216  require Charterers to nominate a safe port which lies within the relevant Range,
1217  and may only cancel this Charter if Charterers shall not have nominated such
1218  safe port within forty-eight (48) hours of receipt of such request.

1219  39.3  Owners shall not be required to continue to load cargo for any voyage, or to
1220  sign Bills of Lading for any port, or to proceed or continue on any voyage, or
1221  on any part thereof, or to proceed through any canal or waterway, or to
1222  proceed to or remain at any port whatsoever, where it appears, either after the
1223  loading of the cargo commences, or at any stage of the voyage thereafter before
1224  the discharge of the cargo is completed, that, in the reasonable judgement of the
1225  Master and/or Owners, the Vessel, her cargo (or any part thereof), crew or
1226  other persons on board the Vessel (or any one or more of them) may be, or are
1227  likely to be, exposed to War Risks. If it should so appear, Owners may, by
1228  telex, request Charterers to nominate a safe port for the discharge of the cargo
1229  or any part thereof, and if within forty-eight (48) hours of the receipt of such
1230  telex, Charterers shall not have nominated such a port, Owners may discharge
1231  the cargo at any safe port of their choice (including the loading port) in
1232  complete fulfilment of their obligations under this Charter. Owners shall be
1233  entitled to recover from Charterers the extra expenses of such discharge and, if
1234  the discharge takes place at any port other than the loading port, to receive the
1235  full freight as though the cargo had been carried to the discharge port originally
1236  nominated. Any additional period by which the steaming time taken to reach
1237  the port at which the cargo is discharged exceeds the time which would have
1238  been taken had the Vessel proceeded to the original discharge port directly,
1239  and bunkers consumed for steaming during such additional period, shall be
1240  calculated and compensated in accordance with the provisions of Clause 22.3.

1241  39.4  If at any stage of the voyage after the loading of the cargo commences, it
1242  appears, in the reasonable judgement of the Master and/or Owners, that the
1243  Vessel, her cargo, crew or other persons on board the Vessel may be, or are
1244  likely to be, exposed to War Risks on any part of the route (including any canal
1245  or waterway) which is normally and customarily used in a voyage of the nature
1246  contracted for, and there is another longer route to the discharge port, Owners
1247  may give notice to Charterers that this route should be taken. In such case this
1248  Charter shall be read in respect of freight and all other conditions whatsoever
1249  as if the voyage performed were that originally designated.

1250  However if the Vessel discharges the cargo at a port outside the Ranges stated
1251  in Section F of PART 1, freight shall be paid as for the voyage originally
1252  designated and any additional period by which the steaming time taken to
1253  reach the discharge port exceeds the time which would have been taken to
1254  reach the originally designated discharge port directly, and bunkers consumed
1255  for steaming during such additional period, shall be calculated and
1256  compensated in accordance with the provisions of Clause 22.3. Any additional
1257  port, canal or waterway expenses incurred by Owners as a result of the Vessel
1258  discharging outside the Ranges stated in Section F of PART 1 as aforesaid shall
1259  be for Charterers' account and Charterers shall reimburse to Owners any
1260  amounts due under this Clause 39.4 upon receipt of Owners' invoice together
1261  with full supporting documentation.

1262  39.5  The Vessel shall have liberty:-

31

65



| 1263 | 39.5.1 | to comply with all orders, directions, recommendations or advice |
| 1264 | | as to departure, arrival, routes, sailing in convoy, ports of call, |
| 1265 | | stoppages, destinations, discharging of cargo, delivery or in any |
| 1266 | | way whatsoever which are given by the government of the state |
| 1267 | | under whose flag the Vessel sails, or other government to whose |
| 1268 | | laws Owners are subject, or any other government which so |
| 1269 | | requires, or any body or group acting with the power to compel |
| 1270 | | compliance with their orders or directions; |

1271      39.5.2    to comply with the orders, direction or recommendations of any
1272                 war risks underwriters who have the authority to give the same
1273                 under the terms of the war risks insurance applicable to the Vessel;

1274      39.5.3    to comply with the terms of any resolution of the Security Council
1275                 of the United Nations, any directives of the European Community,
1276                 the effective orders of any other supranational body which has the
1277                 right to issue and give the same, and with national laws aimed at
1278                 enforcing the same to which Owners are subject, and to obey the
1279                 orders and directions of those who are charged with their
1280                 enforcement;

1281      39.5.4    to discharge at any other port any cargo or part thereof which may
1282                 render the Vessel liable to confiscation as a contraband carrier;

1283      39.5.5    to call at any other port to change the crew or any part thereof or
1284                 other persons on board the Vessel if there is good reason to
1285                 believe that they may be subject to internment, imprisonment or
1286                 other sanctions; and

1287      39.5.6    if cargo has not been loaded or has been discharged by Owners
1288                 under this Clause 39, to load other cargo for Owners' own benefit
1289                 and carry it to any other port or ports whatsoever, whether
1290                 backwards or forwards or in a contrary direction to the ordinary or
1291                 customary route.

1292    39.6   If in compliance with Clauses 39.2 to 39.5 anything is done or not done, such
1293            shall not be deemed to be a deviation, but shall be considered as due fulfilment
1294            by the party concerned of its obligations under this Charter.

1295    40.    BOTH-TO-BLAME COLLISION

1296    40.1   If the liability for any collision in which the Vessel is involved while performing
1297            this Charter falls to be determined in accordance with the laws of the USA, or
1298            the laws of any State which applies laws similar to those applied in the USA in
1299            the circumstances envisaged by this Clause 40, the following provision shall
1300            apply:-

1301            "If the Vessel comes into collision with another vessel as a result of the
1302            negligence of the other vessel and any act, neglect or default of the Master,
1303            mariner, pilot or the servants of the carrier in the navigation or in the
1304            management of the Vessel, the owners of the goods carried hereunder will
1305            indemnify the carrier against all loss or liability to the other or non-carrying
1306            vessel or her owners in so far as such loss or liability represents loss of, or
1307            damage to, or any claim whatsoever of the owners of, said goods, paid or
1308            payable by the other or non-carrying vessel or her owners to the owners of said
1309            goods and set off, recouped or recovered by the other or non-carrying vessel or
1310            her owners as part of their claim against the carrying vessel or carrier.

32



1311
1312
1313

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of collision or contact."

1314
1315
1316
1317
1318
1319
1320

40.2   Whilst Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved falls to be determined under the preamble of this Clause 40, Charterers neither warrant nor undertake that such provision shall be effective. In the event that such provision proves ineffective Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify Owners.

1321   **41.   GENERAL AVERAGE**

1322
1323
1324
1325

General Average shall be adjusted and settled in London in accordance with the York-Antwerp Rules, 1994 or any modification or re-enactment thereof for the time being in force.

1326   **42.   NEW JASON**

1327
1328

If, notwithstanding Clause 41, General Average is adjusted in accordance with the law and practice of the USA, the following provision shall apply:-

1329
1330
1331
1332
1333
1334
1335
1336

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

1337
1338
1339
1340
1341

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo shippers, consignees or owners of the cargo to the carrier before delivery".

1342   **43.   CLAUSE PARAMOUNT**

1343
1344

All Bills of Lading issued under this Charter shall be deemed to contain the following Clause Paramount:-

1345   "CLAUSE PARAMOUNT

1346
1347
1348
1349
1350
1351
1352
1353
1354
1355

(1)   This Bill of Lading shall have effect subject to any national law making the International Convention for the unification of certain rules of law relating to bills of lading signed at Brussels on 25th August 1924 (The Hague Rules) or the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968 (The Hague/Visby Rules) compulsorily applicable to this Bill of Lading. If any term of this Bill of Lading be repugnant to that legislation to any extent, such term shall be void to that extent but no further. Neither the Hague Rules nor the Hague/Visby Rules shall apply to this Bill of Lading where the goods carried hereunder consist of live animals or cargo which by this Bill of Lading is stated as being carried on deck and is so carried.

1356
1357
1358
1359

(2)   Save where the Hague or Hague/Visby Rules apply by reason of (1) above, this Bill of Lading shall take effect subject to any national law in force at the port of shipment or place of issue of the Bill of Lading making the United Nations Convention on the Carriage of Goods by Sea 1978 (the Hamburg Rules)

33



1360  compulsorily applicable to this Bill of Lading in which case this Bill of Lading
1361  shall have effect subject to the Hamburg Rules which shall nullify any
1362  stipulation derogating therefrom to the detriment of the shipper or consignee.

1363  (3)  Where the Hague, Hague/Visby or Hamburg Rules are not compulsorily
1364  applicable to this Bill of Lading, the carrier shall be entitled to the benefits of
1365  all privileges, rights and immunities contained in Articles I to VIII of the
1366  Hague/Visby Rules.

1367  (4)  Nothing in this Bill of Lading shall be construed as in any way restricting,
1368  excluding or waiving the right of any relevant party or person to limit his
1369  liability under any available legislation and/or law".

1370  **44.  OIL POLLUTION INSURANCE**

1371  44.1  Owners warrant that they have, and shall maintain in force throughout the
1372  period of this Charter, the following oil pollution insurances:-

1373  44.1.1  the standard oil pollution insurance cover (currently US$500
1374  million) available, from time to time, from their Protection and
1375  Indemnity Club; and

1376  44.1.2  any additional oil pollution insurance cover (currently US$200
1377  million) which is, or becomes, available from market, or other
1378  sources provided always that the security of the provider of the
1379  cover is acceptable to Charterers.

1380  **45.  OIL POLLUTION PREVENTION**

1381  45.1  Owners undertake that the Vessel:-

1382  45.1.1  is a tanker owned by a member of the International Tanker Owners
1383  Pollution Federation Limited and will so remain throughout the
1384  period of this Charter.

1385  45.1.2  is entered in the P & I Club stated in Section 9.1 of the BP Shipping
1386  Questionnaire last completed by or on behalf of Owners and will
1387  so remain unless Owners have given Charterers prior written
1388  notice of their intention to change. Owners warrant however, that
1389  the Vessel will only be entered in a P & I Club within the
1390  International Group of P & I Clubs.

1391  45.2  When an escape or discharge of Oil occurs from the Vessel and causes or
1392  threatens to cause Pollution Damage, or when there is the Threat of an escape
1393  or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge
1394  of Oil which, if it occurred, would create a serious danger of Pollution Damage,
1395  whether or not an escape or discharge in fact subsequently occurs), then upon
1396  notice to Owners or Master, Charterers shall have the right (but shall not be
1397  obliged) to place onboard the Vessel and/or have in attendance at the incident
1398  one or more Charterers' representatives to observe the measures being taken by
1399  Owners and/or national or local authorities and their respective servants, agents
1400  or contractors to prevent or minimise Pollution Damage and, in Charterers'
1401  absolute discretion, to provide advice, equipment or manpower or undertake
1402  such other measures, at Charterers' risk and expense, as are permitted under
1403  applicable law and as Charterers believe are reasonably necessary to prevent or
1404  minimise such Pollution Damage or to remove the Threat of an escape or
1405  discharge of Oil.

34

68



1406 45.3 The provisions of this Clause 45 shall be without prejudice to any other rights
1407 and/or duties of Charterers or Owners whether arising under this Charter or
1408 under applicable law or under any International Convention.

1409 45.4 In this Clause the terms "Oil", "Threat" and "Pollution Damage" shall have the
1410 same meaning as that defined in the Civil Liability Convention 1969 or any
1411 Protocol thereto.

1412 **46. LIEN**

1413 Owners shall have a lien upon the cargo for all freight, deadfreight, demurrage and
1414 the cost of recovery thereof.

1415 **47. SUB-LETTING**

1416 Charterers may sub-let the Vessel without prejudice to the respective rights and
1417 obligations of either party under this Charter.
1418
1419 **48. ADMINISTRATION**

1420 48.1 Unless otherwise specifically requested by either Owners or Charterers, no
1421 formal charterparty shall be prepared and signed. The terms and conditions of
1422 this Charter shall be evidenced by a recap fixture telex ("Recap Fixture Telex")
1423 issued by Charterers' broker to Owners and Charterers and shall be confirmed
1424 as correct by return telexes from both parties to the said broker who shall
1425 acknowledge receipt of such confirmation telexes to both parties within forty-
1426 eight (48) hours after the lifting of subjects and a charterparty in the format of
1427 this Charter, as modified by the Recap Fixture Telex and bearing the same date
1428 as the Recap Fixture Telex, shall be deemed to have been signed by Owners
1429 and Charterers.

1430 48.2 If either party requires a formal charterparty to be prepared and signed then
1431 Owners shall procure that Owners' broker shall prepare a charterparty in the
1432 format of this Charter, as modified by the Recap Fixture Telex, and bearing the
1433 same date as the Recap Fixture Telex and shall arrange for signature thereof by
1434 both Owners and Charterers.

1435 **49. LAW**

1436 The construction, validity and performance of this Charter shall be governed by
1437 English Law. The High Court in London shall have exclusive jurisdiction over any
1438 dispute which may arise out of this Charter.

1439 *In Witness Whereof* the parties have caused this Charter to be executed as of the date
1440 first above written

1441 .......................................................................................
1442 for and on behalf of

1443 .......................................................................................
1444 OWNERS

1445 .......................................................................................
1446 for and on behalf of

1447 .......................................................................................
1448 CHARTERERS

35

69



APPENDIX 1

THE BP SHIPPING QUESTIONNAIRE

96

parksk/박성근/법무1팀/2018-04-02 19:35:00



## Clearlake Voyage Chartering Terms

### Effective September 1, 2010

**Additional Clauses to BPVOY 4**

1.  **BP ISPS Clause for Voyage Charter Parties**

(a)  (i)  The Owners shall procure that both the Vessel and "the Company" (as defined by the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code)) and the "Owner" (as defined by the US Maritime Transportation Security Act 2002 (MTSA)) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company" and the requirements of the MTSA, if applicable, relating to the Vessel and the "Owner". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or the MTSA, if applicable, or this Clause shall be for the Owners' account.

(b)  (i)  The Charterers shall provide the Owner with their full style contact details and any other information the Owners require to comply with the ISPS Code and the MTSA, if applicable. Additionally, Charterers shall ensure that the contact details of any sub-charterers are likewise provided and that all sub-charters they enter into contain the following provision:

"The Charterers shall provide Owners with their full style contact details and, where sub-chartering is permitted under the terms of the Charter Party, shall ensure that contact details of all sub-charterers are likewise provided to Owners."

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this sub-clause (b) shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(c)  (i)  Without prejudice to the foregoing, Owners' right to tender notice of readiness and Charterers' liability for demurrage in respect of any time delays caused by breaches of this Clause shall be dealt with in accordance with Clauses 6 (Notice of Readiness),7 (Laytime/Demurrage) and 18 (Suspension of Laytime/Demurrage), of the Charter.



71



    (ii)   Except where the delay is caused by Owners' and/or Charterers' failure to comply with sub-clauses (a) and (b) respectively of this Clause, then any delay arising or resulting from measures imposed by a port facility or by any relevant authority, under the ISPS Code/MTSA, shall count as half laytime, or, if the vessel is on demurrage, half rate demurrage.

(d)  Any costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be shared equally between Owners and Charterers, except where:–

    (i)    such costs or expenses are imposed as a result of Owners' or Charterers' failure to comply with sub-clauses (a) and (b) respectively of this Clause; or

    (ii)   if freight for the voyage is based on Wordscale, such costs or expenses are included by Worldscale in their freight calculation (in which case such costs or expenses shall be for Owners' account).

All measures required by the Owners to comply with the Ship Security Plan shall be for Owners' account.

(e)  If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

(f)  (i)  [Other than calling at    on    ] Owners warrant that all of the previous ten ports at which the vessel has called, or will have called, prior to tendering Notice of Readiness at the first load port hereunder:

    (aa)   had an approved security plan; and
    (bb)   were (and remain) registered with the IMO as ISPS Compliant Ports; and
    (cc)   had a security level no higher than Level 1 (Normal) or MARSEC Level 1;
and
    (dd)   were not, nor have subsequently been, deemed unacceptable by the US authorities under their security regime.

  (ii)  Owners further warrant that, other than as expressly disclosed to Charterers in writing, the vessel has not loaded goods or supplies (nor embarked any individuals) from, nor engaged in any Ship to Ship transfer of cargo with, another vessel.

  (iii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by breach by Owners of the warranties contained in this Sub-clause (f) shall be for the Owners' account.

**2.    BP ISM Clause**

parksk/박성근/법무1팀/2018-04-02 19:35:0(

(a)     Owners undertake that for the duration of this Charter, the Vessel and "the Company" (as defined in the International Management Code for the Safe Operation of Ships and for Pollution Prevention (the International Safety Management (ISM) Code) (the "ISM Code")) shall comply with the requirements of the ISM Code.  Charterers may at any time request an inspection of the relevant Document of Compliance and/or Safety Management Certificate, and upon receipt of such a request Owners shall forthwith provide the same.

(b)     Without prejudice to any rights or remedies available to Charterers under the terms of this Charter or under the law applicable hereto, in the event of a breach of the above undertaking any loss, damage, expense or delay following therefrom shall be for Owners' account.

**3.     BP Regulatory and Guideline Compliance Clause**

Throughout the period of this Charter, the Owners and the Vessel shall comply with all relevant regulations and guidelines issued by the IMO and OCIMF and, in the case of a Vessel carrying LPG or LNG, with the recommendations and guidelines issued from time to time by SIGTTO.  In addition, all operations shall be carried out in accordance with the latest edition of ISGOTT, and any amendments or updates thereto which may be issued from time to time.

**4.     Eligibility**

Owner warrants that the vessel is in all respects eligible for trading within, to and from ranges and areas specified in charter party, and that at all times she shall have on board all certificates, records and other documents required for such service.  In the event the vessel is found, at any time, not to be eligible as warranted, Charterers shall have the right to cancel subject charter party as well as to have recourse to Owners for any and all damages, demurrage, expenses and losses related to such cancellation.

**5.     BP Oil Pollution Insurance Certification and COFR'S Clause**

The Vessel shall have on board all Certificates of Financial Responsibility ("COFRs") in respect to oil pollution necessary for the required trade within the agreed trading limits, including but not limited to:

(a)     the certificate of insurance required under the International Convention on Civil Liability for Oil Pollution damage and the protocols thereto; and

and

(b)     the certificate of insurance required under the International Convention on Civil Liability for Bunker Oil Pollution 2001; and
        and



(c)     United States Coast Guard Certificate of Financial Responsibility meeting
        the requirements of the United States Federal Oil Pollution Act 1990
        ("OPA 90").

## 6.   BP ITWF Clause

Owners undertake to ensure that the terms of employment of the Vessel's Master, officers
and crew shall always remain acceptable to the International Transport Worker's
Federation ("ITWF")and the Vessel will at all times carry an ITWF Blue Card or
equivalent certification acceptable to ITWF.

## 7.   Ballast Water Management Clause

Vessel to arrive at each loading port with clean ballast, free of slops and tank washings.
Vessel is to be able to ballast / deballast simultaneously with loading / discharging.
Owners additionally warrants the vessel will comply with all mandatory ballast water
requirements. The Owners shall assume liability for and shall indemnify, defend and hold
harmless the Charterers against any loss and/or damage (excluding consequential loss
and/or damage) and any expenses, fines, penalties and any other claims, including but not
limited to legal costs, arising from the Owners' failure to comply with any such
provisions. Should such failure result in any delay then, notwithstanding any provision in
this Charter Party to the contrary, the period of such delay shall not count as laytime or, if
the Vessel is on demurrage, as demurrage provided that nothing in this clause will render
valid any NOR that would otherwise have been invalid.

## 8.   BP TOPIA 2006 Clause (Issued November 2006)

Owners warrant that they are a Participating Owner (as defined in the Tanker Oil
Pollution Indemnification Agreement 2006 (TOPIA 2006)) and that the Vessel is entered
in TOPIA 2006 and shall so remain throughout the period of this Charter, provided
always that:-

i) the Vessel is and remains a Relevant Ship as defined in cl.III of TOPIA 2006; and
ii) TOPIA 2006 is not terminated in accordance with cl.IX of that agreement.

## 9.   BP STOPIA 2006 Clause (Issued November 2006)

If the Vessel has a Gross Registered Tonnage of **29,548 or less** Owners warrant that they
are a Participating Owner (as defined in the Small Tanker Oil Pollution Indemnification
Agreement 2006 (STOPIA 2006)) and that the Vessel is entered in STOPIA 2006 and
shall so remain throughout the period of this Charter, provided always that:-

i) the Vessel is and remains a Relevant Ship as defined in cl. III of STOPIA 2006; and
ii) STOPIA 2006 is not terminated in accordance with cl. IX of that agreement.



10.   **Fuel Sulphur Content Clause**

(a)   Owners warrant that Owners and the Vessel shall comply with all applicable requirements of any emission control zone and shall, without loss of time and/or deviation, use fuels (which term shall include all heavy fuel oils, marine gas oils and marine diesel oils as applicable) of such specifications and grades to ensure compliance with these requirements.

(b)   For the purpose of this Clause, "emission control zone" shall mean areas as stipulated in MARPOL Annex VI including EU Directive 2005/33/EC and/or zones and/or areas regulated by regional and/or national authorities such as, but not limited to, the EU, the US Environmental Protection Agency and the California Environmental Protection Agency.

(c)   Owners shall indemnify, defend and hold Charterers harmless in respect of any direct or indirect loss, liability, delay, fines, costs or expenses arising or resulting from Owners' failure to comply with this Clause.

11.   **Interim Ports Clause**

Charterer shall pay for any interim load/discharge port(s) at cost and net of any rebates afforded to owners. Time for additional steaming, which exceeds direct route from first loadport to furthest discharge port, shall be paid at the demurrage rate plus additional bunkers consumed, plus actual port costs, if any. The reasonable, estimated costs will be payable as an on account payment together with freight, followed by final invoice plus all supporting documents as soon as possible but not later than ninety (90) days after completion of this voyage. All laytime saved shall be credited towards cost for additional time incurred.

12.   **Unspecified Delay**

Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is on demurrage, as time on demurrage. If demurrage is incurred, on account of such delays, it shall be paid at half the agreed demurrage rate.

13.   **Force Majeure**

Notwithstanding anything to the contrary in this charterparty, neither the Owners nor the Charterers shall be liable for damages for delay or for any failure to perform their respective obligations hereunder if the delay or failure is due to fire, explosion, strikes, lock-outs, slowdown, stoppage or restraint of labour, floods, act of God, war, terrorist activity, civil commotion or any other cause beyond that party's reasonable control. Time lost as a result of any of the aforementioned clauses shall not count as used laytime or time on demurrage.

14. **Third Party Arrest**

In the event of arrest or other sanction levied against the vessel or Charterer arising out of Owner's breach or any fault of Owner, Owner shall indemnify Charterer for any damages, penalties, costs and consequences and any time vessel is under arrest shall not count as used laytime or time on demurrage.

In the event of arrest/detention or other sanction levied against the vessel through no fault of the Charterers, Charterer shall be entitled, in Charterers option, to terminate the Charter. Termination or failure to terminate shall be without prejudice to any claim for damages Charterer may have against Owner.

15. **In Transit Loss**

In addition to any other rights which Charterer may have, Owner will be responsible for the full amount of any in-transit loss if the in-transit loss exceeds 0.3% and Charterer shall have the right to claim from freight an amount equal to the fob port of loading value of such lost cargo plus freight and insurance due with respect thereto. In-transit loss is defined as the difference between net vessel volumes after loading at the loading port and before unloading at the discharge port, as determined by a mutually agreed independent inspector appointed by Charterers or Receivers, whose determination shall be final and binding upon both parties.

16. **Discharge/reload clause**

Charterer shall have the option to discharge and/or comingle and/or reload and/or top off all or part cargo within the load/discharge ranges. If exercised, any additional costs in connection with the reload to be for charterer's account and additional time consumed to count as used laytime. For worldscale purposes, said discharge/reload port to count as a load port under worldscale.

17. **Loss of Turn and Delay**

If, as a result of any breach of this charterparty or any other fault on the part of the Owners or the vessel, the vessel loses its turn to berth or, being at the berth, has to wait idle at the berth or is sent off the berth and has to wait for a further turn, all time lost as a result of having to wait for a berth shall be for Owners account and shall not count as laytime or time on demurrage. All additional costs of unberthing and reberthing and all additional berth fees and any other extra expenses shall likewise be for Owners' account. All other time lost by reason of Owners' breach of any term of this charterparty or any other fault on the part of the Owners of the vessel, shall not count as laytime or time on demurrage. Laytime to resume once vessel commences cargo operations provided that nothing in this clause will render valid any NOR that would otherwise have been invalid.

18. **Private and Confidential Clause**



The terms and conditions of this Charter Party and its negotiations to be kept strictly private and confidential and shall not be reported.

19.      **Charter Party Administration Clause**

Charter Party terms and conditions are evidence by the fixing confirmation sent by the broker. Owner and Charterer shall each confirm their approval of the fixing confirmation by return to the broker     after lifting subjects. The broker shall then confirm receipt of said confirmation to both parties. Except as requested in writing by either Owners or Charterer, there shall be no formal written and signed Charter Party.

parksk/박성근/법무1팀/2018-04-02 19:35:00



**Specific Additional Clauses**

**AC1.   Turkish Straits Clause for Vessels over 200m LOA**

Notwithstanding anything to the contrary elsewhere herein contained, if the vessel commences the ballast voyage (as per itinerary advised in main terms) in time to arrive at Canakkale latest (Canakkale Cancelling Date)
But is delayed because of the traffic regulations or Navigational difficulties (incl. bad weather, fog etc.) through the Turkish straits north-bound such that vessel may not arrive by the Cancelling date, charterers' option to cancel as provided elsewhere herein cannot be exercised.

Owners to notify charterers of the date and time that they expect the Vessel to be ready to load based on the advisory position given by the traffic control.

Notwithstanding anything to the contrary elsewhere herein contained, if the vessel should be delayed during tanker passage or otherwise as a consequence of direct or indirect action of the Turkish authorities and/or observing traffic regulations/recommendations and/or Navigational difficulties (incl. Bad weather and/or adverse climate Conditions) through the Turkish straits in excess of 48 hrs total North-bound and South-bound, the charterers shall pay compensation for such delay at the rate provided for demurrage.

Expenses in excess of customary costs payable by owners in connection with complying with traffic Regulations/recommendations and/or charterers' voyage orders as Regards the passage of the Turkish straits to be for charterers' Account.

If the vessel fails to arrive Canakkale by ....................................
Charterers have the option to cancel the cp as below in this clause.

If it appears to owners that the vessel will be delayed beyond the Canakkale cancelling date, owners will notify charterers of the date on which they expect the vessel to be ready to load whereupon Charterers have the option to cancel this charter and such option to Be declared within 48 hours, Saturdays, Sundays and holidays excluded, of the receipt of said notification from owners. In the event the Owners have given such notification and charterers have not exercised their option to cancel within the stated period, the second day after Readiness stated in owner's notification, or such other date as may be Mutually agreed, shall be the new cancelling date.

Owners shall nominate charterers appointed agents for the Turkish Straits passage.

**Turkish Straits Clause for Vessels under 200m LOA**

Any waiting time in excess of 48 (36 hours if vsl coming from Sea of Marmara, 24 hours if vessel coming from black sea) hours at Turkish straits (north and southbound) total is to be for charterers account and is to be calculated at demurrage rate per day pro rate.

However in case the vessel, in spite of delays at the Turkish straits,
Arrives at loadport within laycan or before the commencment of laydays, the above does not apply for the ballast passage (i.e. Delay all for owners acct), but the time for owners acct on the laden passage is reduced to 24 hrs, thereafter is for charterers accout.

parksk/박성근/법무1팀/2018-04-02 19:35:00



Said claim is to be settled together with freight against owners e-mail invoice with supporting documents attached. If hard copy is needed owners to forward soonest possible.

All delays at Turkish strait to be added to laycan.

Demurrage claim is to be kept separate from above claim.

Owners shall nominate charterers appointed agents for the Turkish Straits passage.

**AC2. H2S Clause**

(a)   Owners undertake that prior to arrival at the load port the Hydrogen Sulphide (H$_2$S) content in the Vessel's tank atmosphere shall be less than 10 PPM.

**AC3. BP Suez Canal Discharge, Transit and Reload Clause**

(a)   If the Vessel is nominated to discharge within the UK/Cont/Mediterranean range, Charterers shall have the option to route the Vessel through the Suez Canal.

(b)   If this option is declared, Owners shall discharge sufficient cargo at Ain Sukhna to enable the vessel to safely transit the Suez Canal northbound. The Vessel shall then reload the same quantity, either of the same grade or of a different grade, at Sidi Kerir for on-carriage to the nominated discharge port(s).

(c)   The Worldscale Flat Rate shall be based on the actual voyage performed from the loading port(s) to the discharge port(s), basis Suez/Suez, but excluding any allowance for Sidi Kerir and Ain Sukhna and the Suez Canal differentials.

(d)   Time spent for discharging at Ain Sukhna and reloading at Sidi Kerir shall count as laytime or, if the vessel is on demurrage, as demurrage. Time spent in deviating into Ain Sukhna over and above the time required for the direct passage from the Arabian Gulf to the Suez Canal entrance, and any time spent in deviating into Sidi Kerir over and above the time required for the direct passage from the Suez Canal exit to the first discharge port within UK/Cont/Mediterranean, in either case calculated on the basis of the Service Speed stated in the Charter, shall count as laytime or, if the vessel is on demurrage, as demurrage. Any port costs in Ain Sukhna and Sidi Kerir shall be reimbursed at cost.

(e)   Suez Canal transit costs for the laden passage shall be paid directly by Charterers, and Charterers shall pay to Owners the Suez Canal ballast transit differential as per Worldscale together with freight.

(f)   Subject always to any obligation that the Charterers may have to pay freight on any agreed minimum quantity of cargo for the entire voyage:

parksk/박성근/법우1팀/2018-04-02 19:35:00

(i)   where the quantity of cargo discharged in Ain Sukhna exceeds the quantity of cargo loaded in Sidi Kerir, Charterers shall only be liable to pay freight on the difference on the basis of the flat rate from the actual loading port to Ain Sukhna; and

(ii)  where the quantity of cargo loaded in Sidi Kerir exceeds the quantity of cargo discharged in Ain Sukhna, Charterers shall only be liable to pay freight on the difference on the basis of the flat rate from Sidi Kerir to the actual discharge port.

**AC4.   BP War Risks Additional Expenditure Clause**

(a)   Owners shall effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the general premiums and/or calls therefore shall be for their account.

(b)   War Risk Insurance additional premiums ("Additional Premiums") incurred as a result of the Vessel entering an excluded area necessary to perform under this Charter shall be for Charterers' account, net of all discounts or rebates or no claims bonus, and always provided that Charterers are given written notice of the amount of such Additional Premiums as soon as possible and, in any event, before such Additional Premiums are paid by Owners. Charterers shall not be responsible for any Additional Premiums should Owners fail to give such prior notice.

(c)   The benefit of discounts or rebates or no claims bonus on Additional Premiums received by Owners from their War Risks insurers, underwriters or brokers shall be credited to Charterers in full whether given at the time or credited to Owners by their War Risks insurers at later date.  Charterers shall reimburse Owners any amounts due under this clause upon receipt of Owners' invoice, together with full supporting documentation including all associated debit and credit notes.

(d)   For the avoidance of doubt any "blocking and trapping", "loss of profit", "loss of hire", "loss of freight" or "loss of bunkers" insurance taken out by Owners in respect of the Vessel, and any additional premium relating thereto, arising from Charterers trading of the Vessel, shall be for Owners' account.

**AC5.   Ice Strengthened Vessel Clause**

(a)   The Charterers shall be entitled to require the Vessel to breach IWL limits and/or force ice and/or follow ice breakers, always within the Vessel's Class and design capabilities.

(b)   The navigation and safety of the Vessel shall remain the responsibility of the Master. However, notwithstanding the provisions of paragraph (a) above, the Vessel shall not enter areas where the published data (as issued by the local coastguard and/or other competent authorities) indicates that the ice is thicker than that for which the Vessel is classed or areas where there is a risk that the Vessel shall be frozen in. Without prejudice to the provisions of Clause 28 of this Charter, upon receipt of

such data, the Master shall immediately notify Charterers by telex or other suitable means requesting revised voyage orders. Pending Charterers' revised voyage orders, the Vessel shall remain outside the area of ice-bound waters and any period of delay shall count as laytime or, if the Vessel is on demurrage, as demurrage

(c)     Where applicable, any extra insurance premium, all ice dues (whether at the load or discharge port) and the costs of any ice breakers or ice advisors shall be for Owners account.

### AC6.  Delays at ice-bound ports

Subject to the provisions of clauses 28 and AC5, where the vessel is delayed in getting to her loading or discharging berth on account of ice, the following provisions shall apply.

   1)  In the event that the vessel is unable to reach the loading or discharging port on account of ice, NOR may be tendered from the edge of ice as near to the port as the vessel may safely reach, **provided always** that such NOR would have been tendered after the Commencement Date stated in Section G of Part 1 had the vessel been able to proceed to the port without delay due to the ice.
   2)  Nothing in this clause shall affect the Charterers' right to cancel the Charter if the Vessel would not have arrived at the first loading port by the Cancelling Date stated in Section G of Part I but for the delay due to the ice.
   3)  Time spent waiting for ice-breakers always to count as laytime, or if the Vessel is on demurrage, demurrage.
   4)  Time spend proceeding to the port shall not count as used laytime or time on demurrage until the Vessel reaches the usual port limit.  Any additional time, over and above the normal shifting time, spent due to the ice on an inward passage from the usual anchorage or usual port limit to the berth over and above normal shifting time, shall count as used laytime or, if the Vessel is on demurrage, demurrage.
   5)  Charterers always to be entitled to the full benefit of the 6 hours notice period.

### AC7.  Primorsk/Kozmino Ballast Clause

   a.  Primorsk :
Owners / master are aware that according to Primorsk port regulations the ballast water in ballast tanks should contain oil products not more than 0.05 mg / dm3. In case of heightened content of oil product found in ballast tanks the discharge of such water will be prohibited by port authorities. In view of the above the master should take ballast water at the considerable sea depth providing clean water at ballast tanks according to Primorsk regulations. Any time lost and / or any costs due to vessel's failure to comply with above, to be for owners account and time not to count as laytime or as demurrage, if on demurrage.

   b.  Kozmino:
Ballast water exchange is compulsory and should be done at open sea with sea depth more than 200 meters.  Only clean sea water ballast taken/changed at open sea is permitted to discharge alongside.  Master has to prepare application de-ballasting letter addressed to Harbour Master, indicating quantity of ballast/location where was taken/changed (must be open sea only), conditions (must be clean, content of oil

*81*



substances less than 0,05 mg/ltr), which have to be handed over to ecological inspector for his analyses/approval

### AC8.  Black Sea Ballast Clause

All tanker vessels must change ballast waters inside the Black Sea. As from 1st May 2006 ecological authorities in Novorossiysk will start the practice of carrying out random inspections and vessels will not be allowed to discharge ballast if it is determined that their ballast water was not changed in the Black Sea as required. Density of ballast water and ship's logs will be checked accordingly.

Any time lost due to Owners non compliance of above and any cost and consequences to be for Owners account.

### AC9. Additional Employment/ Storage Clause

Where a rate for use of the Vessel for additional employment/floating storage has been agreed in this Charter, the following shall apply:-

(a)  Charterers may give orders to use the vessel at the rate specified for the period specified.

(b)  Charterers shall, where possible, give Owners 10 days approximate notice of termination of additional employment.

(c)  First 15 days of additional employment is payable in advance, and every 15 days thereafter. Said rate is exclusive of all bunkers and port charges  (which shall be for Charterers' account).

(d)  Charterers may give orders, once Vessel has arrived at a loading port or storage area, to order Vessel into or out of a storage area one or more times to discharge or load additional cargo. All time to and from storage area or within loading or discharge ranges, under such orders, shall be at the Storage Rate with Charterers paying all additional bunkers for steaming, heating (if any), loading and discharging and all additional port charges, payable against full supporting documentation

(e)  Any diminution in Vessel's performance and any additional bunkers consumed during or after storage as a result of hull fouling, and any hull cleaning costs, shall be for Owners' account. Any such fouling shall not relieve the Owners in any way from the performance of their obligations under the Charter.

### AC10.   BP Commingling Clause

(a)   Owners agree, if so requested by Charterers, to instruct the Master to commingle the cargo or cargoes loaded on board, always in strict compliance with safety rules, and subject to the technical characteristics of the Vessel.

(b)     Charterers warrant that any cargoes to be commingled or blended on board shall be stable and compatible and that no precipitation of solid deposits in cargo tanks, pipes, pumps, valves will occur.

(c)     Charterers will hold Owners harmless and keep them fully indemnified against all costs, losses, claims (including, but not limited to, claims for contamination or quality deterioration or failure to meet any contractual specification) and expenses (including , but not limited to, legal expenses) caused by or in any way arising from Charterers' instructions to commingle or blend on board. Any additional costs incurred as a result of commingling/blending operations are for Charterers' account.

(d)     In the event of commingling or blending on board, Charterers shall return all three (3) original copies of all bills of lading issued in respect of the cargoes to be blended or commingled to Owners for cancellation. Upon return of the original copies of the bills of lading as aforesaid, Owners will issue replacement bills of lading in respect of the commingled or blended cargo, which will state on their face:

      (i)     the details from the bill of lading pursuant to which the cargoes were originally loaded, including the nature of the cargo, the original quantity loaded and the date and place of loading; and

      (ii)    the place and date of the blending or commingling took place.

## AC11. Orders Clause

Notwithstanding any term of this charter to the contrary, Charterers shall have the liberty, at any stage of the voyage, of instructing the vessel to stop and wait for orders at a safe place. In particular and without prejudice to the generality of the foregoing, Charterers shall be entitled to instruct the vessel not to tender NOR on arrival at or off any port or place or to delay arriving at any port of place until Charterers give the order to do so. Time to count as used laytime or time on demurrage, if vessel is on demurrage.

## AC12. USCG C.O.C Clause

If the vessel requires a C.O.C or TVEL and does not have a valid one, no NOR can be tendered in relation to any cargo operation at any port in the USA or its controlled territories until such time as a valid C.O.C or TVEL, as the case may be, has been obtained.

If the USCG requires to carry out a periodic inspection during the currency of a valid C.O.C or TVEL held by the vessel, the NOR tendered by the vessel shall not be or become effective for the purposes of calculating laytime, of if the vessel is on demurrage, demurrage unless and until the periodic inspection has been carried out and the vessel has been cleared for cargo operations.

The same provisions shall apply mutatis mutandis in respect of any port not in the USA or its controlled territories where any similar certificate is required to be issued and vessel inspect to be carried out by any state authority

83



### AC13. Speed Clause

Charterer shall also have the option to request the vessel to reduce her speed on laden passage. Additional voyage time shall count against laytime or time on demurrage, if vessel is on demurrage and the value of any bunkers saved shall be deducted from any demurrage claim Owner(s) may have under this Charterparty with the value being calculated at last invoiced price. Owner shall provide documentation to fully support the claims and calculations under this clause.

### AC14.  Proceed at Utmost Dispatch

Vessel not to perform interim voyage prior to entry into charterers service.

### AC15.  Splitting of BL's

Charterers have the option to split B/L during loading of cargo grade and master to sign accordingly, and stoppage of cargo will be reported in the time sheet. If homogenious cargo and thus a commingling of cargo will take place charterers to issue an LOI during or after the splitting of BL's for practical reasons only as per Owners P and I club wording.

### AC16.  Turkish B/L Clause

In case next voyage will discharge Turkey – Owners will re-issue "Not Negotiable" copy of the B/L and/or cargo manifest for Turkey Custom Clearance. Only consignee is to be changed for Custom's purposes and all other terms/details of the B/L and/or cargo manifest remain unchanged. The "Not Negotiable" copy must be duly mrked with "For Customs Purposes Only."

### AC17 Cargo Supervisors
**Korea:**
If required, a supervisor who is nominated by the terminal in South Korea should attend the safe berthing and loading/discharging, for owner's account.
**Japan:**
Owners to arrange for a Japanese speaking superintendent at the Japanese Port(s) for owners account, and to attend the vessels full cargo operations.
**Arabian Gulf:**
Owners to embark charterer's surveyor at Fujairah inbound at no additional cost.

### AC18.  Korean Anchorage

In case vessel arrived at quarantine station at Korean Ports and tender notice of readiness to load/discharge between 18:00 and 24:00 hours, laytime shall count from 06:00 hours the next day. In regards to South Korean anchorage dues first 48 hours for owners account, thereafter to be for charterers account.

### AC19.  Chinese River Ports Clause



If the vessel is required to call at non-coastal Chinese ports/berths, all extra inbound transit time in the river in excess of actual steaming time, is to count as laytime or time on demurrage if the vessel is on demurrage. For purposes of calculating extra transit time, time is to count upon expiry of 6 hours after arrival at first inbound pilot station until arrival at customary anchorage for such port/berth. All extra transit time up to dropping outbound river pilot, in excess of actual outbound steaming time in the river, is to count as laytime or time on demurrage. All time spent waiting for tide, daylight or weather to count in full.

# EXHIBIT C



A MEMBER OF THE GUNVOR GROUP

**LETTER OF INDEMNITY**

[8TH MAY 2016]

TO : [PAN OCEAN CO., LTD]
CHARTER PARTY DATED: 13TH APRIL 2016
SHIP    : [GRAND ACE12]
VOYAGE  : [VO85 / ZHOUSHAN + TAICHUNG + SUBIC BAY - NANSHA]
CARGO   : [LIGHT CYCLE OIL + GASOIL / APPROX. 36,000 MT]

DEAR SIRS

**PARCEL A**

TERMINAL/ LOADPORT    : ZHOUSHAN, CHINA
SHIPPER         : GUNVOR SINGAPORE PTE LTD
CONSIGNEE       : TO THE ORDER OF SOCIETE GENERALE, SINGAPORE BRANCH
DESTINATION     : SINGAPORE FOR ORDERS
CARGO/ QUANTITY : LCO / 11,420.866 MT
BILL OF LADING  : B/L NUMBER 1, DATED 1ST MAY 2016 AT ZHOUSHAN, CHINA

**PARCEL B**

TERMINAL/ LOADPORT    : ZHOUSHAN, CHINA
SHIPPER         : GUNVOR SINGAPORE PTE LTD
CONSIGNEE       : TO THE ORDER OF SOCIETE GENERALE, SINGAPORE BRANCH
DESTINATION     : SINGAPORE FOR ORDERS
CARGO/ QUANTITY : GASOIL / 2,354.553 MT
BILL OF LADING  : B/L NUMBER 2, DATED 1ST MAY 2016 AT ZHOUSHAN, CHINA

**PARCEL C**

TERMINAL/ LOADPORT    : TAICHUNG, TAIWAN
SHIPPER         : GUNVOR SINGAPORE PTE LTD
CONSIGNEE       : TO THE ORDER OF SOCIETE GENERALE, SINGAPORE BRANCH
DESTINATION     : SINGAPORE FOR ORDERS
CARGO/ QUANTITY : LIGHT CYCLE OIL / 22,583.795 MT
BILL OF LADING  : B/L NO. TCH-0502, DATED 4TH MAY 2016 AT TAICHUNG, TAIWAN

**PARCEL D**

PORT OF DELIVERY : SUBIC BAY
CARGO/ QUANTITY  : MGO / 50 MT
DATE OF DELIVERY : 7TH MAY 2016
DELIVERY RECEIPT NO  : NO. 00735

NOTWITHSTANDING THE ABOVE FOUR CARGOES SHOULD BE LOADED SEPARATELY INTO RESPECTIVE
DIFFERENT TANKS, WE HEREBY REQUEST YOU TO COMMINGLE AND LOAD THE SAID CARGOES INTO
THE SAME TANK AT OUR SOLE RISK, RESPONSIBILITY AND COSTS.

AND WE ALSO REQUEST OWNERS TO INSTURCT THE MASTER TO CARRY OUT THE PROCEDURE FOR
INTERNAL TRNASFER OF CARGO AT THE PORT OF [SUBIC BAY PHILIPPINES] WITH THE
PRODECURE AS STATED BELOW:

**CLEARLAKE SHIPPING PTE. LTD.**
(Co. Reg No. 201106793D)
12 Marina Boulevard, #35-02        Tel: +65 6496 9900
Marina Bay Financial Centre Tower 3   Fax: +65 6496 9901
Singapore 018982                   www.gunvorgroup.com



CLEARLAKE
A MEMBER OF THE GUNVOR GROUP

CARGO OPERATION PROCESS WILL BE AS BELOW,

AA) LOADING APPROX. 50 MT MGO AT SUBIC BAY INTO 1 SLOP TANK ONLY
BB) ITT 50 MT FROM SLOP TANK TO 1 COT ONLY

WE ALSO REQUEST YOU TO SUBSTITUTE THE ORIGINAL BILLS OF LADING FOR THE CARGO(ES) REFERRED IN (A),(B) AND (C) ABOVE WITH A NEW BILL OF LADING TO BE ISSUED ON THE DATE ON WHICH THE COMMINGLING IS COMPLETED:

"A QUANTITY OF [11,420.868 MT] OF [LCO] LOADED AT [ZHOUSHAN, CHINA] ON/AROUND 1ST MAY 2016, COMMINGLED WITH [2,354.553 MT] OF [GASOIL] LOADED AT [ZHOUSHAN, CHINA] ON/AROUND 1ST MAY 2016, COMMINGLED WITH [22,583.795 MT] OF [LIGHT CYCLE OIL] LOADED AT [TAICHUNG, TAIWAN] ON/AROUND 4TH MAY 2016 AND COMMINGLED WITH [50MT] OF [MGO] LOADED AT [SUBIC BAY] ON 7TH MAY 2016 NEITHER THE VESSEL NOR THE OWNERS ASSUME ANY RESPONSIBILITY FOR THE CONSEQUENCES OF SUCH COMMINGLING NOR FOR THE SEPARATION THEREOF AT THE TIME OF DELIVERY."

THE CARRIER SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE TO THE CARGO CAUSED BY THE COMMINGLING".

NO B/L WILL BE ISSUED FOR [50 MT OF MGO] WHICH LOADED AT [SUBIC BAY], ONLY BDN WILL BE PROVIDED.

AND THE B/L WILL BE SWITCHED AT *[SINGAPORE]* AS FOLLOWING:

**OLD BILL OF LADING**

**(1)**
```
TERMINAL/ LOADPORT      : ZHOUSHAN, CHINA
SHIPPER              : GUNVOR SINGAPORE PTE LTD
CONSIGNEE            : TO THE ORDER OF SOCIETE GENERALE, SINGAPORE BRANCH
DESTINATION         : SINGAPORE FOR ORDERS
CARGO/ QUANTITY     : LCO / 11,420.868 MT
BILL OF LADING      : B/L NUMBER 1, DATED 1ST MAY 2016 AT ZHOUSHAN, CHINA
```

**(2)**
```
TERMINAL/ LOADPORT      : ZHOUSHAN, CHINA
SHIPPER              : GUNVOR SINGAPORE PTE LTD
CONSIGNEE            : TO THE ORDER OF SOCIETE GENERALE, SINGAPORE BRANCH
DESTINATION         : SINGAPORE FOR ORDERS
CARGO/ QUANTITY     : GASOIL / 2,354.553 MT
BILL OF LADING      : B/L NUMBER 2, DATED 1ST MAY 2016 AT ZHOUSHAN, CHINA
```

**(3)**
```
TERMINAL/ LOADPORT      : TAICHUNG, TAIWAN
SHIPPER              : GUNVOR SINGAPORE PTE LTD
CONSIGNEE            : TO THE ORDER OF SOCIETE GENERALE, SINGAPORE BRANCH
DESTINATION         : SINGAPORE FOR ORDERS
CARGO/ QUANTITY     : LIGHT CYCLE OIL / 22,583.795 MT
BILL OF LADING      : B/L NO. TCH-0502, DATED 4TH MAY 2016 AT TAICHUNG, TAIWAN
```

**CLEARLAKE SHIPPING PTE. LTD.**
(Co. Reg. No. 201106753D)
12 Marina Boulevard #35-02          Tel +65 6496 9900
Marina Bay Financial Centre Tower 3   Fax: +65 6496 9901
Singapore 018982                     www.gunvorgroup.com



A MEMBER OF THE GUNVOR GROUP

## NEW BILL OF LADING

(1)
SHIPPER          : IXION CORPORATION
                   LOT 8B, BRAND REX COMPOUND
                   ARGONAUNT HIGHWAY, SUBIC BAY FREEPORT ZONE
                   PHILIPPINES 2000
CONSIGNEE        : TO THE ORDER OF SOCIETE GENERALE SINGAPORE BRANCH
NOTIFY ADDRESS   : CHINA-BASED NINGBO FOREIGN TRADE CO., LTD.
VOYAGE             : LOAD          : SUBIC BAY PHILIPPINES
                 : DISCHARGE     : NANSHA, CHINA
CARGO / QUANTITY : 10,000.000 MT OF LIGHT CYCLE OIL
BILL OF LADING   : B/L NO.: GA12SUBNSHA-VM2016-1,
                 : DATED 7TH MAY 2016 AT SUBIC BAY PHILIPPINES

(2)
SHIPPER          : IXION CORPORATION
                   LOT 8B, BRAND REX COMPOUND
                   ARGONAUNT HIGHWAY, SUBIC BAY FREEPORT ZONE
                   PHILIPPINES 2000
CONSIGNEE        : TO THE ORDER OF SOCIETE GENERALE SINGAPORE BRANCH
NOTIFY ADDRESS   : CHINA-BASED NINGBO FOREIGN TRADE CO., LTD.
VOYAGE             : LOAD          : SUBIC BAY PHILIPPINES
                 : DISCHARGE     : NANSHA, CHINA
CARGO / QUANTITY : 16,000.000 MT OF LIGHT CYCLE OIL
BILL OF LADING   : B/L NO.: GA12SUBNSHA-VM2016-2,
                 : DATED 7TH MAY 2016 AT SUBIC BAY PHILIPPINES

(3)
SHIPPER          : IXION CORPORATION
                   LOT 8B, BRAND REX COMPOUND
                   ARGONAUNT HIGHWAY, SUBIC BAY FREEPORT ZONE
                   PHILIPPINES 2000
CONSIGNEE        : TO THE ORDER OF SOCIETE GENERALE SINGAPORE BRANCH
NOTIFY ADDRESS   : CHINA-BASED NINGBO FOREIGN TRADE CO., LTD.
VOYAGE             : LOAD          : SUBIC BAY PHILIPPINES
                 : DISCHARGE     : NANSHA, CHINA
CARGO / QUANTITY : 10,409.216 MT OF LIGHT CYCLE OIL
BILL OF LADING   : B/L NO.: GA12SUBNSHA-VM2016-3,
                 : DATED 7TH MAY 2016 AT SUBIC BAY PHILIPPINES

IN CONSIDERATION OF YOUR COMPLYING WITH OUR ABOVE REQUEST, WE HEREBY AGREE AS
FOLLOWS:

1. TO INDEMNIFY YOU, YOUR SERVANTS AND AGENTS AND TO HOLD ALL OF YOU HARMLESS
   IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE OF WHATSOEVER NATURE
   WHICH YOU MAY SUSTAIN BY REASON OF THE LOADING OF THE CARGOES AS AFORESAID
   IN ACCORDANCE WITH OUR ABOVE REQUEST EVEN IF SUCH LIABILITY, LOSS, DAMAGE
   AND/OR EXPENSE IS CAUSED AND/OR INCURRED SOLELY BY ACT OR NEGLIGENCE OF YOU,
   YOUR SERVANTS AND/OR AGENT.

**CLEARLAKE SHIPPING PTE. LTD.**
Co Reg No. 2C11067630-
12 Marina Boulevard. #35-02        Tel: +65 6496 9900
Marina Bay Financial Centre Tower 3   Fax: +65 6496 9901
Singapore 018982                   www.gunvorgroup.com



A MEMBER OF THE GUNVOR GROUP

2. IN THE EVENT OF ANY PROCEEDINGS BEING COMMENCED AGAINST YOU OR ANY OF YOUR SERVANTS OR AGENTS IN CONNECTION WITH THE LOADING OF THE CARGOES AS AFORESAID, TO PROVIDE YOU OR THEM ON DEMAND WITH SUFFICIENT FUNDS TO DEFEND THE SAME.

3. IF, IN CONNECTION WITH THE LOADING OF THE CARGOES AS AFORESAID, THE SHIP, OR ANY OTHER SHIP OR PROPERTY IN THE SAME OR ASSOCIATED OWNERSHIP, MANAGEMENT OR CONTROL, SHOULD BE ARRESTED OR DETAINED OR SHOULD THE ARREST OR DETENTION THEREOF BE THREATENED, OR SHOULD THERE BE ANY INTERFERENCE IN THE USE OR TRADING OF THE VESSEL (WHETHER BY VIRTUE OF A CAVEAT BEING ENTERED ON THE SHIP'S REGISTRY OR OTHERWISE HOWSOEVER), TO PROVIDE ON DEMAND SUCH BAIL OR OTHER SECURITY AS MAY BE REQUIRED TO PREVENT SUCH ARREST OR DETENTION OR TO SECURE THE RELEASE OF SUCH SHIP OR PROPERTY OR TO REMOVE SUCH INTERFERENCE AND TO INDEMNIFY YOU IN RESPECT OF ANY LIABILITY, LOSS, DAMAGE OR EXPENSE CAUSED BY SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR SUCH INTERFERENCE , WHETHER OR NOT SUCH ARREST OR DETENTION OR THREATENED ARREST OR DETENTION OR SUCH INTERFERENCE MAY BE JUSTIFIED.

4. THE LIABILITY OF EACH AND EVERY PERSON UNDER THIS INDEMNITY SHALL BE JOINT AND SEVERAL AND SHALL NOT BE CONDITIONAL UPON YOUR PROCEEDING FIRST AGAINST ANY PERSON, WHETHER OR NOT SUCH PERSON IS PARTY TO OR LIABLE UNDER THIS INDEMNITY.

THIS INDEMNITY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH [ENGLISH LAW] AND EACH AND EVERY PERSON LIABLE UNDER THIS INDEMNITY SHALL AT YOUR REQUEST SUBMIT TO THE JURISDICTION OF THE [HIGH COURT OF JUSTICE OF ENGLAND].

YOURS FAITHFULLY,
FOR AND ON BEHALF OF
CLEARLAKE SHIPPING PTE LTD
MR TERENCE SOH
CHARTERING MANAGER
THE REQUESTOR

_____
SIGNATURE

**CLEARLAKE SHIPPING PTE. LTD.**
(Co  Reg  No  201106763D)
12 Marina Boulevard, #35-02      Tel. +65 6496 9900
Marina Bay Financial Centre Tower 3   Fax: +65 6496 9901
Singapore 018982              www.gunvorgroup.com

jysung/성제용/탱커영업팀/2015-07-24 13:39:2